## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERDIGITAL TECHNOLOGY
CORPORATION, a Delaware corporation, IPR
LICENSING, INC., a Delaware corporation,
INTERDIGITAL COMMUNICATIONS, INC.,
a Delaware corporation, INTERDIGITAL
HOLDINGS, INC., a Delaware corporation, and
INTERDIGITAL, INC., a Pennsylvania
corporation,

        Plaintiffs,

        v.

LENOVO HOLDING COMPANY, INC., a
Delaware corporation, LENOVO (UNITED
STATES) INC., a Delaware corporation and
MOTOROLA MOBILITY LLC, a Delaware
limited liability company,

        Defendants.

Civil Action No.: 19-1590-LPS

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiffs InterDigital Technology Corporation, IPR Licensing, Inc., InterDigital

Communications, Inc., InterDigital Holdings, Inc., and InterDigital, Inc. (collectively

"InterDigital" or "Plaintiffs"), through their undersigned counsel, file this First Amended

Complaint ("FAC") against Lenovo Holding Co. Inc., Lenovo (United States) Inc., and Motorola

Mobility LLC (collectively "Lenovo" or "Defendants").  In support of this FAC, InterDigital

alleges as follows:

## THE PARTIES

1.      InterDigital Technology Corporation is a Delaware corporation with its principal

place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

2.      IPR Licensing, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

3.      InterDigital Communications, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

4.      InterDigital Holdings, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

5.      InterDigital, Inc. is a Pennsylvania corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809.

6.      On information and belief, defendant Lenovo Holding Co. Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1009 Think Place, Morrisville, NC 27650.  On information and belief, The Corporation Trust Company, with its principal place of business at 1209 N Orange St, Wilmington, DE 19801, is the registered agent for Lenovo Holding Co. Inc.

7.      On information and belief, defendant Lenovo (United States) Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 8001 Development Dr., Morrisville, NC 27560.  On information and belief, The Corporation Trust Company, with its principal place of business at 1209 N Orange St, Wilmington, DE 19801, is the registered agent for Lenovo (United States) Inc.

8.      On information and belief, defendant Motorola Mobility LLC is an affiliate of Lenovo (United States) Inc., and is a corporation organized under the laws of the State of Delaware, with its principal place of business at 222 W. Merchandise Mart Plaza, Chicago, IL 60654.  On information and belief, The Corporation Trust Company, with its principal place of

business at 1209 N Orange St, Wilmington, DE 19801, is the registered agent for Motorola

Mobility LLC.

## JURISDICTION AND VENUE

9.     This is a complaint including causes of action for patent infringement arising

under 35 U.S.C. § 271 *et seq.*  The Court has subject matter jurisdiction under 28 U.S.C.

§§ 1331, 1338(a), 1367, and 2201-02.

10.    Personal jurisdiction over each Defendant is proper in this District based on one

or more of the following: its presence in this judicial district; it has availed itself of the rights and

benefits of the laws of Delaware; or it has derived substantial revenue from sales of handsets and

other cellular devices in Delaware and it has systematic and continuous business contacts with

Delaware. Each Defendant was incorporated in Delaware and/or formed under the laws of

Delaware.  Lenovo provides cellular device products, which are advertised, offered for sale, sold,

and used in Delaware.

11.    Venue is proper in this district under 28 U.S.C. § 1400(b) and 28 U.S.C.

§§ 1391(b)(1), (b)(2). For purposes of §1400(b), each Defendant was incorporated in Delaware

and/or formed under the laws of Delaware and therefore resides within this District. For purposes

of § 1391(b)(1), (b)(2), each Defendant resides in the District of Delaware by virtue of being

incorporated in Delaware and/or formed under the laws of Delaware.

## THE PATENTS-IN-SUIT

12.    This action involves the following patents:  United States Patent Nos. 8,085,665

("the '665 patent"), 8,199,726 ("the '726 patent"), 8,427,954 ("the '954 patent"), 8,619,747

("the '747 patent"), 8,675,612 ("the '612 patent"), 8,797,873 ("the '873 patent"), 9,203,580

("the '580 patent"), and 9,456,449 ("the '449 patent") (collectively, "the Patents-in-Suit").

## '665 Patent

13.     The '665 patent is entitled "AUTOMATIC REVERSE CHANNEL

ASSIGNMENT IN A TWO-WAY TDM COMMUNICATION SYSTEM," and issued on

December 27, 2011 to inventor Kevin P. Johnson.  IPR Licensing, Inc. owns by assignment the

entire right, title, and interest in and to the '665 patent.  A true and correct copy of the '665

patent is attached to this FAC as Exhibit 1.

14.     The '665 patent stems from a patent application filed on May 19, 2000.  At that

time, subscriber units (such as cellular phones) were generally optimized for voice

communications.  The '665 patent explains that cellular telephone networks, "were intended to

support voice communications, as compared to the digital communication protocols needed for

Internet packet-oriented communications." '665 patent at 1:33-36.  The patent further explains

that "[v]oice communication requires a continuous duplex connection, that is, a user at one end

of a connection expects to be able to transmit and receive to a user at the other end of a

connection, while at the same the user at the other end is also transmitting and receiving." *Id.* at

1:45-49.  In contrast, "access to Web pages over the Internet in general is burst-oriented.

Typically, the user of a remote client computer first specifies the address of a Web page to a

browser program.  The browser program at the client computer then sends the request…. The

Web server then responds with the content of the required Web page…." *Id.* at 1:51-59.

15.     Against this backdrop, the '665 patent explains that "[a] particular problem exists

with efficiently adapting communication systems which use on-demand multiple access

techniques in the physical layer to efficiently handle the TCP/IP message traffic which is

prevalent in Internet communications." *Id.* at 2:28-32.

16.     As a solution, the '665 patent "makes use of timeslots to allocate specific channels on a demand basis.  Thus, for example, a given forward link channel is allocated for only a predetermined time slot duration and only upon user request." *Id.* at 2:52-55.  "To minimize overhead in the allocation of channels, forward and revere link time slots are automatically assigned in pairs.  In particular, rather than requiring a separate process for allocating revere link channels for the sending of acknowledgement message in response to receipt of a forward link packet, a different scenario takes place.  At the receiving end, such as for valid reception of data on a forward link channel at a central base station site, a reverse link time slot is automatically allocated in a time slot which depends upon the time slot allocation on the forward link." *Id.* at 2:56-65.  In this manner, the '665 patent provided a technical improvement to enable cellular handsets to, for example, handle TCP/IP messages efficiently.

17.     As stated by the examiner in allowing the claims of the '665 patent:

> *Claim 1-41 are allowed over closest prior art of record.  The following is an examiner's statement of the reasons for allowance:  Applicant teaches novel methods steps to cure deficiencies in demand-based multiple access techniques of the prior art, such as utilizing maximum use of available radio channels in a TDM communication system supporting duplex operations whereby multiple users share forward and reverse channels, and minimizing overhead in the allocation of channels.  The novel method step include, "receiving reverse link message, an acknowledgement, in a second time internal positioned a predetermined time period away from time internal allocated on forward link channel wherein a specific allocation of the second time interval is not received by subscriber unit (claims 1-41).  The closet prior art, Clark (US 3,982,074), Jorgensen (US 2002/0099854) fails to disclose the above inventive features.*

18.     As explained above, the patent examiner recognized that the '665 patent provided improvements to prior "demand-based multiple access techniques."  Specifically, the '665 patent provided a predetermined (or automatic) allocation of a reverse link to enhance efficiency of acknowledgement-based messaging (such as TCP/IP) in a cellular network.  The predetermined (or automatic) allocation reduced the amount of messaging (or overhead) required to provide a

reverse link.  In other words, employing "a second time interval, wherein the second time interval is a predetermined time interval after the first time internal" was not routine, conventional or well-understood.

19.     Nor was it routine, conventional or well-understood to send feedback information when "a specific allocation of the second time interval is not received by the CDMA subscriber unit."  A "CDMA subscriber unit" capable of sending an acknowledgement without receiving an explicit allocation was also not routine, conventional or well-understood.  Rather, CDMA devices typically relied upon an explicit or dedicated allocation.

### '726 Patent

20.     The '726 patent is entitled "CHANNEL QUALITY MEASUREMENTS FOR DOWNLINK RESOURCE ALLOCATION," and issued on June 12, 2012 to inventors Stephen E. Terry, Stephen G. Dick, James M. Miller, Eldad Zeira, and Ariela Zeira.  InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '726 patent.  A true and correct copy of the '726 patent is attached to this FAC as Exhibit 2.

21.     The '726 patent stems from Provisional Patent Application No. 60/290,739, filed on May 14, 2001.  At that time, "wireless communications systems were increasingly shifting away from primarily voice traffic to an ever-increasing share of data traffic, such as for internet applications."  '726 patent at 1:17-20.  This was true for "communication stations employing code-division multiple access (CDMA) technology utilizing measurement techniques to efficiently determine downlink resource allocation."  *Id.* at 1:12-16.  As a result, the capacity requirements of such systems had increased as did the need to maximize the capacity of downlink (DL) transmissions.  *Id.* at 1:20-23.

22.     The '726 patent explains that "[t]he manner in which the [user equipment] collects the measurements and transmits the measurement data is typically a trade-off between the amount of data provided, and the overhead necessary to transmit the measurement data back to the base station.  For example, measurement and transmission of all data for both ISCP and RSCP for every selected timeslot provides the most information.  However, the drawback is the large amount of data required to be transmitted and the overhead required to transmit it." *Id.* at 5:10-18.

23.     As a solution, the '726 patent describes generating a compact channel quality report based on a first channel quality measurement and differentials for individual downlink resources.  *Id.* at 6:20-21.  In an embodiment, "[t]he [channel quality] CQ measurement for this timeslot is transmitted, and then for the remaining timeslots it is only necessary to transmit the differential information as referred to the reference point." *Id.* at 6:21-24.  Because, for example, the reference timeslot may be four or five bits and the difference from the reference for the remaining timeslots may be one or two bits, this would require fewer bits to transmit the downlink channel quality information.  *Id.* at 6:24-27.

24.     The patent application that eventually issued as the '726 patent was subject to various office actions prior to its eventual allowance.  In response to the examiner's obviousness rejection, dated August 19, 2011, the inventors argued that "Lundby [the alleged prior art reference] does not teach or suggest, at least, measuring and deriving first CQI for a plurality of downlink resources. … Lundby only measures the forward link pilot signal, which is one downlink resource measured at multiple instances in time. Contrast this with the Independent claims, and which measurements are taken on a plurality of downlink resources.  Additionally,

Lundby does not disclose deriving a difference between the first CQI and a CQI for each of the plurality downlink resources, because Lundby only measures one downlink resource."

25.     In light of the applicants' arguments and corresponding claim amendments, the examiner allowed the claims of the '726 patent, reasoning that "[t]he present invention is directed to a method for providing channel quality measurement for allocation of downlink resources. The prior arts in the record fail to teach or make obvious to a method comprising derive a plurality of difference indications, each difference indication being between the first channel quality indication and a channel quality indication for one of the plurality of downlink resources within a structure of the claim." In other words, the invention of the '726 patent was directed to taking a plurality of measurement of downlink quality, deriving a first channel quality indication for the plurality, using that channel quality indication to derive difference indicators for individual downlink resources, and then transmitting a report including both the channel quality indicator for the plurality of downlink resources and the difference indicators.

26.     At the time of the invention of the '726 patent, user equipment configured to take measurements on a plurality of downlink resources was not routine, conventional or well-understood. Nor was it routine, conventional, or well-understood to derive a plurality of difference indicators for the plurality of downlink resources. It was not routine, conventional, or well-understood to generate a report containing both a channel quality indicator for the plurality of downlink resources and the difference indicators. Additionally, user equipment capable of receiving a subsequent downlink transmission with modulation and coding set in response to the report represented a departure from that which was routine, conventional or well-understood. In sharp contrast, the prior art approach (as represented by Lundby) entailed measuring a pilot

channel at multiple instances in time.  No information regarding individual downlink resources would have been available for use in setting modulation and coding settings.

### '954 Patent

27.     The '954 patent is entitled "AUTOMATIC REVERSE CHANNEL ASSIGNMENT IN A TWO-WAY TDM COMMUNICATION SYSTEM," and issued on April 23, 2013 to inventor Kevin P. Johnson.  IPR Licensing, Inc. owns by assignment the entire right, title, and interest in and to the '954 patent.  A true and correct copy of the '954 patent is attached to this FAC as Exhibit 3.

28.     The '954 patent stems from the same original patent application as the '665 patent and therefore shares a common written description.  Accordingly, the above discussion regarding the teachings of the '665 patent is also applicable to the '954 patent.

29.     During prosecution of the application that eventually issued as the '954 patent, the patent examiner reached the following conclusion:

> *The closest prior art of record, Jorgenson (US 2002/0099854), Nakamura et al. (US 5,740,168) and Malcolm et al. (US5,781,540) are in the same field of endeavor, disclose allocating shared bandwidth to the attached devices, and TDM circuit switching that divides bandwidth into time slots specified on the uplink channel messages.  However the prior art, alone or in obviousness, fails to disclose the inventive features of 'transmitting feedback information regarding the received information in a time interval on a second uplink channel on a condition that an explicit allocation of a first uplink channel is not received, wherein the time internal on the second uplink channel is a predetermined period away from the time internal on the downlink channel', as claimed herein.*

30.     In other words, the predetermined (or automatic) allocation on the "second uplink channel" represented an improvement over prior art subscriber units.  Indeed, Jorgenson taught the use of quality-of-service as a mechanism for reducing latency where the subscriber unit would need to affirmatively schedule sending the acknowledgement.  In contrast, the '954 patent enabled sending feedback information on the second uplink channel a predetermined period

away from the time internal on the downlink channel.  The automatic allocation on a second uplink channel was not routine, conventional or well-understood.

31.     The '954 patent also enables the subscriber unit to alternatively send feedback information with user data on the first uplink channel "on condition that an explicit allocation of a first uplink channel is received."  Including both user data and feedback information on the same uplink channel was not routine, conventional or well-understood.  Nor was it routine, conventional or well-understood to place feedback information on different channels depending on whether or not there was an explicit allocation.

32.     Additionally, the requirement that "a specific allocation of the second time interval is not received by the CDMA subscriber unit" would not have been routine, conventional or well-understood.  Similarly, a "CDMA subscriber unit" capable of sending an acknowledgement without receiving an explicit allocation was not routine, conventional or well-understood.

### '747 Patent

33.     The '747 patent is entitled "METHOD AND APPARATUS FOR PROVIDING AND UTILIZING A NON-CONTENTION BASED CHANNEL IN A WIRELESS COMMUNICATION SYSTEM," and issued on December 31, 2013 to inventor Stephen E. Terry, Jin Wang, Arty Chandra, John S. Chen, and Guodong Zhang.  InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '747 patent.  A true and correct copy of the '747 patent is attached to this FAC as Exhibit 4.

34.     The '747 patent traces its origin to a first provisional patent application filed on January 31, 2006 and a second provisional application filed January 23, 2007.  The inventions are directed to LTE where "[o]ne of the main technological challenges of such networks is

efficient channel usage when there is a varied traffic mix in the system." '747 patent at 1:30-32.
The '747 patent identifies two known options for addressing this problem: a Random Access
Channel (RACH) or, alternatively, a shared channel. The '747 patent explains the shortcoming
of both known options before proposing a non-contention based (NCB) uplink control channel.
The improved wireless transmit/receive units (WTRU) of the '747 patent receive an allocation
including a configuration for transmitting scheduling requests over the NCB uplink control
channel. The configuration may include a periodicity for transmission of scheduling requests for
the particular WTRU. This NCB uplink control channel advantageously provided for low-
latency uplink transmission without incurring substantial overhead associated with the sending of
uplink control information.

35.    The use of a time multiplexed NCB uplink control channel for multiple WTRUs
was not routine, conventional or well-understood at the time of the '747 patent's invention. A
conventional approach would have been to use either a contention-based channel or a dedicated
channel.

36.    Further, the NCB uplink control channel allowed for scheduling requests to be
indicated with a "burst." The use of a burst to indicate scheduling requests on a time multiplexed
NCB uplink control channel was not routine, conventional, or well-understood. The inventors of
the '747 patent recognized that a burst minimized the overhead associated with a scheduling
request for uplink resources which, in turn, enhanced system throughput.

37.    In addition, having the improved WTRU monitor a downlink control channel for
shared channel resource allocation and then detecting a second allocation on an uplink shared
channel was not routine, conventional or well-understood.

**'612 Patent**

38.     The '612 patent is entitled "CHANNEL QUALITY MEASUREMENTS FOR DOWNLINK RESOURCE ALLOCATION," and issued on March 18, 2014 to inventors Stephen E. Terry, Stephen G. Dick, James M. Miller, Eldad Zeira, and Ariela Zeira.  InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '612 patent.  A true and correct copy of the '612 patent is attached to this FAC as Exhibit 5.

39.     The '612 patent stems from the same original patent application as the '726 patent and therefore shares a common written description and figures.  Accordingly, the above discussions regarding the teaching of the '726 patent are also applicable to the '612 patent.

40.     During prosecution, the patent examiner rejected the pending application claims as unpatentable in view of U.S. Patent No. 6,366,763 ("Ue reference").  In a response, dated January 2, 2013, the inventors made certain claim amendments and also argued that the Ue reference "teaches how an interference signal+noise power measurement circuit operates. There is no teaching in [the] Ue [reference] of measuring a plurality of downlink resources."  The inventors further argued that "[t]here is no teaching in [the] Ue [reference] of transmitting the derived channel qualities in a pattern of time intervals by rotating through the derived channel qualities, wherein each derived channel quality is transmitted in different time intervals of the pattern."  These distinctions, among others, were specific improvements by the '612 patent over the user equipment of the prior art.

41.     More specifically, "deriving, by the [user equipment] UE, a channel quality for each of a plurality of downlink resources" was not routine, conventional, or well-understood. This limitation was clearly distinct over the Ue reference discussed by the patent examiner. Additionally, "transmitting, by the [user equipment] UE, the derived channel qualities in a

pattern of time intervals by rotating through the derived channel qualities" was not routine, conventional, or well-understood.

42.    The '612 patent claims that the "derived channel quality indicates a modulation and coding set." That was not routine, conventional, or well-understood. A conventional approach would have been to measure a pilot channel at multiple instances in time and rely on that measurement to set modulation and coding settings for the downlink resources.

### '873 Patent

43.    The '873 patent is entitled "METHOD AND APPARATUS FOR TRANSMITTING SCHEDULING INFORMATION IN A WIRELESS COMMUNICATION NETWORK" and issued on August 5, 2015 to inventor Paul Marinier. InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '873 patent. A true and correct copy of the '873 patent is attached to this FAC as Exhibit 6.

44.    The '873 patent stems from a provisional patent application filed on August 21, 2006. The "Background" section of the '873 patent explains that "[t]he Third Generation Partnership Project (3GPP) Release 6 defines fast control of wireless transmit/receive unit (WTRU) transmissions through Node-B based scheduling in HSUPA." '873 patent at 1:26-29. The inventor found a specific deficiency with the HSUPA design. While HSUPA permitted sending data in packet data units (PDUs), it had no provision for sending fractions of PDUs. Consequently, HSUPA required a minimum instantaneous bit rate for the WTRU to transmit data. The minimum bit rate, in turn, translated into a minimum power, below which the WTRU could not transmit data. The inventor realized that there were situations in which transmission of scheduling requests could be "blocked" if the granted power ratio fell below the minimum needed.

45.     As a solution to the above problem, the inventor proposed improving the WTRU to trigger the transmission of scheduling information to a Node-B in response to the WTRU having a non-zero grant smaller than needed thus preventing the WTRU from transmitting of a PDU of any MAC-d flows.  This represented a specific technical improvement to the existing 3GPP WTRUs.

46.     During prosecution of the application which eventually issued as the '873 patent, the inventor emphasized the aforementioned technological improvement in response to an office action.  Specifically, "in the ETSI document there is no consideration or thought of what to do if a non-zero grant is smaller than needed to send a single PDU for an already scheduled MAC-d flow … In section 11.8.1.6.1 triggering of an SI is based on the grant being zero/inactivity and Total E-DCH Buffer Status (TEBS) becoming larger than 0.  It is not in response to the size of a grant or single PDU."  The patent examiner granted the '873 patent in response.

47.     The element of "trigger transmission of scheduling information (SI) from the WTRU to a Node-B, in response to the WTRU having non-zero grant smaller than needed preventing the WTRU of transmission of a mediation access control protocol data unit (PDU) of any of a plurality of scheduled medium access control-d (MAC-d) flows" was not routine, conventional, or well-understood.  As explained above, it represented a specific improvement to overcome the "blocking" condition in HSUPA.

48.     Further, the claims of the '873 patent recite "3GPP WTRU," "Node-b" and "Mac-d flows."  The functional aspects and design of these components were unique aspects of the then nascent 3GPP technical specifications and therefore not routine to persons of ordinary skill in the art in August 2006.

**'580 Patent**

49.     The '580 patent is entitled "METHOD AND APPARATUS FOR PROVIDING AND UTILIZING A NON-CONTENTION BASED CHANNEL IN A WIRELESS COMMUNICATION SYSTEM," and issued on December 1, 2015 to inventor Stephen E. Terry, Jin Wang, Arty Chandra, John S. Chen, and Guodong Zhang.  InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '580 patent.  A true and correct copy of the '580 patent is attached to this FAC as Exhibit 7.

50.     The '580 patent stems from the same original patent application as the '747 patent and therefore shares a common written description and figures.  Accordingly, the above discussions regarding the teachings of the '747 patent are also applicable to the '580 patent.

51.     As discussed above with respect to the '747 patent, the use of an NCB uplink control channel for multiple WTRUs was not routine, conventional or well-understood at the time of the invention of the '747 and '580 patents.  A conventional approach would have been to use either a contention-based channel or a dedicated channel.  Further, the NCB uplink control channel allowed for scheduling requests to be indicated with a "burst," which was not routine, conventional or well-understood at the time of the invention of the '747 and '580 patents.

52.     The claims of the '580 patent also recite an "evolved Node B (eNB)" as the base station in communication with the WTRUs.  An "eNB" was a specific structural component within the then nascent 3GPP technical specification.  An eNB was not well-known, routine, or conventional to persons of ordinary skill in the art at the time of the '580 patent's invention.

**'449 Patent**

53.     The '449 patent is entitled "CHANNEL QUALITY MEASUREMENTS FOR DOWNLINK RESOURCE ALLOCATION," and issued on September 27, 2016 to inventors

Stephen E. Terry, Stephen G. Dick, James M. Miller, Eldad Zeira, and Ariela Zeira.  InterDigital Technology Corporation owns by assignment the entire right, title, and interest in and to the '449 patent.  A true and correct copy of the '449 patent is attached to this FAC as Exhibit 8.

54.   The '449 patent stems from the same original patent application as the '726 and '612 patents and therefore shares a common written description and figures.  Accordingly, the above discussions regarding the teaching of the '726 and '612 patents are also applicable to the '449 patent.

55.   The '449 patent claims "receiv[ing] downlink resource allocations from a base station" and "perform[ing] a plurality of downlink measurements for the plurality of downlink resources."  These steps were not conventional, routine or well-understood.  The conventional approach (as typified by the Lundby reference discussed above in connection with the '726 patent) was to measure channel quality only for a pilot channel.  That pilot channel would be static and thus independent of the particular resources allocated to the user equipment.

56.   The claims of the '449 patent also recite "determin[ing] a first channel quality indication, wherein the first channel quality indication is used to indicate to the base station a modulation and coding set (MCS) that has been determined based on a channel quality of the plurality of downlink resources."  That element was not routine, conventional, or well-understood at the time of the '449 patent's invention.  Indeed, the conventional approach was to measure the signal-to-noise ratio of a pilot channel.  The base station would establish the MCS based this measurement, rather than direct indication from the user equipment.

57.   The claims of the '449 patent also recites "a second channel quality indication" used to indicate MCS "of a particular downlink resource of the plurality of downlink resources."  The conventional approach merely relied on signal-to-noise on a pilot channel.  As such, the

claimed element was not routine, conventional, or well-understood at the time of the '449 patent's invention.

58.    The claims of the '449 patent further recite "at least one channel quality report" which "comprises the first channel quality indication and the second channel quality indication, and the second channel quality indication is reported as a differential channel quality with respect to the first channel quality indication." The state of the art at the time of the '449 patent's invention did not include such reports. Rather, a prevailing technique was to rely on the signal-to-noise ratio on a pilot channel. The recited claim element was, therefore, not routine, conventional, or well-understood at the time of the '449 patent's invention.

59.    The Patents-in-Suit were duly issued by the USPTO and are valid under 35 U.S.C. §§ 101, 102, 103, and 112.

## LENOVO'S KNOWLEDGE OF THE PATENTS-IN-SUIT

60.    On information and belief, Lenovo has had actual and/or constructive knowledge of the Patents-in-Suit since before the Original Complaint was filed on August 28, 2019. For example, InterDigital and Lenovo have been engaged in patent licensing discussions for several years. On information and belief, Lenovo learned of one or more of the Patents-in-Suit, their respective prosecution histories, and/or related patents in the course of its evaluation of InterDigital's patent portfolio.

61.    On information and belief, InterDigital and Lenovo or their affiliates are both involved with the European Telecommunications Standards Institute ("ETSI"). InterDigital has disclosed the Patents-in-Suit, or related patents, to ETSI and, on information and belief, Lenovo has access to and is knowledgeable regarding those disclosures.

62.     Lenovo has cited numerous InterDigital patents in its own patents.  For example, U.S. Patent No. 8,098,644 is assigned to Motorola Mobility LLC.  It cites to a publication, U.S. Patent Publication No. 2005/0220176, assigned to InterDigital.  On information and belief, Lenovo has obtained knowledge of the Patents-in-Suit through its own patent prosecution or willfully blinded itself to obtaining that knowledge.

63.     In addition, Lenovo received notice of the Patents-in-Suit upon the service of the Original Complaint by InterDigital upon Lenovo at the addresses referenced herein, on August 28, 2019.

## **LENOVO WIRELESS DEVICES**

64.     On information and belief, Lenovo designs, manufactures, and sells smartphones and other cellular-enabled devices in the U.S. under the Motorola brand.  Lenovo operates the following website in connection with such products:  https://www.motorola.com.

65.     On information and belief, Lenovo sells a variety of cellular-enabled tablets, notebook computers, and other cellular-enabled devices in the U.S. through its own brand. Lenovo operates the following website in connection with such products:  www.lenovo.com/us. These Motorola- and Lenovo-branded cellular-enabled devices, as well as any other Lenovo cellular-enabled devices, are collectively referred to as the "Lenovo Wireless Devices" throughout this FAC.

66.     The Lenovo and Motorola websites allow customers to directly purchase Lenovo Wireless Devices from Lenovo or, in some cases, directs the customer to cellular providers, such as AT&T and T-Mobile.  Attached as Exhibit 9 to the FAC is a sales receipt and photographs of a Motorola G7 smartphone that Motorola sold in the United States.

67.     The aforementioned Lenovo website includes customer reviews for many of the infringing Lenovo Wireless Devices.  These customer reviews, *inter alia*, summarize experiences purchasing and using the Motorola-branded smartphones in the United States.  Lenovo's website also provides customer support for the Motorola-branded smartphones by, for example, providing "Chat with Us" services.  Lenovo similarly provides "Live Chat" services for Lenovo-branded cellular-enabled tablets and notebook computers.  Lenovo also invites its customers to connect on social media, and provides various phone numbers for customers to call with questions and/or concerns with the Lenovo Wireless Devices.

## INTERDIGITAL'S COMPLIANCE WITH ETSI FRAND COMMITMENTS

68.     The 3G and 4G cellular standards at issue in this case were developed by the 3GPP consortium, in which companies participate through other standards-setting organizations ("SSOs") referred to as organizational partners.  InterDigital participated in 3GPP through its membership in ETSI.  Accordingly, the ETSI IPR (Intellectual Property Rights) Policy governs the FRAND commitments applicable to the cellular standards relevant to this case.

69.     InterDigital has submitted IPR Information Statement and Licensing Declaration forms to ETSI disclosing the patents-in-suit or related patents as patents that may be or may become essential to ETSI/3GPP cellular standards.  Pursuant to the licensing declaration in the forms, InterDigital declared that, to the extent the disclosed IPRs are or become and remain essential to ETSI standards, InterDigital is prepared to grant licenses under such IPRs on fair, reasonable and non-discriminatory (FRAND) terms and conditions.

70.     InterDigital has complied with the FRAND commitments set forth in the ETSI licensing declarations, because it has at all times been prepared to grant a worldwide license on FRAND terms and conditions to Lenovo.

71.     While InterDigital and Lenovo have to date been unable to agree to a negotiated license on FRAND terms and conditions, notwithstanding InterDigital's good faith negotiation efforts over the course of several years, InterDigital has been prepared to grant such a license, including by: (i) engaging in extensive efforts to seek to negotiate a license with Lenovo, including through numerous in-person meetings, telephone calls, and written correspondence; (ii) being willing to enter into binding international arbitration under which the arbitration tribunal would determine FRAND terms and conditions for a worldwide license; and (iii) filing an action in the UK seeking a declaration that InterDigital has made a FRAND offer to Lenovo or, in the alternative, a determination of FRAND terms and conditions for a worldwide license that Lenovo would have the option of accepting as an alternative to an injunction against infringement in the UK.

72.     Accordingly, InterDigital respectfully requests that the Court issue a declaratory judgment that InterDigital has not breached ETSI FRAND commitments because it is prepared to grant a license on FRAND terms and conditions in accordance with those commitments.

## COUNT I
## INFRINGEMENT OF THE '665 PATENT

73.     InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

74.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '665 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices with Wideband Code Division Multiple Access ("WCDMA") capabilities in the United States, including but not limited to the Motorola-branded smartphones. For instance, the Motorola-branded smartphones are CDMA subscriber units with circuitry configured to receive a first wireless CDMA signal in a first time interval, wherein the first time

interval includes at least one time slot; and circuitry configured, in response to receipt of the first wireless CDMA signal, to transmit an acknowledgement in a second time interval, wherein the second time interval is a predetermined time interval after the first time interval and a specific allocation of the second time interval is not received by the CDMA subscriber unit.  The Motorola-branded smartphones therefore directly infringe at least claim 18 of the '665 patent. InterDigital expects to identify additional claims of the '665 patent that Lenovo infringes through the discovery process.

75.     On information and belief, Lenovo, with knowledge of the '665 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '665 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless Devices with WCDMA capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '665 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with WCDMA capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the Lenovo Wireless Devices in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

76.     On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an WCDMA system.  Because the Lenovo Wireless Devices are specifically

designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '665 patent in violation of 35 U.S.C. § 271(c).

77.     Lenovo's past and continuing infringement of the '665 patent has caused monetary damage and irreparable injury to InterDigital.

**COUNT II**
**INFRINGEMENT OF THE '726 PATENT**

78.     InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

79.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '726 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices which utilize the Long Term Evolution ("LTE") standards in the United States.  For example, the Motorola-branded smartphones constitute user equipment comprising a measurement device configured to take a plurality of measurements based on a downlink quality (*e.g.*, channel quality) wherein each of the plurality of measurements is taken on a respective downlink resource of a plurality of downlink resources (*e.g.*, a plurality of subbands).  The Motorola-branded smartphones include a channel quality determination device configured to derive a first channel quality indicating a channel quality of the plurality of downlink resources (*e.g.,* a wideband report) and to derive a plurality of difference indications (*e.g.*, subband differential values).  These difference indications being between the first channel quality indication and a channel quality indication for one of the plurality of downlink resources (*e.g.*, subband differential channel quality values indicate the difference between the subband channel quality and wideband channel quality).  The Motorola-branded smartphones further include a transmitting device configured to transmit at least one report including the first channel quality indication and the plurality of difference indications.  The Motorola-branded smartphones

therefore directly infringe at least claim 1 of the '726 patent.  InterDigital expects to identify additional claims of the '726 patent that Lenovo infringes through the discovery process.

80.     On information and belief, Lenovo, with knowledge of the '726 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '726 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '726 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the accused products in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

81.     On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an LTE system.  Because the Lenovo Wireless Devices are specifically designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '726 patent in violation of 35 U.S.C. § 271(c).

82.     Lenovo's past and continuing infringement of the '726 patent has caused monetary damage and irreparable injury to InterDigital.

## COUNT III
## INFRINGEMENT OF THE '954 PATENT

83.     InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

84.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '954 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices with LTE capabilities in the United States, including but not limited to the Motorola-branded smartphones.  For instance, the Motorola-branded smartphones include circuitry configured to receive information on a downlink channel in a time interval, such as, the physical downlink shared channel ("PDSCH") and on a condition that an explicit allocation of a first uplink channel, such as, the physical uplink shared channel ("PUSCH"), is received, circuitry configured to transmit feedback information  regarding the received information on the first uplink channel, wherein the feedback information is transmitted with user data on the first uplink channel.  On a condition that an explicit allocation of the first uplink channel is not received, the Motorola-branded smartphones include circuitry configured to transmit feedback information regarding the received information in a time interval on a second uplink channel, such as the physical uplink control channel ("PUCCH"), wherein an explicit allocation of the second uplink channel is not received, and wherein the time interval on the second uplink channel is a predetermined time period away from the time interval on the downlink channel. The Motorola-branded smartphones therefore directly infringe at least claim 1 of the '954 patent. InterDigital expects to identify additional claims of the '954 patent that Lenovo infringes through the discovery process.

85.     On information and belief, Lenovo, with knowledge of the '954 patent, and without authority, has actively induced and continues to actively induce infringement by end-

users and cellular carriers of at least one claim of the '954 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '954 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the Lenovo Wireless Devices in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

86.     On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an LTE system.  Because the Lenovo Wireless Devices are specifically designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '954 patent in violation of 35 U.S.C. § 271(c).

87.     Lenovo's past and continuing infringement of the '954 patent has caused monetary damage and irreparable injury to InterDigital.

## COUNT IV
## INFRINGEMENT OF THE '747 PATENT

88.     InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

89.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '747 patent by making, using, offering for sale, and/or selling

Lenovo Wireless Devices with LTE capabilities in the United States, including but not limited to the Motorola-branded smartphones.  For example, Motorola-branded smartphones include a processor configured to receive, from an evolved Node B (eNB), a first allocation, wherein the first allocation is an allocation of a non-contention based (NCB) uplink control channel, the first allocation comprises a configuration for transmitting scheduling requests (SRs) over the NCB uplink control channel, the configuration comprises a periodicity and an indication of dedicated physical resources allocated to the smartphone for transmitting SRs, and allocated physical resources of the NCB uplink control channel are time multiplexed such that given frequency resources of the NCB uplink control channel may be used by different smartphones for transmitting control signaling at different instances of time; transmit a transmission burst over the NCB uplink control channel in accordance with the first allocation, wherein the presence of the transmission burst on resources dedicated to the smartphone by the first allocation is indicative of a request for uplink transmission resources by the smartphone; monitor a downlink control channel; detect a transmission intended for the smartphone on the downlink control channel, wherein the transmission comprises a second allocation and the second allocation is an allocation of an uplink shared channel; and transmit data over the uplink shared channel in accordance with the second allocation.

90.    On information and belief, Lenovo, with knowledge of the '747 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '747 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '747 patent.  On information and belief, Lenovo actively

induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the Lenovo Wireless Devices in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

91.     On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an LTE system.  Because the Lenovo Wireless Devices are specifically designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '747 patent in violation of 35 U.S.C. § 271(c).

92.     Lenovo's past and continuing infringement of the '747 patent has caused monetary damage and irreparable injury to InterDigital.

**COUNT V**
**INFRINGEMENT OF THE '612 PATENT**

93.     InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

94.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '612 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices which utilize the LTE standards in the United States.  For example, the Motorola-branded smartphones are configured to report a channel quality to a base station.  The Motorola-branded smartphones include a channel quality determination device, configured to derive a channel quality for each of a plurality of downlink resources and a channel quality

-27-

transmitter configured to transmit the derived channel qualities in a pattern of time intervals by rotating through the derived channel qualities, wherein each derived channel quality is transmitted in a separate time interval of the pattern; wherein a derived channel quality is not transmitted by the smartphone in each time interval of a frame.  The Motorola-branded smartphones therefore directly infringe at least claim 12 of the '612 patent.  InterDigital expects to identify additional claims of the '612 patent that Lenovo infringes through the discovery process.

95.     On information and belief, Lenovo, with knowledge of the '612 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '612 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '612 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the accused products in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

96.     On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an LTE system.  Because the Lenovo Wireless Devices are specifically

designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo

contributorily infringes the '612 patent in violation of 35 U.S.C. § 271(c).

97.     Lenovo's past and continuing infringement of the '612 patent has caused

monetary damage and irreparable injury to InterDigital.

**COUNT VI**
**<u>INFRINGEMENT OF THE '873 PATENT</u>**

98.     InterDigital repeats each and every allegation of the preceding paragraphs as if set

forth fully herein.

99.     In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed

and continues to infringe the '873 patent by making, using, offering for sale, and/or selling

Lenovo Wireless Devices with HSUPA (HSPA) capabilities in the United States, including but

not limited to the Motorola-branded smartphones.  For example, the Motorola-branded

smartphones are  Third Generation Partnership Project (3GPP) wireless transmit/receive units

with circuitry configured to trigger transmission of scheduling information (SI), from the

smartphone to a Node-B, in response to the smartphone having a non-zero grant smaller than

needed thereby preventing the smartphone from transmitting a medium access control protocol

data unit (PDU) of any of a plurality of scheduled medium access control-d (MAC-d) flows.  The

Motorola-branded smartphones therefore directly infringe at least claim 6 of the '873 patent.

InterDigital expects to identify additional claims of the '873 patent that Lenovo infringes through

the discovery process.

100.     On information and belief, Lenovo, with knowledge of the '873 patent, and

without authority, has actively induced and continues to actively induce infringement by end-

users and cellular carriers of at least one claim of the '873 patent, under 35 U.S.C. § 271(b), by

intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless

-29-

Devices with HSUPA (HSPA) capabilities, intending to encourage, and in fact encouraging, end-users and carriers to directly infringe the '873 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with HSUPA (HSPA) capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the Lenovo Wireless Devices in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

101.    On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an HSUPA (HSPA) system.  Because the Lenovo Wireless Devices are specifically designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '873 patent in violation of 35 U.S.C. § 271(c).

102.    Lenovo's past and continuing infringement of the '873 patent has caused monetary damage and irreparable injury to InterDigital.

**COUNT VII**
**INFRINGEMENT OF THE '580 PATENT**

103.    InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

104.    In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '580 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices with LTE capabilities in the United States, including but not limited to the Motorola-branded smartphones.  For example, the Motorola-branded smartphones include a

processor configured to receive a first allocation from an evolved Node B (eNB), wherein the first allocation is an allocation of a non-contention based (NCB) uplink control channel, the first allocation comprises a configuration for transmitting scheduling requests (SRs) over the NCB uplink control channel, and the configuration indicates a periodicity allocated to the smartphone for transmitting scheduling requests on the NCB uplink control channel and indicates which sub-carrier resources of the NCB uplink control channel are to be used by the smartphone for transmitting the scheduling requests; transmit a scheduling request over the NCB uplink control channel in accordance with the first allocation, wherein the transmitted scheduling request comprises a transmission burst, and presence of the transmission burst on NCB uplink control channel resources assigned to the smartphone by the first allocation is indicative of a request for uplink transmission resources by the smartphone.  The smartphone then monitors a downlink control channel and detects that a transmission intended for the smartphone on the downlink control channel is intended for the smartphone based on an identifier indicated in the transmission on the downlink control channel, wherein the transmission on the downlink control channel comprises a second allocation, the second allocation being an allocation of an uplink shared channel; and transmit data over the uplink shared channel in accordance with the second allocation. The Motorola-branded smartphones therefore directly infringe at least claim 1 of the '580 patent.  InterDigital expects to identify additional claims of the '580 patent that Lenovo infringes through the discovery process.

105.    On information and belief, Lenovo, with knowledge of the '580 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '580 patent, under 35 U.S.C. § 271(b), by intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless

Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and cellular carriers to directly infringe the '580 patent.  On information and belief, Lenovo actively induced infringement by, *inter alia*, designing and introducing into the stream of commerce Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional literature describing and instructing in the operation of the accused devices in an infringing manner and by offering support and technical assistance to its customers that encourage use of the Lenovo Wireless Devices in ways that infringe the asserted claims.  In addition, Lenovo has had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the Original Complaint.

106.    On information and belief, Lenovo Wireless Devices are specifically designed to be used in at least an LTE system.  Because the Lenovo Wireless Devices are specifically designed to so operate, they have no substantial non-infringing uses.  Accordingly, Lenovo contributorily infringes the '580 patent in violation of 35 U.S.C. § 271(c).

107.    Lenovo's past and continuing infringement of the '580 patent has caused monetary damage and irreparable injury to InterDigital.

**COUNT VIII**
**INFRINGEMENT OF THE '449 PATENT**

108.    InterDigital repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

109.    In violation of 35 U.S.C. § 271(a), InterDigital alleges that Lenovo has infringed and continues to infringe the '449 patent by making, using, offering for sale, and/or selling Lenovo Wireless Devices with LTE capabilities in the United States, including but not limited to the Motorola-branded smartphones.  For example, the Motorola-branded smartphones are user

equipment with a receiver configured to receive downlink resource allocations from a base station, wherein a received downlink resource allocation indicates to the user equipment which downlink resources of a plurality of downlink resources have been allocated to the user equipment for a downlink transmission.  Motorola-branded smartphones include a measurement device configured to perform a plurality of downlink measurements for the plurality of downlink resources, wherein the plurality of downlink measurements are performed to determine channel quality information associated with one or more of the plurality of downlink resources. Motorola-branded smartphones also include a channel quality determination device configured to determine a first channel quality indication, wherein the first channel quality indication is used to indicate to the base station a modulation and coding set (MCS) that has been determined based on a channel quality of the plurality of downlink resources, and determine at least a second channel quality indication, wherein the second channel quality indication is used to indicate to the base station an MCS that has been determined based on a channel quality of a particular downlink resource of the plurality of downlink resources; and a transmitter configured to transmit at least one channel quality report to the base station.  The at least one channel quality report comprises the first channel quality indication and the second channel quality indication, and the second channel quality indication is reported as a differential channel quality with respect to the first channel quality indication.  The Motorola-branded smartphones therefore directly infringe at least claim 1 of the '449 patent.  InterDigital expects to identify additional claims of the '449 patent that Lenovo infringes through the discovery process.

110.    On information and belief, Lenovo, with knowledge of the '449 patent, and without authority, has actively induced and continues to actively induce infringement by end-users and cellular carriers of at least one claim of the '449 patent, under 35 U.S.C. § 271(b), by

intentionally inducing the use, importation, offer for sale, and/or sale of Lenovo Wireless
Devices with LTE capabilities, intending to encourage, and in fact encouraging, end-users and
cellular carriers to directly infringe the '449 patent. On information and belief, Lenovo actively
induced infringement by, *inter alia*, designing and introducing into the stream of commerce
Lenovo Wireless Devices with LTE capabilities, and by publishing manuals and promotional
literature describing and instructing in the operation of the accused devices in an infringing
manner and by offering support and technical assistance to its customers that encourage use of
the Lenovo Wireless Devices in ways that infringe the asserted claims. In addition, Lenovo has
had actual knowledge of end-users' direct infringement and that Lenovo's acts induced such
infringement since at least August 28, 2019, when InterDigital served Lenovo with a copy of the
Original Complaint.

111.    On information and belief, Lenovo Wireless Devices are specifically designed to
be used in at least an LTE system. Because the Lenovo Wireless Devices are specifically
designed to so operate, they have no substantial non-infringing uses. Accordingly, Lenovo
contributorily infringes the '449 patent in violation of 35 U.S.C. § 271(c).

112.    Lenovo's past and continuing infringement of the '449 patent has caused
monetary damage and irreparable injury to InterDigital.

## COUNT IX
## DECLARATORY JUDGMENT

113.    InterDigital repeats each and every allegation of the preceding paragraphs as if set
forth fully herein.

114.    An actual controversy has arisen and now exists between InterDigital and Lenovo
as to whether InterDigital is in breach of contractual commitments reflected in the IPR

Information Statements and Licensing Declarations to be prepared to grant licenses on FRAND terms and conditions for cellular standards-essential patents.

115.    InterDigital has fully complied with its FRAND commitments by being prepared to grant licenses on FRAND terms and conditions for cellular standards-essential patents.  It has done so, for example, by initiating an action in the UK court seeking a determination of FRAND terms and conditions for a worldwide license with Lenovo by that court, through its negotiations with Lenovo, and by being willing to enter into binding international arbitration with Lenovo to determine FRAND terms and conditions for a worldwide license.  InterDigital has indicated that it is willing to enter into such a worldwide license on terms consistent with those that the UK court determines to be FRAND.

116.    Therefore, InterDigital requests a declaratory judgment that it is not in breach of its FRAND commitments under the ETSI IPR Policy with respect to Lenovo.[1]

## JURY DEMAND

117.    InterDigital demands a jury trial as to all issues that are triable by a jury in this action.

## PRAYER FOR RELIEF

118.    WHEREFORE, InterDigital respectfully requests that this Court enter judgment against Lenovo as follows:

(a)    Declaring that InterDigital is not in breach of relevant FRAND commitments made in ETSI licensing declarations with respect to Lenovo;

---

[1] The UK claim seeks a declaration that InterDigital has made a FRAND offer to Lenovo or, in the alternative, a determination of the terms and conditions of a FRAND license.  If Lenovo enters into a license on those terms covering its worldwide sales, the controversy that exists would be resolved, as would InterDigital's claims for damages, if and to the extent they are covered by the license.

(b)      That Lenovo is liable for infringement, contributing to the infringement, and/or inducing the infringement of one or more claims of the Patents-in-Suit, as alleged herein;

(c)      To the extent that Lenovo has not:

(i) agreed to a negotiated worldwide patent license with InterDigital;

(ii) agreed to a fair process for binding international arbitration to determine FRAND terms and conditions of a worldwide patent license with InterDigital; or

(iii) undertaken following a declaration and/or determination of FRAND terms and conditions by the UK court to enter into a worldwide license with InterDigital on FRAND terms and conditions consistent with those determined by the UK court to be FRAND;

an injunction pursuant to 35 U.S.C. § 283 providing that Lenovo and its parents, subsidiaries, affiliates, successors, predecessors, assigns, and the officers, directors, agents, servants and employees of each of the foregoing, customers and/or licensees and those persons acting in concert or participation with any of them, are enjoined and restrained from continued infringement, including but not limited to using, making, importing, offering for sale and/or selling products that infringe, and from contributorily and/or inducing the infringement of the Patents-in-Suit prior to their expiration, including any extensions;

(d)      An Order directing Lenovo to file with this Court and serve upon Plaintiffs' counsel within 30 days after the entry of the Order of injunction a report setting forth the manner and form in which Lenovo has complied with the injunction;

(e)      An award of damages adequate to compensate InterDigital for the infringement that has occurred, pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest;

(f)      An award of enhanced damages including, without limitation, treble damages for willful infringement pursuant to 35 U.S.C. § 284;

(g)      An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through the Court's decision regarding the imposition of a permanent injunction;

(h)      An award of attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including prejudgment interest on such fees;

(i)      Costs and expenses in this action; and

(j)      An award of any further relief that this Court deems just and proper.

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Eve H. Ormerod*

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
Beth A. Swadley (No. 6331)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com
bswadley@skjlaw.com

*Attorneys for Plaintiffs*
*InterDigital Communications, Inc., InterDigital*
*Technology Corporation, IPR Licensing, Inc.,*
*InterDigital Holdings, Inc., and InterDigital, Inc.*

OF COUNSEL:

WILSON SONSINI GOODRICH & ROSATI
David S. Steuer
E-mail: dsteuer@wsgr.com
Michael B. Levin
E-mail: mlevin@wsgr.com
Maura L. Rees
E-mail: mrees@wsgr.com
Ryan R. Smith
E-mail: rsmith@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

Dated:  December 9, 2019