1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

PIVITAL IP LLC,

4                                    :      CIVIL ACTION
              Plaintiff,            :
5   v                               :
                                    :
6   ACTIVECAMPAIGN, LLC,            :
                                    :      NO. 19-2176-LPS
7           Defendant.              :
    ------------------------------------
8   PIVITAL IP LLC,
                                    :      CIVIL ACTION
9             Plaintiff,            :
    v                               :
10                                  :
    TWILIO, INC.,                   :
11                                  :      NO. 20-254-LPS
            Defendant.              :
12  ------------------------------------
    PIVITAL IP LLC,
13                                  :      CIVIL ACTION
              Plaintiff,            :
14  v                               :
                                    :
15  SHARPSPRING, INC.,              :
                                    :      NO. 20-255-LPS
16          Defendant.
                            - - -

17

                       Wilmington, Delaware
18                     Tuesday, July 14, 2020
                       *35 U.S.C. 101 Hearing*

19                            - - -

20

    BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge
21               HONORABLE JENNIFER L. HALL, Magistrate Judge

22
                              - - -
23
    (Captions continued on page 2)
24

25  Valerie Gunning                Brian P. Gaffigan
    Official Court Reporter        Official Court Reporter

```
------------------------------------
INTERDIGITAL TECHNOLOGY
CORPORATION, IPR LICENSING, INC.,   :
INTERDIGITAL COMMUNICATIONS,        :
INC., INTERDIGITAL HOLDINGS, INC.,  :
and INTERDIGITAL, INC.,             :
                                    :    CIVIL ACTION
          Plaintiff,                :
                                    :
v                                   :
                                    :
LENOVO HOLDING COMPANY, INC.,       :
LENOVO (UNITED STATES) INC., and    :
MOTOROLA MOBILITY LLC,              :
                                    :    NO. 19-1590-LPS
          Defendant.                :
------------------------------------
MENTONE SOLUTIONS LLC,
                                    :    CIVIL ACTION
          Plaintiff,                :
v                                   :
                                    :
DIGI INTERNATIONAL INC.,            :
                                    :    NO. 20-280-LPS
          Defendant.                :
------------------------------------
MENTONE SOLUTIONS LLC,
                                    :    CIVIL ACTION
          Plaintiff,                :
v                                   :
                                    :
ELO TOUCH SOLUTIONS, INC.,          :
                                    :    NO. 20-281-LPS
          Defendant.                :
------------------------------------
```

APPEARANCES:


          STAMOULIS & WEINBLATT LLC
          BY:  STAMATIOS STAMOULIS, ESQ.

                and

          DIRECTION IP LAW
          BY:  DAVID R. BENNETT, ESQ.
               (Chicago, Illinois)

               Counsel for Pivital IP LLC
               in Civil Action 19-2176-LPS

1    APPEARANCES:   (Continued)

2              CONNOLLY GALLAGHER LLP
               BY:  ARTHUR G. CONNOLLY, III, ESQ.
3
                    and
4
               PERKINS COIE LLP
5              BY:  MARK T. SMITH, ESQ., and
                    STEPHANIE NELSON, ESQ.
6                   (Chicago, Illinois)

7                   Counsel for ActiveCampaign, LLC
                    in Civil Action 19-2176-LPS
8    ----
               CHONG LAW FIRM
9              BY:  JIMMY CHONG, ESQ.

10                  and

11             DIRECTION IP LAW
               BY:  DAVID R. BENNETT, ESQ.
12                  (Chicago, Illinois)

13                      Counsel for Pivital IP LLC
                        in Civil Action 19-254-LPS
14
               POTTER ANDERSON & CORROON LLP
15             BY:  BINDU A. PALAPURA, ESQ.

16                  and

17             JONES DAY
               BY:  MICHAEL A. OBLON, ESQ.
18                  (Washington, District of Columbia)

19                  and

20             JONES DAY
               BY:  MICHAEL C. HENDERSHOT, ESQ.
21                  (Palo Alto, California)

22                  and

23             JONES DAY
               BY:  JENNIFER HARTJES, ESQ.
24                  (Minneapolis, Minnesota)

25                  Counsel for Twilio, Inc.
                    in Civil Action 19-254-LPS

```
 1    APPEARANCES:   (Continued)

 2
                    CHONG LAW FIRM
 3                  BY:   JIMMY CHONG, ESQ.

 4                        and

 5                  DIRECTION IP LAW
                    BY:   DAVID R. BENNETT, ESQ.
 6                        (Chicago, Illinois)

 7                            Counsel for Pivital IP LLC
                              in Civil Action 19-255-LPS
 8
                    ASHBY & GEDDES, P.A.
 9                  BY:   ANDREW C. MAYO, ESQ.

10                        and

11                  GODFREY & KAHN, S.C.
                    BY:   SHANE M. DELSMAN, ESQ., and
12                        JENNIFER L. GREGOR, ESQ.
                          (Madison, Wisconsin)
13
                              Counsel for SharpSpring, Inc.
14                            in Civil Action 19-255-LPS

15    ----

16                  SMITH, KATZENSTEIN & JENKINS LLP
                    BY:   NEAL C. BELGAM, ESQ.
17
                          and
18
                    WILSON SONSINI GOODRICH & ROSATI
19                  BY:   RYAN R. SMITH, ESQ.
                          DAVID S. STEUER, ESQ., and
20                        MICHAEL B. LEVIN, ESQ.
                          (Palo Alto, California)
21
                              Counsel for InterDigital Technology
22                            Corporation, IPR Licensing, Inc.,
                              InterDigital Communications, Inc.,
23                            InterDigital Holdings, Inc., and
                              InterDigital, Inc.,
24                            in Civil Action 19-1590-LPS

25
```

```
1    APPEARANCES:   (Continued)

2
                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3                   BY:  RODGER D. SMITH, II, ESQ.

4                        and

5                   SIDLEY AUSTIN LLP
                    BY:  JOSEPH A. MICALLEF, ESQ., and
6                        SCOTT BORDER, ESQ.
                         (Washington, District of Columbia)
7
                         and
8
                    SIDLEY AUSTIN LLP
9                   BY:  RICHARD A. CEDEROTH, ESQ.
                         (Chicago, Illinois)
10
                              Counsel for Lenovo Holding
11                            Company, Lenovo (United States) Inc.,
                              and Motorola Mobility LLC
12                            in Civil Action 19-1590-LPS

13   ----

14                  O'KELLY & ERNST, LLC
                    BY:  GEORGE PAZUNIAK, ESQ.
15
                              Counsel for Mentone Solutions, LLC
16                            in Civil Action 20-280-LPS

17
                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
18                  BY:  ANNE SHEA GAZA, ESQ.

19                       and

20                  JENNER & BLOCK LLP
                    BY:  AMR O. ALY, ESQ.
21                       (New York, New York)

22                            Counsel for Digi International
                              in Civil Action 20-280-LPS
23
     ----
24

25
```

1    APPEARANCES:   (Continued)

2
            O'KELLY & ERNST, LLC
3           BY:  GEORGE PAZUNIAK, ESQ.

4                    Counsel for Mentone Solutions, LLC
                     in Civil Action 20-281-LPS
5

6           FISH & RICHARDSON P.C.
            BY:  JEREMY D. ANDERSON, ESQ.
7
                 and
8
            FISH & RICHARDSON P.C.
9           BY:  RICARDO J. BONILLA, ESQ., and
                 MICHAEL A. VINCENT, ESQ.
10               (Dallas, Texas)

11                   Counsel for Elo Touch Solutions, Inc.
                     in Civil Action 20-281-LPS
12

13

14

15

16

17

18

19

20

21

22                    - oOo -

23              P R O C E E D I N G S

24          (REPORTER'S NOTE:  The following Section 101

25    hearing was held remotely, beginning at 10:03 a.m.)

1          CHIEF JUDGE STARK:  Good morning, everybody.

2   This is Judge Stark.  I am in my jury room in Wilmington,

3   Delaware, along with Judge Hall.

4          Good morning, Judge Hall.

5          JUDGE HALL:  Good morning, Judge Stark.

6          Good morning, everybody.

7          CHIEF JUDGE STARK:  We are keeping a safe social

8   distance from one another, and this is our 101 day.  We're

9   here on a number of different cases.  I will list all the

10  cases for the record in a moment, and I will give the

11  parties all a chance to enter their appearances.

12          I just wanted to say first that we do have in

13  front of us copies of the slides that were submitted

14  yesterday in connection with each of the hearings that are

15  going to occur today, and so counsel should feel free to

16  refer to those as we go through the day.

17          And just as a reminder, although we do expect

18  all the parties to be represented throughout the day, we're

19  going to start with argument in the Pivital cases; that will

20  be 30 minutes a side.  And then we'll turn to argument in

21  the InterDigital case, which is 40 minutes a side, then

22  we'll take a break.  Then we will come back and hear

23  argument in the Mentone Solutions cases, and then we will

24  probably reconvene again sometime thereafter.

25          It's going to be important that anyone who is

not speaking keep themselves on mute, and also very

important that you identify yourself when you are speaking

so we can keep track exactly of who we are speaking to.

So with that, let me note that we are first here

in the Pivital cases:  Pivital IP, LLC vs. ActiveCampaign,

LLC, it's Civil Action No. 19-2176; vs. Twilio, Inc. is

Action 20-254, and vs. SharpSpring, Inc. is Action 20-255.

Who is there, please, for Pivital?

MR. STAMOULIS:  Your Honor, hi.  Good morning.

Your Honors, this is Stam Stamoulis.  It's good to hear your

voices.

I'm here on behalf of Pivital in one of the

matters.  Jimmy Chong is the other Delaware attorney.  We

are splitting the cases with Pivital.

And presenting for us today is David Bennett who

is lead counsel for all the Pivital matters.

MR. BENNETT:  Good morning, Your Honors.

CHIEF JUDGE STARK:  Good morning to all of you

for Pivital.

Who is there for the defendant ActiveCampaign?

MR. CONNOLLY:  Good morning, Your Honors.  This

is Arthur Connolly from Connolly Gallagher.  With me on the

line are Mark Smith and Stephanie Nelson from Perkins Coie,

and Mr. Smith will be presenting today on behalf of

ActiveCampaign.

1          CHIEF JUDGE STARK:  Okay.  Good morning.

2          MR. MARK SMITH:  Good morning.

3          CHIEF JUDGE STARK:  Who is there for Twilio?

4          MS. PALAPURA:  Good morning, Your Honor.  This

5    is Bindu Palapura from Potter Anderson.  And with me today

6    from Jones Day is Michael Hendershot, Michael Oblon, and

7    Jennifer Hartjes.  And also with us from Twilio is Robert

8    McHenry and Eugene Kim.  Mr. Hendershot is going to be doing

9    the argument for Twilio today.

10          CHIEF JUDGE STARK:  Thank you.  And good morning

11   to you all.

12          And who is there for SharpSpring?

13          MR. MAYO:  Good morning, Your Honors.  This is

14   Andrew Mayo from Ashby & Geddes on behalf of SharpSpring.

15   And I am joined this morning by my co-counsel from Godfrey &

16   Kahn.  You have Jennifer Gregor and Shane Delsman on the

17   line.

18          And we intend to, obviously, largely defer,

19   consistent with the letter we submitted, to the arguments

20   that are going to be presented by ActiveCampaign and

21   Twilio's counsel.  But to the extent the Court has any

22   questions for SharpSpring, I will defer to Ms. Gregor.

23          CHIEF JUDGE STARK:  Okay.  Good morning to you

24   both.  Thank you very much for that.

25          So next on our agenda after that with the Pivital

cases will be our InterDigital Technology Corporation, et al.

vs. Lenovo Holdings Company Inc., et al, our Civil Action No.

19-1590.

Who is there for InterDigital, please?

MR. BELGAM:  Good morning, Your Honor.  It's

Neal Belgam for InterDigital.  Addressing the Court today on

behalf of InterDigital will be Ryan Smith, and with him on

the phone are his partners, David Steuer and Michael Levin;

also our client in-house counsel, Steve Akerley and Scott

Clark.

CHIEF JUDGE STARK:  Okay.  Thank you.  Good

morning to all of you.

And who is there for the Lenovo parties, please?

MR. RODGER SMITH:  Good morning, Your Honors.

It's Rodger Smith from Morris Nichols on behalf of Lenovo.

This morning my colleague, Joe Micallef from Sidley & Austin

will be arguing the motion.  He is joined by his colleagues,

Richard Cederoth and Scott Border, also from Sidley &

Austin, as well as Anup Shah from Lenovo.

CHIEF JUDGE STARK:  Okay.  Good morning to all

of you.

And then --

MR. MICALLEF:  Good morning.

CHIEF JUDGE STARK:  Good morning.

And then we have two related cases that we'll

1    finish the day with, Mentone Solutions, LLC vs. Digi

2    International, Inc., it's Civil Action No.  20-280, and vs.

3    Elo Touch Solutions, Inc. Is Civil Action No. 20-281.

4                Who is there for Mentone, please?

5                MR. PAZUNIAK:  Good morning, Your Honors.

6    George Pazuniak representing Mentone in both cases.

7                CHIEF JUDGE STARK:  Okay.  Good morning to you.

8                Who is there for Digi, please?

9                MS. GAZA:  Good morning, Your Honors.  It's Anne

10   Gaza from Young Conaway on behalf of Digi.  And I'm joined

11   today by my colleague Amr Aly of Jenner & Block who will be

12   presenting on behalf of Digi today.

13               MR. ALY:  Good morning, Your Honors.

14               CHIEF JUDGE STARK:  Good morning.

15               Finally, who is there for Elo Touch, please?

16               MR. ANDERSON:  Good morning, Judge Stark and

17   Judge Hall.  This is Jeremy Anderson from Fish & Richardson

18   on behalf of Elo Touch Solutions.  With me are my

19   colleagues, Ricardo J. Bonilla and Michael Vincent from our

20   Dallas office.

21               CHIEF JUDGE STARK:  Okay.  Good morning to you

22   as well.

23               Just a few more quick housekeeping points before

24   we get started.

25               Effectively, Judge Hall and I are both on the

1   bench. We could both ask you questions. None of these

2   motions are referred to Judge Hall. There will be no

3   reports and recommendation, but her assistance has been

4   invaluable in getting me prepared for today, and she will be

5   helping me throughout the day. But I will be the one making

6   the decisions in whatever form or fashion it is, whether it

7   is later today or after the hearing.

8           But certainly she is free to ask questions, and

9   you should treat us both as if we're on the bench presiding.

10           This is the first time I have done this on the

11   phone. Obviously it's because of the unfortunate pandemic,

12   and we wish we were all together, but cramming the 40 or so

13   of you into a courtroom together in Delaware just did not

14   seem prudent and safe in today's time and circumstances,

15   unfortunately.

16           So with that, let's start with the argument in

17   the Pivital cases.

18           Which defendant are we going hear from first,

19   please?

20           MR. MARK SMITH: Good morning, Your Honor. This

21   is Mark Smith on behalf of ActiveCampaign.

22           Counsel for Twilio, Mr. Hendershot, and I have

23   coordinated and anticipate sharing approximately 20 minutes

24   for our argument and reserving approximately 10 minutes that

25   we will share in rebuttal.

1    CHIEF JUDGE STARK:  Okay.  We'll try to let you

2  know when you have around 10 minutes left.

3    MR. MARK SMITH:  Thank you.

4    Pivital is asserting only claims 1 and 11

5  against ActiveCampaign.  Both claims relate to sending an

6  e-mail with a common portion along with additional text in

7  the form of an encrypted comment that only select recipients

8  can access.

9    The chief dispute in this case is at step 1 and

10 whether the claims are directed to improving how a computer

11 works.

12    As evidenced by Pivital citing the *Finjan* case

13 in its letter brief, which was a step 1 only case, related

14 to a computer-specific advancement, that allowed the

15 computer to identify new computer viruses for the first

16 time.

17    That is not what we have here.

18    These claims use basic computer components to

19 perform a task that can be performed without computers.

20    The problem identified in the patent is

21 described in the context of a president of a company that

22 wants to send a message to all employees but also additional

23 texts to only managers.

24    At column 1, lines 29 through 35, the patentee

25 stated the problem in the prior art was that the managers

1   who lined up were receiving two messages.

2           At column 1, lines 49 through 58, the patentee

3   has described the solution:  to send one message with an

4   encrypted comment that only the managers can access.

5           Now, the managers are only receiving one

6   message.

7           The same problem and the same solution exists in

8   a pre-computer world.

9           Using hardcopy memos, the president of the

10  same company could send all employees one memo and managers

11  a second memo with the additional text.  Again, the same

12  problem.  The managers are receiving two messages.

13          Same solution.  Redaction is just a hardcopy

14  analog of encryption; and we cited on pages 5 and 6 of

15  ActiveCampaign's reply brief, which is Docket Entry 16, to

16  that effect.

17          A president can address one memo with a common

18  message that includes the additional texts for the managers

19  and simply redact the additional texts.  The mailroom can

20  give the employees the redacted memo and the managers the

21  unredacted memo if, for example, they identify their ID.

22          The managers are now just receiving one message.

23          The claims at issue here are not addressing

24  computer-specific problems or the computer virus detection

25  in *Finjan*.

1          We submitted three slides yesterday; and I would

2     like to turn to ActiveCampaign's first slide which shows

3     that there is multiple ways to conclude that the claims here

4     are directed to an abstract idea.

5          The first task is to identified the claims

6     advanced over the prior art.  As reflected by the title

7     of the patent and described in the specification of the

8     identified problem with how to send comments, which are

9     just additional texts to particular recipients, for example,

10    managers, without generating each message individually.

11         That's at column 1, lines 14 through 35.

12         And the claimed advance, meaning the solution

13    to that problem, was sending group e-mails with encrypted

14    comments that only selected recipients could access.  Again,

15    that is at column 1, lines 49 through 58.

16         The question is whether that claim advanced is

17    abstract and the claimed advanced to be abstract, if it has

18    a real-world analog, if a prior case found the comparable

19    patent claim abstract or if it claimed functionally.

20         If the claimed advance is abstract under any one

21    of these analytical approaches listed in slide 1, the claim

22    is directed to an abstract idea and we move on to step 2.

23         I'll start with the pen-and-paper test and the

24    brick-and-mortar test because they ask whether the claimed

25    advanced is addressing a comparable real-world problem that

1    exists without computers.

2              I start here because this is the chief dispute;

3    and as I just described, the claims here address the

4    comparable problem and solution that exists in the hardcopy

5    memo context.

6              In a hardcopy world, the president can draft a

7    single memo that includes the managers' eyes only text.  The

8    non-managers get a redacted memo, and the managers verify

9    their identities by their staff.  They get a single,

10   unredacted memo.

11             Because the claimed advance has a direct

12   non-computer analogy, the claims are directed to an abstract

13   idea.

14             Under the case analogy approach, this is the

15   second analytical approach I'd like to touch on, that looks

16   for analogous patent claims; in essence, asking whether any

17   prior cases find patent claims covering similar claimed

18   advances have been found abstract.  This approach was

19   described at the Federal Circuit in *Enfish vs. Microsoft*.

20   That's 822 F.3d 1327 at 1334.

21             The *Umbanet* case, cited in ActiveCampaign's

22   briefing and our letter brief, provides a good example both

23   as using that analytical approach and as finding patent

24   claims directed to assemble an abstract idea.

25             There, the claim was directed to "providing

selective or particularized access to an e-mail."

And the Court looked for and found analogous cases explaining that quote courts have consistently declared similar claims to be abstract.

Similarly, *Prism Technologies*, again, cited in ActiveCampaign's briefing and letter brief, found a comparable claimed advance to be abstract. There, the patent claimed advance was providing restricted access to resources. The claimed advances comparable further restricted access to encrypted comments as part of the claimed advance in this case.

Using this case analogy approach, we can, again, conclude that the claims are directed to an abstract idea.

Pivital relies on the *Finjan* case cited in its letter briefs as a comparable claimed advance. But the claims in *Finjan* are very different for a number of reasons.

In *Finjan*, the patentees explained that in the past, computers could only use code matching which compared downloaded code from the compute to a list of known viruses. In *Finjan*, the patentee's claimed advance was a new behavioral-based method to detect unknown viruses and downloaded code, allowing a computer for the first time to detect unknown viruses using this behavioral analysis discussed in the patent.

Under the case analogy analytical framework,

behavioral virus scanning has zero to do with the claims

in this case. And to the extent Pivital is just saying

*Finjan* stands for the general proposition that solving

computer-specific problems in a way that improves how a

computer works, again, the claims at issue here are not

addressing the computer-specific problem, nor do they

improve how a computer works. Both the problem and the

solution of the patent exists without computers.

The claimed advance is also abstract under a

functional claiming framework. Under the functional

claiming approach, the question is whether the claimed

advances is claimed at a functional level. It's a question

of specificity.

The asserted claims recite creating and sending

e-mails generically, encrypting and decrypting comments

generally.

The two-page patent is lacking the necessary

specificity, focusing in on a claimed advance as what is

claimed at a generic and functional level.

So under any analytical approach in slide 1, the

claims are directed to an abstract idea, and the Court can

move on to step 2.

But before we get to step 2, I'd like to turn

to ActiveCampaign's second slide to dive a little bit deeper

on the chief dispute here: whether the asserted claims can

1  improve how a computer works.

2  Pivital argues that the claims make a computer

3  more efficient.  But that is not correct because the

4  efficiencies described in the patents relate to efficiencies

5  from the drafter's perspective, meaning the drafter need

6  only draft one e-mail as opposed to two; where on the flip

7  side, the manager receive one e-mail as opposed to two.

8  But that doesn't make a computer more efficient.

9  In fact, the same efficiency exists in the hardcopy memo

10  analogy we discussed underscoring that the claim are not

11  directed to improving computer functionality.

12  Pivital also argues the claims improve

13  bandwidth.  But any bandwidth improvements are directed to

14  an unclaimed embodiment where a comment is decrypted before

15  it is transmitted.  Figure 3 makes this clear, as does the

16  specification at column 3, lines 55 through 59.

17  And as shown in slide 2, that "decrypt before

18  processing" is cited specifically as the reason for the

19  bandwidth efficiency.

20  Claims 1 and 11 --

21  JUDGE HALL:  This is Judge Hall.

22  Isn't it reasonable to infer that just sending

23  less e-mails will use less bandwidth makes a computer more

24  efficient?

25  MR. MARK SMITH:  That's not what the patentees

1   are telling us.  The patentees identify that problem and

2   said the way to supposedly get bandwidth efficiency is to

3   decrypt before sending, and that is what they cited and

4   told us what they thought the bandwidth efficiency was.

5           So there is nothing in the record to suggest

6   that it is improved for bandwidth here.  That claims 1 and

7   11 never decrypt before sending; they always encrypt the

8   comments.

9           So the bandwidth discussion in the patent is

10  related to claims that never issued and just simply are not

11  at issue here.

12          CHIEF JUDGE STARK:  So the embodiment in Figure

13  3, was it abandoned during prosecution, and do we have that

14  in front of us, or is it just not in claim 1 or 11?

15          MR. MARK SMITH:  It is certainly not in claims 1

16  or 11.  During the prosecution history, there were

17  originally claims directed.

18          For Figure 3 that were dropped, I don't believe

19  that is in the record, although I will double-check if that

20  is in front of you.

21          CHIEF JUDGE STARK:  And going back to Judge

22  Hall's question, we're here on a motion to dismiss.  If we

23  disagree with you and we think it is at least plausible,

24  perhaps in an amended complaint if we were to allow one, at

25  least plausible to think that sending fewer e-mails would

1    lead to the reduction in use of bandwidth, would that allow

2    the plaintiffs to survive this motion?

3               MR. MARK SMITH:  In this instance, I don't think

4    it would.  That is not an improvement to how a computer

5    works.  That is not the -- using the *Finjan* example, that is

6    not the type of computer-centric improvement that the cases

7    are talking about.

8               And, again, there is nothing in the record,

9    and the patentees certainly didn't think that there was a

10   bandwidth improvement because when they did, they identified

11   it for in the specifications.

12              And as to the asserted claims here, there is no

13   representation that any bandwidth efficiency occurred.

14              So I don't want to cut into Mr. Hendershot's

15   time.  I just very quickly want to touch on the last

16   ActiveCampaign slide, the third one, and that relates to

17   step 2.

18              The two-page patent pretty clearly only

19   describes well-known generic components shown on the slide.

20   And they're used normally in capturing forum, a patent

21   directed to an abstract idea into a patent eligible

22   invention.

23              So, again, unless Your Honors have more

24   questions for me at the moment, I want to turn it over to

25   Mr. Twilio's counsel, Mr. Hendershot, to make sure he has

1    sufficient time for his presentation.

2              CHIEF JUDGE STARK:  Well, just one.

3              In response to your briefing, I think the

4    plaintiff argues "There is no prior art that had a message

5    structure that required a common message portion and

6    encrypted comment and an icon or an instruction to determine

7    access to an encrypted comment."

8              How do I find otherwise at this stage or how do

9    I reject as even plausible that contention?

10             MR. MARK SMITH:  So starting with step 1, the

11   claimed advance is described without reference to the

12   combination that Pivital refers to in its briefing.

13             So what you are asking is more of a step 2 type

14   of question.  There, we could, again, look to the patents

15   and see what the patentees described.  They talk about

16   generally encrypting in column 3, line 24.  They say use a

17   generic e-mail, use additional text.

18             For an icon or a prompt in column 4, lines 9

19   through 20, they say use a visual icon.

20             There is no disclosure about any innovative

21   combination because they don't describe how to combine it.

22   They just say to use encryption, you use an icon.  At best,

23   all they're arguing is the claims were found novel and

24   nonobvious.

25             But as ActiveCampaign pointed out on pages 8 and

1    9 of its reply brief, that is always the case and it is not

2    relevant to 101.

3              Judge Bryson said the same thing in the *British*

4    *Telecomms.* case when rejecting a similar, nonconventional

5    combination argument.  And that's at 381 F.Supp.3d 293 at

6    310.

7              CHIEF JUDGE STARK:  Okay.  Thank you.  You can

8    hand it over if you'd like.

9              MR. MARK SMITH:  Thank you.

10             MR. HENDERSHOT:  Good morning, Your Honors.

11   This is Mike Hendershot of Jones Day on behalf of Twilio.

12             Can you hear me okay?

13             CHIEF JUDGE STARK:  Yes.  Thank you.

14             MR. HENDERSHOT:  So in the Twilio case, the 254

15   case, we only have claim 1 being asserted.  So I'm going to

16   focus there.  I really have three main points, two of which

17   are directed to Your Honors' questions.

18             With respect to Judge Hall's question about

19   sending less e-mails necessarily making a computer more

20   efficient or incidentally making a computer more efficient,

21   I don't think that is enough to save the claims here.

22             I'd like to direct Your Honors to slide 9 in our

23   presentation, in Twilio's presentation.

24             You had, in the *British Telecomms.* case,

25   Judge Bryson was dealing with similar arguments where the

patentee had argued that their purportedly improved message

system allowed the system to send fewer e-mails or send

fewer messages and avoid waste, then increase efficiency.

And Judge Bryson looked at the claims and recognized that

they weren't a technological improvement to how the computer

fundamentally operates.

And, in fact, the benefit of decreased e-mail

volume was one that was borne from the abstract idea itself

which was a long, established practice of trying to reduce

volume in communications, being in a hardcopy communication

or in an electronic communication.

And I think that is exactly the case that we

have here.

If I could flip back to slide 6 in our

presentation.

And I apologize for jumping around if you are

working with a hard copy as well.

This is an excerpt of claim 1 of the '965

patent.  I think the claim is very clear, and I think

Pivital agrees in its briefing, that claim 1 involves

preparing a message, preparing an encrypted comment and

attachment to the message that is intended just for a

subset of recipients, and sending both of those to all of

the recipients.  That's the number of recipients in the

claim is the superset, and the selected subset are those

who are supposed to access the encrypted comment.

The claim itself is talking about sending a
series of encrypted comments, two people that aren't ever
intended to receive them.  So that the claim itself is
reciting sending a lot of unnecessary redundant information.

So I don't think it is clear from the claims,
which controls, that you are going to see the benefit that
was alluded to.

Turning to slide 7.  This is Pivital's
opposition brief in the '254 case.

They point to another embodiment where a message
is sent to all recipients but only the encrypted comment
goes to those who are supposed to receiving it, so people
only receiving the information that they're intended to
receive, and you don't have this redundant forwarding of
encrypted comments to people who never open them that is
addressed in claim 1.

And that difference is significant because --
turning to slide 8 -- when you get beyond the aspirational
statements about improved bandwidth and efficiency, when
the specs at column 3 in the '965 patent really talks about
here is the bandwidth benefit, they are tying it to this
embodiment that Pivital has acknowledged is not within claim
1, it is clear from claim 1's language is not covered, where
you are only sending the attachment selectively to different

1    users.

2              So that is an embodiment that is not reflected

3    in claim 1, certainly, and that is really where the patent

4    talks about, okay, in connection to this purported invention,

5    this is where you see the bandwidth benefit.  That is where

6    it is.

7              So without that bandwidth benefit, they're

8    really left with that -- and I think this is the point

9    Your Honor was getting at was -- does the system let you

10   conceivably send fewer messages?

11             And they articulate this in their letter brief

12   to the Court at page 2.  First of all, it is saying, "Look,

13   if you limit it to this before, it was necessary for

14   users to create and send separate messages:  one for the

15   recipients of the common message and a separate one for

16   those receiving the particular instructions or comments."

17             That is not a problem.  That is true of hardcopy

18   messages.  That is true of electronic messages.  That has

19   been true with form letters or attachments and numbers for

20   years before this patent.  This is not a problem and a

21   solution that's arising specifically in the context of

22   computers or electronic messages.

23             So, yes, while you could have an incidental

24   benefit under this approach of sending fewer e-mails, that

25   is a result of this idea that has long been applied and

Judge Bryson addressed in *British Telecomms*. where you have the benefit that would apply to hardcopy messages or electronic messages.

So I don't think it is a benefit resulting from a technological solution that would save the claims at step 1.

I'd like to address briefly their argument as well that they have a new message structure, which I believe goes to Judge Stark's question about their allegation about there is not prior art that has a message structure with a message, a comment, and an icon.

First of all, I agree with co-counsel's comments that at that stage, if you had to point to prior art showing something evidence, something was known, I don't think you would ever -- every patentee could argue you get past Rule 12, but you wouldn't ever resolve 101 or Rule 12, and I don't think that is our burden or necessary under the law, particularly with this claim.

If you look at this claim and what their actual message structure is, it is a message with an encrypted attachment and an icon indicating that there is an attachment. That is what they point to. That is what they characterize it at. That is what is claimed and is consistent with the spec.

Respectfully, an e-mail having a message with an icon indicating that there is an attachment and having the

attachment encrypted is not a new structure.  That is a

classic e-mail structure that we have all seen, with the

icon being either a little PDF thumbnail or a Word thumbnail

or a little paperclip indicating there is an attachment.

So, respectfully, I think you can look at the

claim and resolve it.  This is not an unconventional

structure.  It is certainly not an innovative or

unconventional technological solution.

And if I could direct Your Honors to slide 5

briefly in Twilio's presentation.

This is an image from their complaint that is in

there repeatedly; and this is Pivital's annotation of the

graphic.  It appears in paragraphs 19, 20, 22, and 23 of the

Twilio complaint.

And I think this reinforces that we're not

dealing with a new message structure here if you look at

how they are framing their claims and stating what they're

addressed to.

This is a picture from a Twilio website with a

receipt.  And they -- in mapping the claim elements to this

in their complaint, Pivital says the common message is the

logo and the preformed template with the delivery addressed

for the company.  And then the comment, this comment that

you add to it, is just the receipt, which is what the person

purchased, and the buyer's address, whatever the custom

1  portion would be.

2          And that is the structure they're pointing to

3  and saying their claim was directed to.

4          And, respectfully, that is not a new message

5  structure.  We have all been getting receipts in this format

6  for years.

7          The idea of populating custom information on a

8  preformatted or preprinted form is not a problem or a

9  solution arising specifically in computers.  It is something

10 that was solved by letterhead or templates or form letters.

11         And this is the message that they're pointing

12 to.

13         So I think with respect to their argument that

14 they have a message structure, you can look at the language

15 of the claim and the specification, that is sufficient to

16 resolve it here.  And that result is reinforced by how they

17 are framing their claims in the complaint.

18         I have used a fair amount of time.  I don't know

19 how much time I have left, Your Honor.  I'm happy to answer

20 any questions.

21         CHIEF JUDGE STARK:  Just a couple of quick

22 questions here for either you or your co-counsel.

23         But you all have not agreed on what the abstract

24 idea is here at step 1.  Does it make a difference that you

25 all have not agreed on that?

1           MR. HENDERSHOT:  Your Honor, I think we have

2      different wording of really the same abstract idea.  I don't

3      want to speak for co-counsel, but I believe we have the same

4      understanding.

5           The claim is really getting at how restricted

6      access in the context of electronic messages.

7           You can word that different ways.  I wouldn't

8      object to their interpretation.  I don't think they would

9      object to our articulation.  But it is really getting at

10     restricted access to electronic information, and it is done

11     here in the context of electronic messages.  And it is done

12     in ways that are entirely conventional and described with no

13     particular detail in the two-page specification.

14          So --

15          CHIEF JUDGE STARK:  Okay.

16          MR. HENDERSHOT:  -- I don't think it is really

17     material here, but if you think there is some issue, I'm

18     happy to address it more specifically.

19          CHIEF JUDGE STARK:  Mr. Smith, do you agree it

20     doesn't matter which articulation of the abstract idea we

21     adopt?

22          MR. MARK SMITH:  Yes, I agree with Twilio's

23     counsel that we're effectively saying the same thing.

24          CHIEF JUDGE STARK:  All right.  Defendants have

25     five minutes left which we'll save for you for rebuttal.

1          So we will turn now to plaintiff.

2          MR. BENNETT:  Good morning, Your Honors.  David

3     Bennett on behalf of the plaintiff, Pivital IT.

4          In terms of the defendants' motions, there

5     are -- what they were focusing on is really an aspect of a

6     general solution rather than a specific claim solution to

7     the problem at hand.

8          The claim is resolving the problem of creating

9     customized messages for particular recipients without having

10    to create individual messages.

11         And of the two claims at issue in the

12    ActiveCampaign case, claim 1 and claim 11, that we work

13    differently, which I will get into.

14         But the claims themselves, when you read them in

15    the context of the specification, have some of the hallmarks

16    that the Federal Circuit has stated make the claims patent

17    eligible.  They're rooted in computer technology to overcome

18    the problems.

19         And I'm looking at slide 3 of the presentation,

20    specifically arising in the realm of computer networks.

21         The way that the problem is described in the

22    specification has to do with improving electronic messaging

23    systems.  So that is the intensity mentioned.

24         It improves the efficiency of using the

25    electronic device.  And that is specific from *Core Wireless*.

1     And what happened in *Core Wireless* is it's -- they

2     specifically said:  "The disclosed invention improves the

3     efficiency of using the electronic device."

4               And that patent in *Core Wireless* had to do with

5     an improved menu structure which made it easier for a user

6     to go through the system.

7               And that is one of the improvements that you see

8     here is as opposed to a user having to create two e-mails,

9     it allows the creation of one e-mail, and then the system

10    itself addresses what to do with everything.

11              But in addition, there is the improvement of

12    sending fewer messages.  And defendants point to column 3 as

13    referring to that.

14              And, in fact, column 3 is referenced.  It is

15    important because -- this is at line 39 to 43.  It says:

16    "The process may be advantageous in a client-server

17    architecture where it is desirable to limit the transmission

18    of unnecessary data to each of the recipients in order to

19    avoid unnecessary consumption of network bandwidth."

20              So although that is in reference to that --

21    immediately before that, it talks about a different

22    embodiment.  The fact that sending fewer transmissions

23    avoids unnecessary consumption of network bandwidth is also

24    relevant if you send fewer e-mails.

25              CHIEF JUDGE STARK:  All right.  Let me stop you.

1    I want to make sure I understand what you are saying.

2              This Figure 3 embodiment, do you contend that

3    that is captured in claim 1 or claim 11?

4              MR. BENNETT:  No, Your Honor.  What I'm saying

5    is that the benefits that are described with respect to

6    the Figure 3 embodiment are also important, are also

7    applicable when you are sending less messages.  Because when

8    you are talking about Figure 3, part of it is included in

9    some of the embodiments where it talks about -- in claim 1

10   where it says -- at Figure 3, it refers to, it says "either

11   the common portion of the message or the common portion with

12   one or more of the comments."

13             So you are sending one message to each

14   recipient, and that is what you are doing in claim 1.

15             Claim 11 is not sending one message to

16   recipients.  Claim 11 actually sends to two recipients two

17   messages to a subset of recipients.  So --

18             CHIEF JUDGE STARK:  In --

19             MR. BENNETT:  So with respect --

20             CHIEF JUDGE STARK:  In claim 1, you are sending

21   the general message as well as the encrypted data to

22   everyone, aren't you?

23             MR. BENNETT:  That's correct.  In claim 1, you

24   are sending one message; and in claim 11, to the subset you

25   are sending two messages.

1          So in claim 11, you would not necessarily have

2    the benefit of sending fewer messages.

3          CHIEF JUDGE STARK:  All right.  So how, in

4    either claim 1 or claim 11, are the claims telling us that

5    bandwidth efficiencies can be accomplished?

6          MR. BENNETT:  Well, I think in terms of claim --

7    well, claims 1 and 11, if you look back at column 1 of the

8    patent, where it starts at line 35, it says, "In order to

9    communicate the same main message to all employees and to

10   provide additional information to selected groups of those

11   employees, multiple messages with different distribution

12   lists would need to be created, sent, and opened.  Besides

13   being inconvenient to the user, this approach can also

14   create bandwidth issues and some type of messaging networks

15   also; for example, local area networks."

16          So in this portion of the specification it is

17   specifically saying if you send fewer messages, then you

18   have less bandwidth issues.

19          In the same section it is talking about

20   inconvenience to the user, which means that the way that the

21   system is designed, is it makes it easier or more efficient

22   for the user to use the system.

23          And that type of benefit is explicitly described

24   in *Core Wireless* licensing where they do talk about having a

25   simplified menu system, improves the efficiency of the

electronic device, which is an improvements to the system.

CHIEF JUDGE STARK:  Now, what about *British Telecomms*. and what Judge Bryson and also the Federal Circuit had to say about what seems to be the same argument?

MR. BENNETT:  Well, if you look at slide 9 of what defendants pointed out, plaintiff slide 9 of Twilio, what the language actually says is -- this is in the middle box -- "Any such improvements to a messaging system, however, is merely the consequence of using commonly understood distribution techniques in the context of electronic communication."

So what they're arguing in *British* -- well, what the Judge was saying in *British Telecomms*. is that you're just doing things the way things were ordinarily done.  And when you look at the claim language itself, in *British Telecomms*., which is on -- is it on slide ...

On slide 14.

What they're saying there is that there really is no details in the claims.  All we're doing is we're distributing -- we're sending information, but there's really not details as to what we're doing.  We're just sending -- we have distribution rules.  We don't tell you in the claims what those distribution rules are.

We said the first data message.  We don't tell you what that structure of the data message is.

1        We receive feedback.  We don't tell you what

2   that feedback is.

3        And then based on the feedback, they use a

4   second set of rules for a predefined criteria based on the

5   feedback to decide what to send.  But, again, they don't say

6   what that information is.

7        So *British Telecomms*., when he is talking about

8   that they're just using commonly understood distribution

9   techniques, here it's just saying, well, if you have rules,

10  you have data messages, you have feedback and you respond to

11  the feedback.  There is no details into the claim as to what

12  that is or how you are doing that differently.

13       In the claims of the '965 patent, they tell you

14  how they're doing it differently.  The distribution rules

15  are explicit in the claims.  You have a common portion which

16  goes to all recipients.  You have a comment that goes to a

17  subset.  You don't just have a first data message; you have

18  a structure to that message.  You have a common portion,

19  you have an encrypted comment, and you have an icon or

20  instruction.

21       You don't just get feedback.  Instead, you get

22  feedback by the recipient selecting the icon or performing

23  the instruction in order to review the encrypted

24  information.

25       And the response is not just simply, well, some

undefined rule.  Instead, with respect to claim 1, the

rule is, if they respond, if they select the icon or the

instruction, you then have to determine if they're on the

subset list or the second address list.  And, if so, then

they have access to that information.

Now, this is not the way that the *British*

*Telecomms.* court said using commonly understood distribution

techniques.  As explained in the specification and in the

prosecution history, sending a message of this structure and

having this operation of selecting the icon and determining

whether they're on the second address list was not a

commonly understood distribution technique.

So that --

CHIEF JUDGE STARK:  Where do you see that?  Show

me where that is in the specification.

MR. BENNETT:  Well, in the specification, it's

where it talks about what the commonly used distribution

techniques were in the background section where it said

users or the person would have to bring two individual

customized messages that would then have to be sent.

So there is no way for the user to create a

single message that could then be distributed to multiple

people in different ways.

And it is also discussed in the prosecution

history, which is on slide 10 where it talks about what was

the reason for allowance.  And it was the inclusion of
"determining whether a particular recipient is allowed to
decode said encrypted comments by transmitting an icon
instruction with the common message portion and said
encrypted comment ..."

So that is the structure of the e-mail.

"... and determining if said particular
recipient has selected the icon or performing the
instruction and if so, determining if said particular
recipient is also on said second address list of said number
of recipients selected to review said comment in independent
claims."  So that is what was used to overcome the prior
art.

So you had not only the message structure, but
you also had the operation of what would happen by requiring
a user to select the icon and perform the instruction, and
then comparing it to a second address list.

So both in the specification where it describes
how it was done in the prior art, and in the prosecution
history where it says this is not how the prior art did it,
I think that explains why it's different from *British
Telecomms.* when it says just a consequence of using commonly
understood distribution techniques.

You would not be able to use the common e-mail
systems in the prior art to create these message structures.

They just weren't arranged for that. And they wouldn't be
able to respond to the selection of an icon to check against
a different list.

So, again, this is not something that you could
even do with your common e-mail structures or e-mail systems
at the time. And, therefore, just like in *DDR Holdings*,
this sort of overrides the routine and conventional sequence
of events that would ordinarily occur when you tried to use
an e-mail system.

And so the prior -- or the column 1 describes
what the prior e-mail systems would do, and this is not
doing what the prior e-mail systems would do.

CHIEF JUDGE STARK: Address -- there are a
whole lot of cases from the Federal Circuit now that address
patents that basically provide for selective access to
certain resources, in a computer environment, for instance,
and the defendants analogize your claim to those.

Why is that not a persuasive analogy here?

MR. BENNETT: I think that in all the cases,
what they say is, it's not enough to come up with an
analogy. You know, it's always possible to come up with
some human analogy. There are many times where an inventor
says, you know, my invention was inspired by something.

But that doesn't mean that it's ineligible for
patent just because it was inspired by or that is how they

1    developed their invention.

2          So in terms of all we think about selective

3    access to information, the claim is really not fully

4    directed to the selective access of information.

5          What it is saying is that, how do I make it

6    easier and better and more efficient for someone to create

7    e-mails that allows for selective access information?

8          So the focus is not on the selective access for

9    information, it is how you do it.  And that is usually what

10    the distinguishing point is in the claims of the patents

11    that are allowed.

12          And that is why I think *Finjan* is important on

13    the first step, and so is the *Uniloc* case; and these are on

14    slides 11 and 12.

15          In *Finjan*, on slide 11, the information that was

16    used to distinguish the claims and find that they were not

17    abstract was a step of generating by the inspector, a first

18    downloadable security profile, that identifies suspicious

19    code in the received downloadable; and then linking it to

20    the first downloadable security profile.

21          The claim itself does not say what the inspector

22    is.  It does not say what the security profile is or how do

23    you generate it.  And it does not say how you identify

24    suspicious code in the receipt of downloadable.

25          What the claim is directed to is having that

attached to the downloadable is really what is the inventive

concept. It is a new step of having something attached

together which ordinarily would not have been attached

before and doing it in a different location.

And so what Twilio, in their reply -- this is at

Docket Index 17 at 5, they say "scan programs did not and

could not identify potential threats, only previously

identified viruses."

Well, in the '965 patent, it's the same thing.

E-mail programs could not allow a user to create a single

e-mail with a common portion for the entire list and a

comment for a subset.

Nor could it respond to selection of an icon or

instruction to determine if somebody is on the second

address list.

So the way that the '965 patent is operating is

very similar to the *Finjan* claim in that, yes, I'm sure the

defendant in the *Finjan* case did say you are just claiming a

result because you are not having too much specificity -- or

we're not having enough specificity on what the downloadable

security profile is or how you identify suspicious code.

But what it is, is it is a combination of the

steps in *Finjan* is what makes it not an abstract idea, and

that is what makes it not an abstract idea here.

And it is also similar in the *Uniloc* case, which

1    is on slide 12.

2              The step or the part that was really -- that was

3    the focus of the inquiry was the last limitation, which is,

4    we're "adding to each inquiry message, prior to

5    transmission, an additional beta field for polling at least

6    one secondary station."

7              Polling secondary stations was known in the

8    prior art, but doing it in this way at this time was not.

9    So it wasn't a matter of, well, this was done before.  No.

10   It is how is it combined in this claim, and the way it is

11   combined makes it non-abstract.

12             And the Court in *Uniloc* specifically addressed

13   that the fact that the invention was compatible with

14   conventional communication systems does not render it

15   abstract.

16             So this is the software claim, just like in the

17   '965 patent.

18             Just because you could modify an e-mail system

19   to be able to perform the claimed invention does not make it

20   abstract; that you use a conventional server, that you use

21   all these other conventional parts.  That is not what makes

22   it abstract.  You have got to look at the actual claim

23   language.

24             And that is what I think defendants' flaw is in

25   their argument is they do all this high-level analysis, but

1    they don't really look at the claim language.

2              So, for example, if you look at slide 7 of

3    Pivital's presentation, I have highlighted in the claim

4    language where the structure is and where the operation is

5    of the claim.

6              So you have the "creating the electronic message

7    with the common message" portion.  That is delivered to a

8    number of recipients.

9              You have the comment that is attached with the

10   message.  That is for the subset.

11             Then you step down to where it says "encrypting

12   said comment," so it is encrypted.  And then with it, you

13   are "transmitting an icon or instruction with the common

14   message portion" instead of encrypted comment.

15             So that is the message structure, and that is

16   what was discussed in the prior art that wasn't something

17   that was done before.

18             And then furthermore, in the blue, you are

19   creating the two different message address lists, the main

20   one and then the subset, and then what you do is you

21   transmit the message, the encrypted comment, and the icon to

22   the user.  And then to determine whether the user is allowed

23   to see it, then you have to see if they select the icon and

24   then, if so, determining if they're on the second address

25   list.

1          So there is a lot of specificity in this claim

2     in combination of not only how the structure of the message

3     is but also how the steps are performed.  And both of those

4     were bound to be something different than what was in the

5     prior art.  And so the systems are not operating in a

6     routine or conventional sequence of events.  This is

7     something new and different.

8          And claim 11, if you move to slide 9, has a

9     different -- well, it has the same message structure.  You

10     have the common message, the comment, and then the encrypted

11     comment along with the icon.  So you have that.

12          Now, what this does, claim 11, is a little

13     different because it allows a user to still create one

14     message that contains all those parts.  But then how this

15     system sends it is different.  It sends the common message

16     portion to all the recipients, and then it only sends the

17     encrypted comment to a subset of the recipients.

18          So this operates different from claim 1, which

19     shows that these claims actually can cover two different

20     inventions.  This is not abstract because there is a lot

21     of specificity, and it shows from the claims and how they

22     operate.

23          CHIEF JUDGE STARK:  Where do you see in here,

24     these claims, that bandwidth conservation benefit being

25     captured in these claims?

1    MR. BENNETT:  The bandwidth conservation would

2  be found -- in claim 1 is where the bandwidth conservation

3  is found because it is only sending one message to everybody

4  as opposed to sending two messages, which is one bandwidth

5  conservation.  And that would be described in column 1 where

6  it talks about sending fewer messages.

7    Claim 11 has it a little bit different because

8  it is sending -- it can send less information in the second

9  message than in the first message.  Because the first

10  message would be the common message to everybody, and then

11  the second message would just be the encrypted comment to a

12  selected subset.

13    So claim 11 sends -- as opposed to sending two

14  sets of messages of full data, it is sending a large message

15  and a smaller message.

16    So although there is some benefit with probably

17  a reduction in data, the advantage here is more directed

18  towards the benefit of being more convenient to the user

19  which is what is found in the *Core Wireless* case.

20    CHIEF JUDGE STARK:  All right.  You have a

21  little under 10 minutes left.  Let me ask you a few more

22  questions.

23    So the parties seemed to have only argued about

24  claims 1 and 11.  Are you accepting that those claims are

25  representative of all claims that could be asserted in this

1    case?  And what would it -- what impact would it have on

2    the case if I'm persuaded that 1 and 11 do not survive the

3    motion?

4              MR. BENNETT:  I think that 1 and 11 are not

5    representative.  There was a reason why claim 6 was not

6    asserted.  I'd have to go through it again to specifically

7    remember why it was not asserted, but it does have some

8    different aspect to it, which we did not believe was met by

9    either Twilio, SharpSpring's, or ActiveCampaign's systems.

10             So that is why claim 6 was not asserted.

11             CHIEF JUDGE STARK:  All right.  So claims 1, 11

12   are the only claims that are or would ever be asserted in

13   the three cases in front of me?  Is that fair?

14             MR. BENNETT:  Yes, Your Honor.

15             CHIEF JUDGE STARK:  Okay.  And then I'm a little

16   confused about your position on claim construction.

17             Your letter, the 101 letter that I had you write

18   me, says the briefing does not raise any claim construction

19   issues but then maybe seems to suggest that ultimately there

20   may be a claim construction issue.

21             What is your position?  Is there some claim

22   construction issue I have to resolve in connection with or

23   prior to resolving these motions?

24             MR. BENNETT:  My position is that sometimes you

25   don't know what the claim construction issues are until you

determine what defendants' noninfringement arguments are.

I would expect that they're going to come in and say that they don't meet one or more of the limitations, which then, therefore, would be relevant to whether it is an abstract idea or not.

If they're saying, well, we have a system but, in fact, we don't meet two or three of these limitations and here is why, that would obviously impact, or it could be relevant into whether there is a claim construction issue or not. There could be fact issues.

But I found that sometimes when you get into what their noninfringement arguments are, that is when you really start to understand what their positions are as to what the claims mean and whether there's claim construction issues.

CHIEF JUDGE STARK: Are you arguing that speculation should somehow deter me from resolving the motion today?

MR. BENNETT: I would say that in the context of a motion to dismiss, when you're weighing the factors in favor of the plaintiff, if you are at a point where it is something that could weigh, tip the balance point in one direction if more information would help resolve the issue.

CHIEF JUDGE STARK: Okay. Those are my questions.

1          JUDGE HALL:  No additional questions, counsel.

2          CHIEF JUDGE STARK:  You do have a few minutes

3     left.  If there is anything more you want to add, feel

4     free.

5          MR. BENNETT:  Yes, I would like to address

6     step 2 because defendants implied there was no issue on

7     step 2.

8          Plaintiff -- or I identified one claim -- one

9     case in the letter because that is what the Court asked.

10    That doesn't mean that I didn't think there were more cases

11    that would be relevant.

12          So I did think the *Finjan* case was relevant, and

13    so was the *Uniloc* case on step 1.  But on step 2 -- this is

14    on slide 18 -- there is a problem with -- the way that the

15    problem is defined in the patent is not how the defendants

16    are defining the problem.  They define it more as just

17    simply encrypting things.  And everybody has always had this

18    problem.

19          But in terms of analyzing the claims, you're

20    supposed to do it in terms of the context and the

21    specification.  And the issue was how to create customized

22    messages for particular recipients without generating each

23    message individually.

24          And this is in column 1, lines 15 to 18.

25          And it describes how -- what they did in the

prior art was they said, we would send one message to the

common -- one common message to everybody, and then you

would send a separate message to the recipient.  So you had

to create two messages.

And so the solution to the '965 patent really

has more than just encrypting a portion of the e-mail to

provide selective access to it.  Instead, it allows the user

to create single message, and that is contained within the

claims, as I described before, and that single message has a

common message for the entire group and comments that can

only be selected by, I believe by selected individuals.

So when you are looking at the abstract idea

that they are alleging, which is "selective access to a

portion of electronic message," the claims do more than just

claiming that.  They claim it in a very specific way.

So when you are looking at what is unconventional,

you would look at, well, it creates a single message with a

common portion, encrypted comment, and an icon and instruction.

So you have a new message structure, and that is not

contained within their abstract idea.  And then you have the

two lists of recipients.

But then claim 1 and claim 11 also reads how

they send and respond differently.

So claim 1 sends the entire message to all

recipients and determines whether the recipient can decode

the comments by the selection of the icon and if they're on

the second address list.  So that's a different way that is

not included in the abstract idea for how to operate the

invention.

And then claim 11 sends the common message to

all, and then sends the encrypted comment and icon to a

subset; and if the icon is selected, can determine whether

it can decode the encrypted comment.

So, again, this is a different operation that is

more distinct and unconventional from what the abstract idea

is.

And this is very similar to the *Bascom* case,

which you will see on slide 19.

In *Bascom*, what they said is that:  "... an

inventive concept can be found in non-conventional and

non-generic arrangement of known conventional pieces."

What defendants have said in their slides and

arguments is they say each individual piece is known in the

art.  But they're not discussing the whole combination of

those pieces, not only in the combination of how the e-mail

is structured, but also how it operates.

So, again, in *Bascom*, they say, "Filtering

content on the Internet was already a known concept ..."

Well, what defendants are arguing here is that

selective access to a portion of electronic message was

1   already known in the prior art.

2           Well, then, what *Bascom* says is "the patent

3   describes how its particular arrangement of elements is a

4   technical improvement over prior art ways of filtering such

5   content."  And that is what is happening here.

6           The structure of the e-mail is different.  How

7   it defines whether a recipient has access to particular

8   selected information is different.

9           So it's not just doing the abstract idea.  At a

10  minimum, it is the combination of the elements together

11  which makes it patent-eligible under the second step of the

12  analysis.

13          Defendants did not go into -- well, I guess, let

14  me address their *Prism Tech*. case.

15          Now, if you look at the *Prism Tech*. case, it

16  just talks about creating a new message for -- it is using a

17  hardware identifier to send that back and forth to basically

18  identify what the hardware is.

19          And if you read the claims, again, it doesn't

20  have any specificity.  There is no message structure.  There

21  is no information on what is contained in the message or how

22  things respond.  It's just hardware identifier.  That is how

23  we tell who you are.

24          So the *Prism Tech*. case really doesn't have any

25  details, and that is why, I think, that the claims in the

'965 patent are patent-eligible because they don't just

generally describe selective access to a portion of an

electronic message, they want to simplify how the message

is created and how the system responds to access to

selective -- access to the selected information.

The defendants did not address their other

summary judgment arguments.  So unless Your Honors have any

questions on those -- I'm sorry, motion to dismiss

arguments -- I won't address those here.

CHIEF JUDGE STARK:  Okay.  No, that's fine.

And your time is up.  So thank you very much for

the argument.

We'll turn it back to defendants for their last

five minutes.

MR. MARK SMITH:  Hi.  Thank you.  This is Mark

Smith from ActiveCampaign.

I will be very brief, but I want to end going

back to the third ActiveCampaign slide, showing only that

generic components are disclosed here.

And I'd like to add to that, the discussion of

the icon in the patent at column 4, lines 9 to 17, and the

discussion of the applet or mini program with instructions

at line -- column 4, lines 41 to 48.

The patentees are just saying to generically use

the generic components without describing how to combine

them, or suggesting they're used or combined in some
unconventional way, and that is not a technological
solution.

So I think the slide kind of encapsulates the
two-page disclosure. And adding even with the applet and
the icon, the patentees are just saying, use them, and that
is not a technological solution.

With that, I will turn it over to Twilio's
counsel, Mr. Hendershot.

Thank you, Your Honors.

CHIEF JUDGE STARK: Thank you.

MR. HENDERSHOT: Thank you, Your Honors. I'll
try to be equally brief.

Just a handful of points.

Pivital argued, I think, a number of times that
creating a common message with customized portions in a
single message or a single communication permits creation
and delivery of fewer messages.

Again, respectfully, that is no different than
the benefit you would get using hardcopy memorandum with
custom inserts or attachments. That is not a (no audio)
like what was recognized in the cases cited.

With respect to e-mail system capabilities
that were being characterized, you absolutely could create a
message with an encrypted attachment and have icons

1    indicating that there was an attachment on there.  That is

2    sort of a fundamental e-mail format.

3            And that is exactly what (no audio), and I

4    believe that is how counsel characterized it.  You have a

5    message with an attachment and an icon indicating there was

6    an attachment.

7            And presenting and determining if an icon has

8    been selected is one of the most conventional computer

9    activities since the advent of Windows.  All they add to

10   that is checking the list and seeing if someone is on it.

11           I don't think they have innovated or added any

12   capabilities to the messaging system with respect to claim 1

13   as they claimed it, and I certainly don't think that it's --

14   it fundamentally changes the way a computer operates or an

15   e-mail system operates.  And I have difficulty squaring that

16   argument with what they point to in their complaint which is

17   effectively a receipt.

18           With respect to the *Selective Access* cases,

19   absolutely think we're in line with that authority.  What

20   they do, their way of checking to see if someone has access

21   is having something being generically encrypted and checking

22   the list to see if they're on it.

23           I think the *Dropbox* case, which we submitted a

24   notice of supplemental authority concerning that was decided

25   in June, is instructive here.

1    If you look at the technical detail in claims 1

2    and 8 of the '505 patent in *Dropbox*, you have, I think,

3    considerably more and materially more technical detail and

4    specifics as to what is being considered beyond checking a

5    list.  And those claims in *Dropbox* were found to be

6    abstract; and for the same reason I think these should be

7    here, too.  The generic encryption and checking the list

8    additions, if you will, are wholly conventional.

9    CHIEF JUDGE STARK:  All right.  What about,

10    there was reference in the argument to *Uniloc*.  How do you

11    survive a comparison to *Uniloc*?

12    MR. HENDERSHOT:  Thank you, Your Honor.

13    I think there is a little more to *Uniloc* than

14    what was suggested.  I think *Uniloc* dealt with

15    communications of Bluetooth piconets.

16    The conventional protocol for communications in

17    those had cycles for inquiry and polling.  This established

18    a conventional protocol that was used in virtually all

19    Bluetooth piconets led to latency when you had

20    battery-operated devices entering a park mode.

21    The Court found, as you might expect, that that

22    problem arose specifically in the context of Bluetooth

23    piconets.  There wasn't a real-world analog, no one really

24    had to face this problem specifically -- the specific

25    technological problem outside of that context.

1        That is not the case here with trying to send

2   fewer messages.

3        And the Court found, and I think this is pretty

4   clear and pretty significant, that the specification in

5   *Uniloc* specifically identified this particular technological

6   problem that arose in the context of Bluetooth piconets.

7        And the Court found it described a particular

8   technological solution to it that overrode that established

9   and fundamental communications protocol with the inquiry of

10  polling cycles, and that the claim reflected that solution.

11       Counsel pointed to a data field.  But,

12  respectively, that was a data field in connection with an

13  inquiry, and those inquiry and polling words carry a lot of

14  significance in that technological space.

15       With respect to *Uniloc*, neither the problem

16  nor the solution, according to the Court, existed outside of

17  Bluetooth.  And I think that is a technological problem and

18  a particular technological solution in that Court's views

19  that I think is a far cry from the idea of having to say,

20  okay, we want to create fewer messages, or more efficiently

21  prepare messages to multiple people, and what we'll do is

22  have a common message and then we will attach something it,

23  or insert customized information.

24       That solution, if you will, is not a solution to

25  any problem particularly arising in computers; and I think

that that, frankly, is really what distinguishes it from
*Uniloc*, *Finjan*, *Bascom*, all of those cases that were cited.

CHIEF JUDGE STARK:  Okay.

MR. HENDERSHOT:  Does that answer your question?

CHIEF JUDGE STARK:  Yes, and your time is up.
So thank you very much.

I thank all the counsel in the Pivital cases;
and we'll move on now to InterDigital.

So we'll hear from the defendant first.  I
believe the defendant is Lenovo.

MR. MICALLEF:  Good morning, Your Honors.  This
is Joe Micallef for Lenovo.

Can you hear me?

CHIEF JUDGE STARK:  I can hear you just fine.
Thank you.

MR. MICALLEF:  Oh, thank you, Your Honor.  I
would like to reserve ten minutes of my time for rebuttal.

CHIEF JUDGE STARK:  Yes, we'll try to let you
know when you have around ten minutes left.

MR. MICALLEF:  Great.  Thank you.

I'd like to start, Your Honors, maybe pointing
you to slide 2, which is -- of our slides, which is a
summary slide, or perhaps we could call it an overview of
where we think the issues are or how they've sort of fallen
out after briefing.

1          First and foremost, while the parties certainly

2    disagree on whether the claims at issue here are directed

3    to abstract ideas, I don't think there is any substantial

4    disagreement as to the focus of the asserted claims.  We

5    sometimes use different words, formats, but generally

6    speaking, I think, with only a minor -- a couple of minor

7    distinctions, what these claims are all about, if that is

8    the focus of the case to say, we're pretty close in

9    agreement.

10          I think the difference in conclusion thus far

11   of the abstract idea in each one is driven by what I would

12   suggest to you is Interdigital's misunderstanding of the law

13   of step 1 in *Alice*.

14          And I'm going to go through each of these, but

15   generally speaking, I think step 1 of *Alice* is satisfied

16   only when the claims recite a non-abstract technical

17   improvement.

18          And the cases that have followed *Alice* have

19   been pretty clear that just generic results-oriented claim

20   language or claim language that recites mathematical

21   operations, that doesn't cut it for step 1 in *Alice*.  I

22   think that is the line or difference between the plaintiff

23   InterDigital and Lenovo as far as step 1.

24          As far as step 2, I think you will see that in

25   each case -- well, there are sort of two ways in which,

again, I think InterDigital is misapplying the law.

First of all, if you read that first amended complaint, all of these allegations they're pointing to are utterly conclusory. In each one, it's a quotation or a recitation of claim language and then the statement "It is not routine."

And then another claim element recited, and then, "Well, that is not routine."

This Court and the Federal Circuit and many other courts have said time and again that is not enough. That is not enough. You have to plead facts that show a substantive plausibility, and merely say pleading that "we satisfy the law" is not enough.

Secondly, again, on step 2, I think there is sort of a confusion in their analysis of step 2 of *Alice*.

Step 2 asks what is in that claim other than the abstract idea that constitutes significantly more than the abstract idea?

The abstract idea doesn't count for step 2 of *Alice*. And I think in several of these claims in their step 2 analysis, they are pointing and relying on the abstract idea.

So with that --

CHIEF JUDGE STARK: All right. Yes, before you jump in, let me ask you a few questions.

1          So, first of all, I guess, at step 1, your

2    articulation as to what step 1 law is, I want to make sure I

3    understand how you fit in particular the *Uniloc* and the *KPN*

4    decisions.

5          If I were to be persuaded by you that what you

6    just articulated is the way to look at step 1, how do you --

7    how do I also adhere to what the Federal Circuit is telling

8    me in *Uniloc* and *KPN*?

9          MR. MICALLEF:  Yes, it's a great question.

10          So in *Uniloc*, as you may recall, it's claims 2

11    to 5 that were before the Court.

12          And they, in claim 2, specifically claim an

13    additional data field in a message that permitted two

14    operations to occur basically at the same time where in

15    the prior art, there was a message, it didn't have that

16    data field, and you had to do these two operations at two

17    different times.

18          So the benefit was you could do it at the same

19    time.

20          But it wasn't the benefit that was claimed that

21    saved that claim from a 101 challenge.  It was the fact that

22    claim 2, which was the main claim at issue that the others

23    depended from claim 2, specifically claimed that additional

24    data field in the message.

25          And what is interesting about that case, Your

Honor, if you go back and read it, the District Court in

that case actually found claims 1 to 5 ineligible.  And the

patentee did not appeal the independent claim, claim 1.

I submit to you -- and we don't know, this is

speculation, I admit, but I submit to you it is because

claim 1 didn't have, didn't recite the additional data field

in that message.

And so there wasn't that specific claiming of a

non-abstract technical improvement.  That is what happened

in *Uniloc*.

And the same thing in *KPN*.  Again, in that case,

I think it was claims 2 to 4.  The relevant aspect of the

claim was a dynamic check data generator.  So it's a part of

the computer that generates check data to determine if there

is an error, potentially, in some data that is communicated.

The prior art had that, but the supposed

advance, or the advance claims recited and described in the

patent was that their check data generator was dynamic;

that it had buried how it generated the check data in time.

That was recited specifically varying that

process in time in claim 2.  So, again, it specifically

claimed a non-abstract technical improvement.

And I think in that case, also, by the way,

claim 1 was, I think it was found patent ineligible and it

didn't have that:  vary the check data generation in time.

1    So it didn't have the specifically claimed non-abstract

2    technical improvement.

3          And I think this is -- you can look at other

4    cases, too.  I know *Finjan* was mentioned a couple times in

5    the last argument.

6          I think it was exactly the same thing.  In

7    *Finjan*, it was adding a security profile to a downloadable

8    profile.  But it was specifically claimed that was the thing

9    that was a technical improvement.  It was non-abstract, and

10    it was specifically recited in the claim.

11          So that is my answer to your question.

12          CHIEF JUDGE STARK:  To some extent -- so there

13    are -- *Two-Way Media* is arguably at least supportive of a

14    different approach.  Is it fair -- I guess two questions

15    here:

16          How many decisions do you think I have to make?

17    You've put six claims of six different patents at issue in

18    your motion.  Are they really six different ones, or are

19    they largely the same question about how to approach in

20    particular the step 1 analysis?

21          And regardless of the answer to that one, for

22    some of these patents at least, is it I need to decide is

23    this really a *Two-Way Media* case or is this a *Uniloc/KPN*

24    case?

25          Is that a fair analysis?

1          MR. MICALLEF:  Yes.  So, first of all, there are

2     six patents, but there's two groups of two, right, because

3     of the same specification, and the claims are very similar.

4     And I think -- I submit, in those groups, those two raise

5     the same issue.

6          But as far as *Two-Way Media*, I'm not so sure

7     that is -- it's a totally different approach.

8          I mean, *Two-Way Media* found the claims to be

9     patent ineligible, but the reason the Court found them to

10    be ineligible there was because the supposed improvement,

11    technical improvement, was not specifically claimed in the

12    claims in a non-abstract way.

13          In that case, of course, it was a system for

14    multigathering, and a supposed improvement -- because there

15    had been multigathering before -- was the architecture of

16    the system; the various servers doing different levels of

17    functionality, et cetera.

18          And some of that was actually in the claims,

19    but the Court found, the Federal Circuit found that that

20    architecture was not specifically claimed.  And so what

21    was in the claim was really just this sort of generic

22    results-oriented language and, therefore, those claims were

23    directed to an abstract idea.

24          So I'm not so sure it's a completely different

25    -- in fact, I don't think it's a different approach.  They

came to different results, *Uniloc* and *Two-Way*, but that's
because the non-abstract technical improvement was actually
recited in a claim in *Uniloc* and it wasn't recited in the
claim in *Two-Way*.

CHIEF JUDGE STARK:  All right.  And going back
to the grouping part of the question, is it three groups or
is it now four groups?  Are these really six patents?

MR. MICALLEF:  I think it is four groups.

I think the '873 is sort of its on own.

And the '665 and '954 share a specification, the
claims are very similar.

The '726 and '449 also share a specification and
the claims are very similar.

And the '612 is, the claims -- the claim is a
little bit different there so that would be also on its own.

So four groups.

CHIEF JUDGE STARK:  All right.  And then what is
the impact of granting the motion?

Let's just say on your best day I grant the
motion in full.  Does that mean those six claims, one claim
per patent, is out of this case, or does it mean that those
six patents are out of this case?

MR. MICALLEF:  No, I think it means you have to
dismiss the six counts that relate respectively to those six
patents because each patent is in a different count.

1           And the reason for that is if the count doesn't

2    sufficiently allege a plausible case, then it should be

3    dismissed under 12(b)(6).  And in each case, they've only

4    advanced allegations relating to that single claim.

5           And so if those allegations don't cut it for

6    12(b)(6), that the allegations in that count should be

7    dismissed.

8           Now, I guess you might ask me, the next question

9    might be, well, what do we do after that?

10           CHIEF JUDGE STARK:  I was getting there, sure.

11    I mean, they would presumably want to amend.  They, I don't

12    think, have ever said that they are never going to assert

13    any of the other claims against your client.

14           MR. MICALLEF:  Yes.

15           CHIEF JUDGE STARK:  So why wouldn't they be

16    right about that, that they at least get a shot?

17           MR. MICALLEF:  Sure.  A couple of points on

18    that.

19           I think it would be futile, and here is why.

20           Just to review the bidding here, they filed this

21    complaint I think, in August 2019; and we filed a motion to

22    dismiss that was basically asserted, basically the same

23    issues that you have before you today.

24           They filed the first amended complaint.  They

25    didn't add any additional claims.  They added some

1    allegations of fact this sort of bald, conclusory

2    allegations, but they didn't add any claim.

3            So the first point, and I guess several more,

4    the first point is from that, I think you can assume that

5    if they had a good faith basis to assert other claims, other

6    claims that raise different eligibility issues, not only

7    they would have done it, but they should have done it

8    because they were on notice that we were looking at the

9    eligibility of their claims and we were going to attack

10   that.

11           But more than that, Your Honor, this is a

12   standards case.  And they're asserting these claims against

13   technical standards and cellular standards.  So they have

14   all the information they need to make a determination

15   about whether they can allege with a good-faith basis a

16   standards-based infringement theory.  And they had it before

17   they filed the original complaint, and they had it when they

18   served their -- or filed the first amended complaint.  And

19   nothing has changed in those standards.

20           So, again, you can assume that they could have

21   put other claims in the patent, and they should have.  And

22   so I think it's futile.

23           And when we think about it, if it is one of my

24   best days, and you agree with me on all these things, where

25   do we go if you do also give them permission to amend?

1           Well, I submit, you know, unless they are

2   sitting on a claim that raises different eligibility, it

3   seems very unlikely to distinguish a situation.  We're going

4   to be right back in one of these 101 days and it's going to

5   be a situation where your prior decision is going to be law

6   of the case.  That just seems terribly wasteful.

7           So I guess I would end with this.  If that is

8   the way it goes and you're inclined to let them amend, what

9   I would ask is you make them file a motion to get permission

10  to amend under Rule 15 and have them attach the second

11  amended complaint so we can make a determination or you can

12  make a determination whether any different eligibility

13  issues are raised by the plaintiffs.  And one of the reasons

14  I do that, I've ask that is I've looked at these claims a

15  lot and I don't see any -- to tell you my opinion, I don't

16  see anything.

17          These claims have been sort of classic claim

18  prosecution where one independent claim is to a user

19  equipment for performing Functions A, B and C, and then

20  there's another independent claim that is a method of

21  operating user equipment for proposed Functions A, B and C.

22  There are not going to be any different eligibility issues

23  on those kinds of claims.

24          CHIEF JUDGE STARK:  Okay.

25          MR. MICALLEF:  So that's my position.

1          CHIEF JUDGE STARK:  And I want to get you back

2    to the more substantive 101 question, but just to confirm

3    all of this.  I don't have the briefing in front of me of

4    which I can make a finding that the claims you put at issue

5    are representative of all the other claims, and therefore

6    even on your best day I think you are not asking me to issue

7    a decision that all of the claims of all of these six

8    patents are patent ineligible.  You're just saying amendment

9    would be futile, and maybe from a case management

10   perspective it's too late to let them amend, but my decision

11   on the merits wouldn't extend beyond just the six claims

12   that you've put at issue.

13          Do you agree with all of that?

14          MR. MICALLEF:  Well, if you dismiss with

15   prejudice a count, I'm not so sure that last part is

16   correct.  It would be just dismissing that count and that

17   claim.  But its effect, I have to say I don't know for sure

18   what the whether res judicata effect would be down the road

19   of that action.

20          CHIEF JUDGE STARK:  Okay.  All right.  That's

21   fine.  I will let you proceed.

22          MR. MICALLEF:  Okay.  And I'm just going to walk

23   through these, Your Honor, unless you want me to do it some

24   other way.  I was going to walk through them in the order

25   that they were briefed.

1           CHIEF JUDGE STARK:  That's fine.

2           MS. MURRAY:  Okay.  So let's start with the

3   '873 patent, and if I could direct you to slide 5 of our

4   slides.

5           The only claim mentioned in this particular

6   count is claim 6 and we have it up there on the slide.  It's

7   directed to what they call a WTRU wireless transmit/receive

8   unit, which is sort of charging for a mobile phone or some

9   kind of subscriber unit.  That is on the one claim element.

10  Circuitry configured to trigger transmission of scheduling

11  information from that phone to the base station in response

12  to that phone having a non-zero grant smaller than needed,

13  preventing the transmission of certain data.

14          So scheduling information, transmission of

15  scheduling information is a way, I don't think anybody

16  disagrees with this, it's a way for the phone to request

17  some uplink bandwidth, to sort of tell the base station I

18  have data I need to send, give them permission to do that.

19          So if you go to the next slide, slide 6, we

20  proposed that this claim is directed to the abstract idea of

21  requesting additional bandwidth when the previously

22  allocated bandwidth is insufficient.

23          Now, their characterization, which is also on

24  this slide, which is page 4 of their opposition, gives

25  it somewhat different wording, but I submit to you it's

the same idea.  They argue that the inventor proposed

changing the phone, the cellular handset to trigger the

transmission of scheduling information.  That is a request

for additional bandwidth and that's done when the phone has

non-zero grant smaller than needed.  Well, that's when the

previously allocated bandwidth, the grant is non-zero, is

insufficient.

So I submit to you, either way, this is -- these

are the same ideas.  Ours is sort of, and I have sort of

filtered out all of the technical jargon, which I guess the

Federal Circuit in the recent *Ericsson* opinion seemed to

shine some light on that.  That's exactly what they did in

that case.

So why is that abstract?  Well, first of all,

it's a very broad general concept requesting additional

bandwidth when what you have is insufficient, and it's

analogous to, well, real world, the same concept used in

very familiar context in the real world.

I think in the brief we pointed out, if you have

a letter to send, your envelope is not big enough, what do

you do?  You ask for a bigger one.  That's a real world

concept that employs the exact same concept, and I think

that's powerful evidence that this is an abstract idea.

In addition, this doesn't really alter the way

the prior art phone worked.  If you look at slide -- for

basically two reasons.  If you look at slide 7 -- I'm sorry,
slide 8.  What I have on slide 8 is a passage from the
background of the '873 patent, and you can see in this
portion of the background, the patent basically says that in
the prior art, the phone could get blocked or interrupted
when its power grant, power issue grant falls under the
minimum required transmitted data.

So that power issue is the allocation of
resources.  And so in that case, you can see in the
highlighted second paragraph there, when that situation
occurs, the phone cannot transmit until the time it is
scheduled to transmit a scheduling information.  So what
this is saying is in the prior art, this exact situation
occurred.  There could be a situation where the phone had
data, they had grant of uplink resources, but it wasn't
sufficient to send all of that data, so it had to request
more.

The difference is that this said you have to --
the problem is that the phone had to wait until some later
time to make the request for additional uplink resources.
So that's how prior art phones work.  Interestingly, if you
go back and look at claim 6 of the '873 patent, it doesn't
say anything about when you ask for more uplink resources.
It just says, you know, you trigger the request for
additional information when you don't have enough.

1          So this claim by its very terms doesn't alter

2     the way the prior art phones worked, at least when you take

3     into consideration the background of the invention disclosed

4     in the '873 patent itself.  So we submit this is directed to

5     an abstract idea.

6          Moving to step 2, if you could go to I guess

7     slide 9, they essentially say that the triggering phrase

8     of this claim is the non-routine claim element that adds

9     significantly more to the abstract idea, but as we pointed

10    out in our slide brief, that is the abstract idea.  So this

11    is a classic example of the patentee saying, well, I'm going

12    to go to step 2 and I'm going to say that significantly more

13    is the abstract idea, which, of course, *Alice* says you have

14    to look at what else is in the claim, find something else in

15    the claim that adds significantly more.

16          They also, just for completeness, on slide 10,

17    they do have a paragraph in the first amended complaint,

18    first amended complaint where they recite some of the jargon

19    from this claim, the 3GPP WTRU MAC-d flows.  And they say

20    the functional aspects and design of these components were

21    unique and therefore not routine.

22          But I just point out that claim 6 doesn't recite

23    any of the functional aspects and design of those

24    components.  Those words were in the claim, but nothing

25    about them is, so that can't be the something else in the

1    claim that adds significantly more as required by step 2 of

2    *Alice*.

3             JUDGE HALL:  Counsel, this is Judge Hall.

4             So you talked about *Uniloc* more generally before

5    and I just want to compare the claim at issue in *Uniloc* more

6    specifically with the claim here.  Right?

7             So *Uniloc*, you can say that the specific

8    technological suite that they're adding is this idea that

9    they're just going to add data field for tolling.  And so

10   under your argument, I mean, *Uniloc*, it seems to me, would

11   be invalid.  That the idea is tolling at the same time you

12   set up that an inquiry, that is the idea, and then that is

13   always going to fail under step 2 because all this claim is

14   the idea.

15            So tell me why the *Uniloc*, just adding that

16   appeal is not abstract, yet here adding circuitry configured

17   to trigger transmission of certain type of information,

18   which sounds a lot to me like adding some type of a data

19   field and transmitting it is not abstract.

20            MR. MICALLEF:  No.  I think there's a big

21   distinction.  In *Uniloc*, the claim, claim 2 actually said

22   for adding to each inquiry message prior to transmission an

23   additional data field for polling, at least one secondary

24   station, that is a specifically claimed alteration of prior

25   art primary station that apparently provided a technological

1   improvement.  What's in this claim is circuitry configured

2   to do something.  It doesn't say and with a data field, I

3   will let you do that.  So in your hypothetical, that data

4   field that you can assume you might use to do that is not

5   recited in the claim and that's a distinction.

6               This claim language --

7               CHIEF JUDGE STARK:  And --

8               MR. MICALLEF:  I'm sorry.  Go ahead.

9               CHIEF JUDGE STARK:  Sure.  The circuitry, and

10  going back to paragraph 48, these other components, what is

11  it that would allow us to say at this stage that none of

12  that would have been viewed as anything other than

13  conventional, well understood and routine?  This seems

14  like a selective, almost conclusory argument that you are

15  making.

16              MR. MICALLEF:  No.  My point is, Your Honor,

17  what they say is not routine.  It's not 3GPP WTRU.  They say

18  the functional aspects and design of that thing is not

19  routine, but the claim doesn't recite any of the functional

20  aspects and design of those things.  Maybe they are.  Maybe

21  they're a functional aspects of a MAC-d flow that wasn't

22  seen, but you are not going to find that in claim 6.  So you

23  don't have to -- I mean, you don't have to make that

24  decision whether a 3GPP WTRU had functional aspects of a

25  routine or not because they're not claimed.

1          Did I answer your question?

2          CHIEF JUDGE STARK:  I think so.  Yes.  You can

3   move on if you want.

4          MR. MICALLEF:  Okay.  If I can move on to the

5   '665 and '954 patents, we put the claims on slide 12 and we

6   have them here as we put them in the claim, excuse me, in

7   the brief next to each other and color coded, and I think

8   it's helpful.

9          Just a little background.  The invention

10  described in the specification here is a way to solve a

11  supposed problem in the prior art, and the problem was that

12  if a phone receives a message from the base station to which

13  it should send back an acknowledgment of some kind of

14  feedback message, in order to send that acknowledgment, it

15  has to ask for permission for uplink resources so that it

16  can send the acknowledgment, and then once it gets the

17  permission, then it will send the acknowledgment.  And this

18  specification, this is the same specification, cites it as a

19  problem because it's an additional step and weighs the

20  resources.

21         And so the solution to that, according to this

22  specification, is that you send a message down and that the

23  phone will send an acknowledgment that a predetermined time

24  interval after receiving the message.

25         And so if you look at on this slide claim 18 of

the '665, the red part, the red text is just receiving the

message, circuitry configured to receive again, for all

generic result oriented claim language.  And the blue stuff

is transmitting it back, a predetermined time interval

later, right, circuitry configured to transmit.

If you look at claim 1 of the '954, it's

essentially the same invention recited, the red is again

circuitry configured to receive, the blue is again circuitry

configured to transmit, in this case, feedback information,

but again it's after a predetermined time interval.

The green part in this claim 1 of the '954 is

simply the prior art technique.  If you read through it,

if you have a grant for uplink resources for the feedback

information, well, then, you use that, and then in the

last paragraph there in the blue, if you don't have that

uplink.

So claim 1 of the '954 basically recites an

apparatus that does it the old way and the new way, if you

will, if I can generalize.

So why is this abstract?  Again, this is result

oriented language.  Circuitry configured, you know, to

perform a result, to receive something, circuitry to

transmit something.  Very broad.  It's effectively, as we

point out in the brief and described in the specification,

it's based on a simple formula.  You transmit that

1    acknowledgment a certain number of time slots after you

2    receive the initial message.  So it's received time slot

3    plus N I think is the mathematical equation that they

4    described in the specification.

5              So we say, I think it's the next slide, slide

6    13, and we say, we proposed these claims are really directed

7    to the abstract idea of receiving a message and where no

8    time interval for response is indicated, transmitting

9    response at a predetermined time interval.  And, again, as

10   you can see on this slide in their opposition, they really

11   seem to characterize the focus of this claim in the same

12   way.  They are talking about what the inventor proposed.

13   They say the CDMA described the unit perceives a message

14   from the base station, and automatically, i.e., without

15   receiving an allocation, sends an acknowledgment that it has

16   in the second time interval positioned the predetermined

17   time period away.  So, again, it's a different word form,

18   but it's directed to the same focus.  I think we agree on

19   what the focus of these claims are.

20             And so, again, why is it abstract?  As I said,

21   it's result oriented claim language.  It's basically putting

22   into effect a formula, received time slot plus N, and it's

23   not really altering, or it's not altering how the prior art

24   phone worked.  All this is is using the phone, which is sort

25   of a computer, as a tool to carry out this abstract idea.

1    It's saying the acknowledgment was in the prior art too on a

2    particular channel.  It's here.  It's just using the

3    computer to calculate when or to choose when, so it's using

4    the computer as a tool.

5            So moving to step 2, I think slide 15.  Again,

6    the allegations in the first amended complaint are arguing

7    that this particular abstract idea is the thing that's not

8    routine or conventional.  All right.  Sending a response at

9    a predetermined time without receiving a specific

10   allocation.

11           And as I pointed out in sort of my summary or

12   overview of my argument, under *Alice*, that doesn't count.

13   It has to be something under step 2 of the *Alice* analysis.

14   It has to be something other than the abstract idea.

15           CHIEF JUDGE STARK:  Mr. Micallef, you have

16   ten minutes left.

17           MR. MICALLEF:  All right.  Well, then, Your

18   Honor, I think I would like to reserve the rest of my time,

19   if I may.

20           CHIEF JUDGE STARK:  All right.  Before I turn it

21   over to plaintiff, let me just try to understand a little

22   bit more about the impact of the motion.  Let's just say if

23   for any one of these patents I think you have not met your

24   burden at step 2, I think it would follow I must deny the

25   motion with respect to that patent.  In that world I think I

don't have to address step 1, but I want to know if you

disagree with that, and then I want to further know in that

instance, if I reach that conclusion, do you want me to

address step 1 or do you want me to refrain?  It seems to me

that the impact of that would be if I do address step 1 and

you prevail, well, then, you know down the road you only

have to prevail to step 2 to get rid of that claim.  On the

other hand, if you lose at step 1, then I think the 101

issue is done for this case for that patent.

So respond to all of that.  I'm looking to where

you disagree, if you do, with that framework, and also what

preference you have, if any.

MR. MICALLEF:  I think we said it generally

correct.  I think that there could be times when you may

have to decide step 1 before step 2, but I think I would

prefer if you come to the conclusion that step 2 torpedoes

my motion and you don't have to decide step 1, I think, yes,

that's in my interest, or my client's interest, I should say

so that's what I would prefer.

CHIEF JUDGE STARK:  Okay.  Thank you for that.

We'll save your time for rebuttal.

MR. MICALLEF:  Yes.

CHIEF JUDGE STARK:  And we'll turn it over to

InterDigital then.

MR. RYAN SMITH:  Good morning, Your Honor.  This

1    is Ryan Smith for InterDigital.

2                And, first of all, the challenged patents are

3    not abstract.  They are directed to approved wireless

4    signalling techniques between cellular handsets and base

5    stations.  As we heard from defendant, they say they're

6    filtering out jargon, but in truth they are filtering out

7    the claimed improvement.

8                And this is not a case where longstanding

9    business practices were implemented on general purpose

10   computers and patents, challenged patents solved technical

11   problems which arose exclusively in the context of cellular

12   transmission.  They are not performed on general purpose

13   computers at all.  We didn't hear anything from defendants

14   suggesting they were.

15               Now, *Alice*, step 1, entails looking at the

16   claims advanced over prior art to determine the claim's

17   character as a whole, and defendants' alleged abstract ideas

18   are entirely wrong.  They ignore the specific improvement,

19   filter them out, so to speak, and we, in contrast, looked at

20   the specific improvement over the prior art, and we have

21   some slides we put together today to explain that.

22               As to the analogous cases, which is also

23   important in a step 1 analysis, the cases the defendants

24   have identified as mostly analogous are not at all

25   analogous.  They've identified the *Ericsson* case, which as

1    we've heard involves controlling access to software and its

2    claim wasn't limited to any particular technical

3    application.  It could have been performed on general

4    purpose computers.

5            They've identified the *Two-Way* case, which we've

6    heard about earlier today, involving streaming of audio

7    visual content.  Again, it could have been performed on

8    general purpose computers.  It wasn't limited to a specific

9    technological area.

10           They've identified *Cybersource* as supposedly one

11   of the most analogous cases.  It involves credit card

12   transactions.

13           And they've also identified the In re Grahams

14   case in their letter brief, and that was a pre-*Alice* case

15   involving clinical aspects.  So in none of these cases they

16   have said are the most analogous or anywhere close to what

17   the InterDigital cases are.

18           I think we've talked about the *Uniloc* case

19   already today, and in our view, that is the most analogous

20   case.  The *KPN* case is also analogous.  And as suggested,

21   *Uniloc* generally, the analogous nature of the case is

22   because in that case, the idea was reducing latency by

23   adding a field to a message in the context of wireless

24   communications, and here we're talking about the same sort

25   of discrete improvement.  We are changing the specific

1    messaging in different fields.  In some cases they are

2    provided between a cellular device and the base station.

3              In our view, these claims are not abstract so

4    the Court needs to reach step 2, but if the Court does, the

5    allegations are plausible.  We didn't merely recite claim

6    language and say they were inventive.  We relied primarily

7    on statements in the prosecution history as support for

8    which elements were inventive concepts.  So rather than

9    accept the defendants' invitation to engage in technical

10   fact-finding, it could be prudent for the experts later on

11   in the case to weigh in on some of these important step 2

12   issues.

13             Now, I think we talked -- I can go in the

14   order that we discussed with the defendant starting with

15   the '873 patent first, and with respect to our slide deck,

16   on slide number 4, we have a diagram we prepared based on

17   the claim language that really gets at what the prior art

18   problem was and really what the solution offered by the

19   invention really was, and so if we can walk through slide 4

20   very quickly.

21             So here is an annotated version of Figure 1 from

22   the '873 patent, and we have some different instances in

23   time, to use an example, and the first instance, we have two

24   MAC-d flows, and these are specific types of data that is

25   being sent from the cellular device to the base station.

1    And as described in the patent background, say a device does

2    not have a grant, which is effectively permission to send a

3    cellular message to the base station, that is a trigger that

4    allows the cellular device to send a scheduling request, and

5    so in this instance, number one, there's no grant, so the

6    device goes ahead and sends a scheduling request.

7              And then in two, the scheduling request has been

8    sent and now the base station has provided a grant, which is

9    permission to send a certain amount of data.  And according

10   to this particular cellular standard to which the '873

11   patent is limited, you could only send data in the size of a

12   protocol data unit.  You can't send data that is smaller

13   than that amount.

14             So in this case, we are -- we have enough to

15   send one protocol data unit, and so the device goes ahead

16   and sends one of the MAC-d flow data elements to the base

17   station, and then at some point, and the patent describes

18   there are various reasons why this can happen, the grant can

19   be reduced or could be reduced to a lower level.  It could

20   be reduced to a level that is too small to send even a

21   single MAC-d flow.

22             So that's what we have in instance three.  The

23   grant has been -- is now smaller, too small, and there's not

24   enough grant to send the remaining MAC-d flow.

25             And so now we effectively have a Catch 22, and

1    this is in the prior art.  The grant is too small to have

2    data, but because the cellular device already has a grant,

3    it's not able to send a scheduling request.  There's no

4    triggering point to cause the scheduling request at that

5    point.

6              So then we get to the actual -- if we go to

7    slide 5, we can see where the improvement in the '873 patent

8    is, and this is shown in what we have as steps 3 and 4,

9    which are circled here.

10             So in step 3, we have now the improvement is the

11   fact that you have a non-zero grant that is too small to

12   send the MAC-d flow, that based on the invention is now a

13   trigger to send a scheduling request to the base station.

14   So that's the new -- a new trigger that was added

15   specifically to address this problem.

16             And in response, the base station can now get

17   the scheduling request and say, okay.  It needs another

18   grant here to send the data and it can effectively

19   supplement the grant, provide additional grant so that now

20   the cellular device has enough grant to send the remaining

21   MAC-d flow to the base station.  So it avoids the blockage

22   condition that is seen.

23             And I think we heard from the defendants that,

24   you know, in their view, this was performed within the prior

25   art and discussed in the patent, and this was in their slide

8.  But what's discussed there, and this is at column 2, lines 11 through 32, it's just talking about in the prior art, a scheduling request could be periodically sent over time by the cellular device to the base station, but that is different.  Sending a scheduling request periodically over time is different than triggering the scheduling request based upon insufficient grant.

So the problem the inventors were looking at was, yes, sure, you may be able to eventually resolve the blockage because eventually a scheduling request is sent, but there is a latency created by the potential of having to wait until the next time you're able to send a scheduling request.  So that was the specific problem we were talking about, this latency caused by the blockage, and that's the specific problem the inventor was trying to solve.

Now, and, again, that entire concept is missing from the defendant's alleged abstract idea.  There's simply no mention of what that is.  And so really what the patent is really directed to, the '873, is triggering a scheduling request when the transmit-and-receive unit has a non-zero grant, smaller than needed, to transmit any schedule MAC-d flow.  So it's really important the triggering request is key here and is entirely missing from what the defendants say the abstract idea is.

Now, on slide 6 of our presentation we have

1    the different inventive concepts that are alleged in the

2    complaint that we say are inventive concepts and we have

3    several.  I think the one to connote here is number one.

4    We identified the trigger transmission of scheduling

5    information response to WTR having a non-zero grant smaller

6    than needed.

7              And we heard from the defendants, well, that's

8    just a recitation of the abstract idea, but what we've seen

9    throughout the briefing is the defendants changed the

10   abstract idea.  Initially they say, well, the abstract idea

11   is something very broad for step 1, and then they come back

12   and try to narrow it down and modify it for step 2, but they

13   have to use the same idea in both, both steps.

14             So this is not what we've identified, number

15   one.  It's certainly not what the defendants are saying the

16   abstract idea is.  They filtered out all of these inventive

17   concepts, and we've looked at some other ones as well that

18   we're -- are in the complaint.

19             Now, moving onto the second group of patents

20   discussed by the defendants, the '954 and the '665 patents,

21   here again we disagree with the articulation of the abstract

22   idea.  We don't even agree that the focus is agreed upon in

23   this case either.  That's simply not correct.  We think they

24   filtered out what the true invention here is.

25             So for the '954 and '665, generally, the idea is

receiving a downlink channel, on a downlink channel and

providing feedback information.  Importantly, it is feedback

information either with the user data on the first uplink

channel when there has been an explicit allocation, or if

there isn't an explicit allocation being able to provide

uplink data, providing at a predetermined interval on a

second uplink channel.  So, importantly, there's multiple

different uplink channels here and we're talking about how

to send feedback information such as an acknowledgment

message in one of those two different channels.

And so the problem here, of this invention, and

we can go to slide 9 of our presentation, summarizes

generally what happened in the prosecution history, is, at

the time of this invention, focused on voice.  This is back

in 2000.  And they required a signed uplink and downlink

channel for the voice communication, but when you are

starting to move to data rather than voice, there's a need

to have multiple different users on the same base station,

so dedicated channels were not feasible.

So instead the idea was you could have basically

dynamic channels that were allocated as needed to different

devices, but the problem with that was there could be

latency, because every time you need to send an

acknowledgment message, the wireless device had to go

through the process of setting up a channel to send that

1    message, and so that was time-consuming.  Especially if you

2    are only sending a small acknowledgment message, you had to

3    go through a lot of steps to set it up and then tear down

4    the channel.

5         The prior art discussed briefly here at slide 9

6    is something called Jorgenson, which solved this problem by

7    at least prioritizing the different messages, so the ones

8    that were more susceptible to latency were prioritized

9    first.  So that may have made things somewhat better, but

10   still, the device had to go through the burdensome process

11   of setting up and tearing down channels.

12        So in contrast, the '954 patent improves the

13   operation of a cellular device by allowing it to send an

14   acknowledgment message without having to set up a separate

15   channel for doing so.  It would be able to do it at a

16   predetermined time, or if it still happened to already have

17   an allocated channel to send the data, it could just send it

18   with the user data.

19        And we could see that in slide 10.  We have some

20   annotated diagrams from the '954 and '665 patent, and Figure

21   2 shows specifically we're talking about a forward link

22   channel, and then there was a reverse channel going in the

23   other direction, and the message is put in a specific time

24   slot on the reverse channel.

25        And in 4 we see largely where the benefit of

1    these patents come into play.  Here is where there's

2    actually a, essentially like someone on a cellphone or a

3    tablet getting a web page.  And when you get a web page,

4    there needs to be an acknowledgment sent back to the web

5    server.

6            And so here the acknowledgment is being sent

7    from the computer through the wireless subscriber unit.

8    This is in Figure 4 of slide 10, and it's being sent without

9    any steps needed to set up a channel.  So it's avoiding a

10   large number of steps.  So it's specific improvement of, by

11   having this automatic allocation, you avoid a large number

12   of steps associated with sending the message.

13           Now, in slides 11 and 12, again, we think we

14   prevail on step 1 of *Alice*, so there is no need to go to

15   step 2, but if the Court was so inclined, we have identified

16   numerous inventive concepts alleged in the complaint with

17   specificity based in part on the prosecution history

18   statements, including in slide 11, the '954, the feedback

19   information transmitted with user data on the first uplink

20   channel, and I think contrary to what the defendants said,

21   we contend that was not something that was routine or

22   ordinary in the prior art.  Rather, feedback information

23   was kept separate from user data and put on different

24   channels, and this effective one is the concept of having a

25   predetermined time period away from the time interval on the

1    downlink channel.  That was also not present in prior art.

2    It was a different way of sending the data with different

3    types of messages.

4              On slide 12 we have similar inventive concepts

5    for the '665 patent.  However, it bears mentioning that the

6    '665 patent is specifically limited to a type of subscriber

7    unit, a code division multiple access subscriber unit.

8              And the claim goes on to, and you can see this

9    at the very end of claim 18, that this is a CDMA subscriber

10   unit that also utilizes different divisions in time, so it's

11   effectively a hybrid between CDMA, which is code division,

12   multiple access, and then has aspects of time division as

13   well.

14             And so using a CDMA device with time division in

15   our complaint, we say that was not routine and conventional,

16   and there's nothing -- at this point, again, we are at the

17   motion-to-dismiss stage.  An expert cannot weigh in on any

18   of these issues at this point.

19             Now, unless Your Honor has any other questions

20   on these patent issues, I can move to the next patent

21   family.

22             CHIEF JUDGE STARK:  That's fine.

23             MR. RYAN SMITH:  And so the third patent family,

24   I think as set forth in the briefing, there are three

25   patents in total -- the '726, '449 and '612 patents.  Two of

those patents, the '726 and '449, were treated collectively.

I can walk through those and the way they were briefed.

So for the '726 and '449 patents, the defendants say the abstract idea is transmitting channel quality information is a quality indicator for a first channel and quality difference information for other channels, and that articulation is simply wrong. The focus of the invention is to measure downlink resources within a channel, generate a first channel quality indication based on measurements of those downlink resources, generate the difference indicators, and send a channel quality report, which is a message that includes the channel quality indication and the difference indication. So it's not about sending channel quality for two different channels. It's about sending channel quality for a channel and the constituent components within that channel to create, to provide higher levels of granularity of information to the base station.

And so what is the benefit here? Well, it's provide more granularity, but at the same time not sending too much overhead data, because if you send more overhead data, that can ultimately slow down the system.

So if we go to slide 15 of our presentation, again, in the complaint, we specifically focus on the improvement over the known prior art and the prosecution history. At the end of the prosecution history of the '726,

the Lundby prior art reference came into focus, and the

difference here was what Lundby did is it measured channel

quality, but only with respect to what is called a pilot

signal, a pilot channel, and so as indicated here in slide

15, that it was measured in one downlink resource in

multiple instances at the time.

And so we can -- we've illustrated that here in

slide 16, and so what we have here is what's shown as a

channel, and then we have divisions within that single

channel.  And in Lundby, for example, one of those

subdivisions, called a downlink resource, could be a pilot

channel, and so what Lundby would do is to assess channel

quality, it would measure the interference or signal

strength in the pilot signal over time and send that channel

quality information to the base station.

Now, we can contrast that with, if we go to

slide 17, the '726 and '449 patents.  Here you have another

channel, the same channel, but instead of using a pilot

signal, the '726 and '449 patents measure the downlink,

measure the channel quality for each of the downlink

resources, and that's shown here as TQ0, TQ1, et cetera.

So now we're giving additional channel quality

measurements, so we have additional granularity on the

different portions of the channel, and this is shown as

being performed.  We have here as an excerpt of Figure 2 of

the '726 patent, and I put the markings to indicate the

portions of that which would be inside the cellular device,

the portions of that hardware which could be performing the

measurements.

And if you go to slide 18, after you make these

measurements, then you have to create the channel quality

reports as claimed.  And so the channel quality, the first

channel quality indication is really based on the downlink

resources, and an example embodiment is to use a mean or

average.  So you could imagine adding up the channel quality

measurement.

In this case, in this example there were five

of them.  You add them up and divided by five is now the

average, and then to create the differences, you take the

channel quality and subtract the channel quality for

individual downlink resources.  And since there is

correlation between the average and a constituent component

of that average, that the idea is, and this is discussed as

one of the benefits is, the difference indicators are going

to be smaller in size than the channel quality indication in

terms of numbers of bits.

And you can see here in Figure 2, there's a

specific -- the channel quality device, which is claimed as,

and this is the device within the overall cellular hardware,

which would be performing these determinations.

1            And so contrary to defendant's assertion, we're

2    not measuring one channel and then another.  We're measuring

3    downlink resources coming up with the average and it's all

4    based on this channel.

5            And then if we go to slide 19, we have here,

6    this is the claimed report that would ultimately be sent

7    from the wireless device to the base station.

8            And here, the idea is you've now created a

9    report that provides granular information about each of the

10   downlink resources, an advantage over the prior art Lundby

11   system, and at the same time, the inventors contemplated

12   that we can't send too much data because that would

13   ultimately slow down the system.  So we have come up with

14   these different syndicators to provide this very compact

15   report.

16           So this is very much like the *Uniloc* case

17   where -- in many ways, our patent is much more specific

18   because in *Uniloc,* they add a field to a message,

19   pre-existing message.

20           Here, that created a new sort of channel-quality

21   message that has new data fields that provide additional

22   information to the base station.

23           And the base station can use this

24   channel-quality information to make better decisions about

25   how to modulate the data and what rates to use when it's

1    sending data to a wireless device.

2              And, again if we go to slide 20 of our

3    presentation, again, we don't believe we need to get to

4    step 2 because these are not abstract ideas.  But if we

5    do, we have identified several inventive concepts in the

6    complaint that we've summarized here at slide 20, including

7    enough to take, in Example No. 1, plurality of measurements

8    of downlink resources.

9              That was indicated in the prosecution history as

10   that was lacking from prior art.  The prior art looked at

11   one pilot, whereas the invention here looks at the plurality

12   of downlink resources to provide more granularity.

13             I think in the briefing the defendants had

14   mentioned, well, the patent specification says that you

15   could measure channel quality for multiple users.  And then,

16   again, with their theme of filtering out language, they say,

17   well, multiple users and multiple downlink resources, it's a

18   distinction without a difference.

19             But, in fact, it is a very important difference

20   because Lundy was exactly the sort of system that was

21   described in the patent as the prior art.  It was, there

22   could be multiple users and all these users are measuring

23   the pilot channel.  It's the same pilot channel everyone is

24   measuring and sending back channel quality.

25             But what they're not doing is measuring a

plurality of downlink resources and going to the multiple

steps as claimed to come up with a channel-quality report

with granular information to provide to the base station.

That's missing.

Now, on slide 21, we have, with respect to the

'449 patent, a similar summarization of the inventive

concepts.  And one thing to note for the '449 patent is it's

very specific about not just channel-quality information

being provided to the base station, but it indicates that

the indication of channel quality is used to indicate a

modulation encoding set to the base station.

So the idea is, it's not merely reporting, for

example, let's say, that the path lots or interference

levels but rather it's providing a recommendation to the

base station of, here are the modulation encoding set that

you may want to consider using if you want to give me the

optimal downlink.  So it's very specific about that sort of

data.

And that, again, was missing from the prior art.

Now, I can turn now to the '612 patent unless

there are any other questions here.

CHIEF JUDGE STARK:  Yes.  Move briefly on to the

'612, and then I will ask you a few questions.

MR. RYAN SMITH:  Okay.  Yes, Your Honor.

So the alleged abstract idea for the '612 was

transmitting quality measurements in a rotating pattern.

We believe that is wrong.  The key concept is really deriving channel quality for each of the downlink resources.

Again, this is the same specification as the '726 and '449, and these channel-quality measurements are transmitted in a rotating pattern.

And, importantly, you don't transmit a channel quality in each interval of frame.

And this gets back to the idea that the patents are providing more granular channel-quality information but also balancing against providing too much overhead data. And so this is a different embodiment.

And they say, with this embodiment on slide 23, we see how the channel quality is measured for different downlink resources in a pattern.  Here in slide 23, the pattern is odd/even.  But just as an example, so you measure 1 and 3, and then you measure 0, 2, and 4.  And, again, these are done by, for example, claim 12 of the '612 patent, is claiming channel quality determination device.  That is shown here on the slide as an example.

And then 24, we have a similar.  Ultimately, a message is being sent to the base station.  But here, the difference is channel-quality information could be -- it's specifically, and this is required by the claim, it is

included within intervals, and the claim is clear that

intervals are portions of frames.  We have frames and then

intervals within frames, and then the claim requires if you

don't send channel-quality information at each interval.

So here, in this example, we're sending channel

quality in a pattern.  This is the odd/even pattern, 1, 3,

but then we're just intermittently skipping some of the

intervals to comply with the claim language.

And so you go through a frame of data that is

being sent to the base station, and then eventually at the

end, you can get to repeat the pattern.

And that shows what the idea of this patent is

really about.  It's about going through this process of

making the granular measurement and sending in this very

specific way of sending data to the base station.

CHIEF JUDGE STARK:  Yes, you have ten minutes

left.  Let me ask you some questions.  I want to start off

with step 2.

A lot of what you have alleged is that you have

said based on things you find in the prosecution history.  I

guess my question is, is that a fair way for the Court to

evaluate a 101 motion to dismiss?

Presumably everyone, every patentee can say

something about the prior art, maybe even point to something

in the prosecution history, and in an arguably conclusory

1   way say, therefore, you know, there is a fact dispute on

2   step 2, essentially.

3            So help me on that.

4            MR. RYAN SMITH:  Well, our point of going to the

5   prior art was if, for example, in -- I guess paragraph 17,

6   we talk about what happened in the examination of the '665

7   patent.  And I think the important point there was for

8   step 2, we're able to say, here was what -- here is a piece

9   of prior art.  This was perhaps representative of what was

10  known at the time, conventional.  And we have some evidence,

11  for example, the Examiner saying, this is missing.  This

12  element is missing from, for example, putting user data and

13  overhead data and sending it together, that is missing from

14  the prior art.

15           So the point here isn't a plausible, factual

16  allegation.  And so we're not just merely saying this

17  element is an inventive concept but pointing to something

18  specific in the prosecution history in saying, there is a

19  factual basis for one to conclude based on what was

20  stated about the prior art that this element may not be

21  conventional.

22           And all we're doing here is creating plausible,

23  factual allegations at this stage since we haven't had any

24  opportunity for experts or fact discovery.

25           CHIEF JUDGE STARK:  All right.  So if, for any

particular patent, I agree with you that there is at least a

plausible allegation of a factual allegation of step 2, what

do you want me to do on step 1?

It sounds like defendants would prefer in that

instance I not address step 1.

What is your view?  Do you have a preference?

MR. RYAN SMITH:  Your Honor, I think if you

were to deny the motion on step 2 grounds, I don't think we

necessarily need to get to step 1.

And so I think that it's a motion to dismiss

stage.  I think one of our key points is we're -- I think

that would decide it, but certainly I think if Your Honor --

I think there is a risk that this will cut back, then, if we

don't have a decision on step 1.

So certainly it would certainly streamline the

case, since we've gone through the process of briefing it,

to have a decision on step 1 as well.

CHIEF JUDGE STARK:  All right.  And you've

pointed out that we're dealing with wireless communications

and cellphones and not necessarily general purpose

computers.

But do you think that the case law that has

been cited that's arisen in the context of general purpose

computers is inapplicable, or is it fair for me to evaluate

these disputes through the same framework that is maybe

more well developed now with respect to general purpose

computers?

MR. RYAN SMITH: I don't think that this -- that

these patents fall within the line of cases which address

techniques applied to general purpose computers at all.

These patents, the problems only arise in the context of

cellular communications.

The defendants don't contend that we could have

done any of these with pencil and paper or even realistic

analogy that actually captures the claim language.

I think clearly the most applicable case is

something like *Uniloc* which looked at various analogous

technology, BIOS technology, and, in particular, the

messaging between a base station and a remote or mobile

device and sort of messaging. Because that is the most

applicable case. I don't think the cases involving general

purpose computers are terribly applicable this case.

CHIEF JUDGE STARK: All right. And with respect

to the scope of the pending motion and its impact on the

case, I think we heard the defendants say that if any one

particular claim for any one particular motion, if they

were to prevail, any one particular claim for any one of the

six patents that had been put at issue in the motion, then

that patent is out of this case, put aside as many possible

res judicata dispute about the claims that haven't been

1    specifically analyzed in the motion.

2              Do you at least agree that the whole patent

3    would be out if the defendant prevails on a particular

4    claim?  And if not, why not?

5              MR. RYAN SMITH:  So I don't agree that the

6    whole patent would be out of the case.  The defendants were

7    specific that their motion was only attempting to address

8    one claim of each patent.  They didn't make any attempt to

9    show representativeness.

10             In our complaint, we specifically said we expect

11   to identify additional claims.  And that's consistent with,

12   for example, the revised patent form scheduling order which

13   has a time frame for identifying asserted claims after the

14   production of technical documents.

15             So our belief is they only moved on specific

16   claims, and that even if they were to prevail, other claims

17   would still be at issue in the case.

18             JUDGE HALL:  So they made the argument that

19   this is a standards case, that you don't really need their

20   technical documents to be able to determine whether there

21   are other claims that could be asserted.

22             Do you disagree with that?

23             MR. RYAN SMITH:  Well, we would -- we do need

24   technical documents, for example, to understand their

25   compliance with the standards, for example.

1          And if I may, certainly if this were a case

2    they were stipulating we were fully compliant with various

3    standards, that would certainly expedite our ability to

4    identify claims, but there will be some amount of discovery

5    needed to make that assessment.

6          JUDGE HALL:  Well, I'm not sure I quite

7    understand that.

8          So you have alleged infringement based on a

9    plausible allegation that they comply with the standards.

10   So if the standard meets other claims, why don't you have

11   enough to plausibly allege that?

12         MR. RYAN SMITH:  Well, we might -- I think

13   it's -- Your Honor, that's a good question.  I think we

14   probably could identify or get close to identifying all

15   the asserted claims at this point in the case, but I think

16   that we understood there is no requirement to provide an

17   exhaustive list of asserted claims in a complaint.

18         The defendants have never asked for an

19   exhaustive list, and the scheduling order contemplates doing

20   so after a production of technical documents.

21         CHIEF JUDGE STARK:  All right.  One last

22   question.

23         On claim construction, is that anything I need

24   to be concerned with?  Because in your letter, I think it

25   was, you speculate that there is highly likely to be

material claim construction disputes, but nothing has been
identified by either party at this point with respect to
the issues in front of me.

What is your position on that?

MR. RYAN SMITH:  That is exactly -- Your Honor,
I think you have succinctly stated our view on it.  We do
speculate there are going to be claim construction issues.
And I think like in the prior case, you know, those may
have some and probably will have some bearing on the 101
analysis, but we have not yet ferreted out what the claim
construction positions of Lenovo might be.

And so we do speculate it will be an issue, but
we don't have a concrete claim term that we believe needs to
be construed.

CHIEF JUDGE STARK:  Okay.  Your time is up.
Thank you very much.  We'll turn it back to Lenovo.

MR. RYAN SMITH:  Thank you, Your Honor.

MS. MICALLEF:  Thank you, Your Honor.  If I
could start with this notion of what would happen if you
dismissed a count, you asked counsel for InterDigital abut
that, and I think part of my response was that if they could
have asserted the claim, you know, that raised different
eligibility issues, they would have and they should have,
and we can assume that they cannot.

Just as sort of evidence of that, you might want

to look at InterDigital slide 22 and the other slides with

regard to the '612 patent, and you might notice that all of

the analogies that counsel just gave you for '612 patent

relate to claim 1 of the '612 patent.

Claim 1 of the '612 patent is not alleged to be

infringed in the first amended complaint.  The only '612

patent claim that's alleged to be infringed is claim 12,

which is a wholly independent separate claim in the '612

patent.  So I think that just confirms that there are no new

issues lurking in the background of these patents.  These

are the eligibility issues raised and they are not going to

be able to assert any further claims.

But just sticking with claim 1, if I could

direct you back to -- I'm sorry, the '612 patent, not claim

1, but the '612 patent.

If I could direct you back to our slides, as far

as the abstract idea, and I direct you to I guess slide 28

beginning, and here we have the actual claim of the '612

patent that's asserted in claim 12.  That's very similar to

what counsel was talking about.

I want to go, and you can see, again, broad

functional language, channel quality determination device

configured to do something, a channel quality transmitter

configured to transmit something, and then the wherein

clause where you don't transmit in every time interval at a

1     frame.

2            So this is the one patent where we do have a

3     slight difference on the focus of the claim, and if you look

4     at the next slide, slide 29, we have our abstract idea,

5     which counsel has correctly recounted.  But I think that the

6     quote on the bottom of the slide, what I'd like to direct

7     your attention to, this is from page 21 of their opposition,

8     and this is where they say what the focus of the claims of

9     the '612 patent are, and they say the claims of the '612

10    patent are specifically focused on transmitting the derived

11    channel quality information for individual resources within

12    a communication channel in a time pattern.

13           So that might mean something different than what

14    my abstract idea is, but I'm happy for you to adopt that one

15    because it's broader and more abstract, and that's their

16    characterization of what these claims are focused on.  And

17    whether you adopt that or not, I think the remaining

18    arguments in the briefing, what I presented today, is the

19    same.  Once you say that is the focus of this claim and

20    then you move to stay, it's clearly result oriented

21    language.  It is formulaic because you're transmitting in

22    a timed pattern, which could be anything from, you know,

23    first slot, second slot, third slot, fourth slot, or two,

24    four, six, eight.

25           It totally --

1          JUDGE HALL:  Isn't *KPN*, isn't that exactly the

2     situation that was found to be not abstract as *KPN*, but

3     just a limitation that you can modify something in time

4     without adding specificity as to how it was modified in

5     time or any sort of requirement about how that would occur?

6          MR. RYAN SMITH:  Well, no.  *KPN* was the data

7     check generator to how it derived that check data -- excuse

8     me, change in time.  This is just transmitting the first

9     slot, transmitting in the second slot, transmitting in the

10    third slot.  It could be as simple as that.

11          And so the difference is, this is a very

12    mathematical and very generic way to transmit channel

13    quality information in any time pattern.

14          Additionally, it had a huge preemption problem

15    because it would be in any time pattern from the simplest

16    one that I've just mentioned to very, very complex patterns,

17    but it preempts any type of transmitting of the general

18    quality information in a time pattern.  In fact, I think it

19    would be hard to come up with a way to transmit channel

20    quality information that would not be a time pattern unless

21    you're only going to do it once.

22          Maybe a single transmission is not a pattern.  I

23    suppose you could do it randomly, like as in an irrational

24    number, like Pi or something, but, you know, those are not

25    realistic possibilities.  So all the realistic possibilities

1    indicate that this focus, the focus of this claim covers --

2    preempts this entire corner of this technology, and I think

3    that's more evidence that this is an abstract idea.

4         I know I don't have much time.  I would like --

5    Your Honor, you asked about the precedent on general purpose

6    computers.  I guess I need to point out, maybe it's obvious,

7    but Section 101 applies to all kinds of technologies and

8    *Alice* and the analysis of *Alice* applies to all kinds of

9    technologies.  There's no separate set of rules for cellular

10   communications or wireless communications and, of course,

11   the Ericsson case was in that area.

12        So I think is a cellular phone analogous to a

13   general purpose computer?  At this point in time, in 2020, I

14   think it is.  We've had them for a long time.  They are

15   computerized.  They have their own processors and they get

16   programmed in lots of different ways to do lots of different

17   things, just like a general purpose computer, so I think

18   that precedent is directly on point.

19        I guess the only other point -- I don't know how

20   much time I have, but the only other point I would want to

21   make is their arguments as far as step 2 were exactly what I

22   noted.  They are relying on allegations in the complaint

23   that are just quoting claim language and saying it's

24   obvious, and then they're quoting to parts of the abstract

25   idea that satisfactory step 2, and I don't think that is the

1    way *Alice* should be applied.

2            So I guess unless there are other questions for

3    me, Your Honor, I will rest.

4            CHIEF JUDGE STARK:  Yes, we have no other

5    questions for you and your time is just about up in any

6    event, so thank you for that.

7            Thank you to all the counsel who have argued to

8    this point and thank you for the patience of the Mentone and

9    Digi and Elo Touch counsel.  We're going to have you wait

10   just a little bit longer as well.

11           We're going to take a break now.  It's 12:30

12   here in Delaware.  We'll take a break until 1:30.  So if all

13   of you could a few minutes ahead of 1:30 call back into the

14   same conference call line, we'll reconvene at 1:30 and hear

15   argument in the remaining cases.  Enjoy your break and we'll

16   be back with you in a little bit.  Thanks.  Bye-bye.

17           JUDGE HALL:  Thank you.

18           (Counsel respond, "Thank you, Your Honor.")

19           (Luncheon recess taken.)

20                   -  -  -

21           (Afternoon Session, 1:30 p.m.)

22           CHIEF JUDGE STARK:  Good afternoon, everyone.

23   It's Judge Stark and Judge Hall rejoining the call after a

24   lunch break.  We'll trust that counsel for all the parties

25   are there.  Certainly, the operator indicated that quite a

1    lot of people are still with us, so we'll now turn to

2    argument in the Mentone cases and hear from defendants

3    first.

4               MR. VINCENT:  Good morning, Your Honor.  It's

5    Michael Vincent for Elo Touch Solutions.

6               Elo and Digi have decided to divide their time

7    for the opening arguments.  I will be taking a little bit of

8    a technical intro and talking about *Cephalon* and then hand

9    it off to counsel for Digi for handling the remaining

10   arguments.

11              Dealing with Elo Touch's presentation on slide

12   2, we begin with the asserted patent, and the important

13   thing to remember with the asserted patent is that it's all

14   about timing.  That is the key to understanding the patent.

15   The patent dictates when communications are simply received

16   but not how.  The question of how to actually send and

17   receive communications is something that's left to the prior

18   art.

19              In the abstract you see that the asserted patent

20   relies on the GPRS protocol to handle all of those pesky

21   details about how to actually downlink the communications,

22   and understanding this prior art GPRS system will get us

23   99 percent of the way to understanding the alleged invention

24   because there's very little daylight between them.

25              We can be certain that this GPR system is

1    something that was conventional and prior art because the

2    specification points out the standard that defines the GPRS

3    at column 1, lines 26 and 27.

4              And the final point on this slide is that the

5    asserted patents even tout as a feature that it does not

6    differentiate itself colorably from the prior art because it

7    has a "minimal effect on the existing prescript."  So this

8    is, this is an admission that the prior art GPRS system is

9    something that is largely undisturbed when practicing this

10   alleged invention.

11             On slide 3, let's start with a very quick walk

12   through the prior art.  I appreciate the Court has an

13   understanding of it through the briefing, but I think

14   walking through it briefly today will get us all on the same

15   page and help to further demystify some of the terms that

16   you see in the claims.

17             So on slide 3 of Elo's presentation, you see

18   Figure 1 here, which is the framework for understanding not

19   only the prior art, but also the alleged invention here.

20   The specification helpfully gives several definitions that

21   explain what some of these acronyms are.  For example, this

22   packet data channel, PDCH, is merely a grouping of uplink

23   and downlink time slots.  So downlink time slot zero

24   corresponds with uplink time slot zero and those together

25   form a PDCH.

1           This scheme is really positioned in time,

2    progressing horizontally, made up of different slots.

3    0.577 milliseconds in duration, eight slots numbered zero

4    through seven form a frame.  And I understand that Mentone

5    takes issue with referring to slots in defendants'

6    briefing, but the patent itself uses that word right in

7    the specification, that there are eight consecutive 0.577

8    millisecond slots that make up a frame, and that if I follow

9    the slots through the downlink and the uplink, that one can

10   understand how the prior art and accordingly the alleged

11   invention actually operate.

12           On slide 4, the concept of the uplink status

13   flag is introduced here, and this is the last feature that

14   one needs to understand to appreciate how the prior art, how

15   the alleged invention operates.  The uplink status flag,

16   while that is quite a mouthful, it really just stands for

17   the concept of a simple communication.  This communication

18   is sent from the uplink on the downlink and it's received by

19   the -- excuse me, it's received by the mobile station, and

20   so in Figure 2, you see the uplink status flag is sent at

21   time zero and then the mobile station interprets and

22   understands the transmission at time zero to allow it to

23   begin transmitting a responsive communication at

24   corresponding time zero on the uplink.  That's really all

25   there is to it.

1       I understand that these are at first glance

2  potentially confusing terms, but as you see on slide 5, the

3  Federal Circuit has repeatedly counseled that Courts should

4  not be swayed or intimidated by seemingly technical sounding

5  terms when, upon further investigation, there may not any

6  relevant technical substance behind them, and that's the

7  case that we have here.

8       The patent talks in terms of PDCHs, but reading

9  the claims in light of the specification, as the Federal

10  Circuit has instructed Courts do, it becomes quickly clear

11  that there's not much more there other than the concept of

12  communications at certain times.

13       On slide 6, the final slide for this background

14  section, we have the prior art at the top juxtaposed with

15  the claimed idea at the bottom.  You'll quickly notice they

16  are strikingly similar, and that's because the claimed idea,

17  the asserted patent does not claim a concept of the downward

18  transmission, upward transmission, USFs and PDCHs.  All of

19  those were known.

20       These are things that are not part of this

21  alleged invention here.  The only difference here is sending

22  this uplink status flag just a little later.  It's

23  performing what was well-known and conventional, but doing

24  it later, and this allowed a little extra data to be

25  sandwiched in the uplink, but the fact that this may be

allegedly different or pose some minor advantage to above and beyond the prior art isn't even at this stage. Those are perhaps questions better suited to the 102 and 103 field. But at this stage we're talking about patent eligibility, and no matter how groundbreaking it may be, it's directed to an abstract without something more, it's not patent eligible.

If the inventors want to protect their ideas, they have ample resources and trade secret law, but if you are dealing with patents here, there has to be more than just an abstract idea, and on slide 7, I think it will be clear that that is not the case here.

On slide 7, on the left side, we have identified claim 5 which all parties agree is representative. Claim 5, if you were just looking at it in a vacuum, again, it might be a little confusing, these acronyms, these packet data channels and USFs, without any -- without having walked through this technical explanation that we just did, it might seem a little opaque.

However, it's not unknown that packet data channels are just time slots, and the USF is just a commanding communication. That it can quickly be surmised that the abstract idea is nothing more than just receiving, monitoring, and transmitting communication. This is just organizing human activity which is the hallmark of an

abstract idea.

Now, you will notice that the identified claim 5 has a rather lengthy "wherein" clause at the bottom. That has a lot of words but not a lot of substance because there is not actually a separate method step in this paragraph here. This merely provides the context for which packet data channel is monitored in the monitoring step.

This is, if anything, background information that is found in the environment that the claim is operating on, but it doesn't represent any independent step that the claimed idea actually has to actually perform. And for that reason, it is safe to disregard it in formulating the abstract idea.

On slide 8, you will see Figure 7 that, again, lines up with the abstract idea quite nicely. This shows the decision tree for outlining the claimed idea here. Again, it's receiving, monitoring, and transmitting information.

And that's something that the Federal Circuit has repeatedly cautioned is not an option. It is simply an abstract idea.

On slide 9, we show a real-world application of this claimed idea. You will notice that the claimed idea of the identified claim 5 does not require any special technical implementation, it is not tied to any specific

practice.  It's something that can perform the technology,

is something that can be practiced just between two

speakers.  And that is what we've designed this to show here

on slide 9.

And so for the first step, receiving an

assignment of time slot is something that can be easily

done by a first speaker.  You can say, listen at time 0 or

time 1.

Again, at step 2, depending on whether or not

USF operation is in use, then the second person will listen

on the assigned time slot.  They can listen for

communication.  The communication could be a word.  It could

be simply saying the word "USF 0."  It doesn't have to be

fancy or magical about it.  It is just a signal that is

presented to a speaker.

And then the third step is that second person

responding at time 0 with a message as allowed by the

assignment of the uplink status log for exact communication.

Now, I expect plaintiff to take issue with this

characterization here, but I would pose the question, what

am I missing?  What is lacking in this example here that is

so fundamental to the path and that I can save it to be sure

there is no PDCH or uplink status flag.

But after having gone through that technical

background, we can readily understand that those terms do

1    nothing more than just obfuscate the abstract idea at the

2    core of this invention.

3              So I would presume to the Court that this is all

4    you really need to understand, this asserted claim 5 here.

5    There is nothing more and nothing less that could save this

6    claim.

7              And then --

8              JUDGE HALL:  Counsel --

9              MR. VINCENT:  -- my final --

10             JUDGE HALL:  Counsel, this is Judge Hall.

11             Can I take this beautiful diagram that you have

12   here on slide 9 and take out the passage and substitute it

13   in with the text from the words from the patent that was at

14   issue in *Uniloc*?  Because it looks like the same thing.

15             You have a primary station, and then it's

16   talking to some other station.  And then it's asking, hey,

17   are you there?  And it's assigning.  Well, it doesn't even

18   have to respond in *Uniloc*.  It's just ask if it's there.

19   And that was found to be not an abstract idea.

20             So what is the difference between this claim and

21   the claim at issue in *Uniloc*?

22             MR. VINCENT:  The difference here is that, as

23   previous counsel has talked about, is the additional data

24   field.  That is the key saving grace to *Uniloc* here.  That

25   is a fundamentally different structure from the prior art

1  that allows the *Uniloc* claim to perform something that the

2  prior art could not.

3        *Uniloc* is actually a very good case for

4  defendants here because in *Uniloc,* the patent described the

5  failings of the prior art in not allowing a primary station

6  to simultaneously poll inquiry messages.  It couldn't do two

7  things at once.

8        That's, in essence, the issue we have with the

9  prior art here, the asserted patent.  It can't simultaneously

10  handle a downlink and an uplink at the same time.  There has

11  to be a transition period when the transmitter changes from

12  transmitting to receiving.

13        In *Uniloc*, that was changed, and that was solved

14  by adding this new structure, this new data field.

15        In the asserted patent here, there is no

16  structure, there is no change.  It is just using the same

17  method but doing it a little later.

18        And I would note if you would look at slide 6,

19  the asserted patents and the claimed idea still doesn't

20  solve that problem.  The problem in *Uniloc* was solved where

21  you could do parallel transmission.  The problem of not

22  being able to do parallel transmission was still not solved

23  with the claimed idea in the asserted '403 patent in this

24  case.

25        You will see on Figure 4, item C points to the

1  gap in between the five uplink transmissions and then this

2  second USF.  That is still necessary because this technology

3  is still not unable to do a simultaneous transmission with

4  the asserted image in here.

5          CHIEF JUDGE STARK:  Counsel, let me pick up on

6  that.

7          I think you have already allowed that that gap

8  may be smaller; that is, there may be less of a delay when

9  you practice the patents with shifted flag than in the prior

10 art.

11         So if that is the case, why isn't -- I don't

12 think the law, but help me if I'm wrong, is that you have

13 to define the problem in such a way that only a complete

14 solution could possibly be inventive; right?  If there is

15 an improvement here, why don't we just say the technical

16 problem was a long delay and the technical solution is a

17 short delay?

18         MR. VINCENT:  Point well taken.

19         The solution is not a total solution.  It may

20 be an alleged improvement.  But as I discussed a little

21 earlier, just the fact that the patent may claim an

22 improvement does not mean that that alleged improvement is

23 patent-eligible.  It still can be an improvement that only

24 exists in the abstraction.  But at this 101 stage, we need

25 to look at whether there is more than just an abstract idea.

1    You can have abstract ideas that improve upon the prior art,

2    but there needs to be more to issue a patent than just an

3    improving abstract idea.

4              CHIEF JUDGE STARK:  All right.  So I'm sure it

5    is that your view there is some claim constructions proposed

6    in the 101 letter.  Do they make a difference, and should I

7    just assume that those are the correct instructions for

8    purposes of the motion?

9              MR. VINCENT:  Let me back up half a step.

10             I did see that plaintiff added claim

11   construction arguments in its letter brief, but I would

12   submit to the Court that there really isn't a genuine claim

13   construction dispute here because if there were, plaintiff

14   would have raised it in its response.

15             Plaintiff did allege that new arguments were

16   raised in reply, but that simply isn't the case under --

17   after reading the briefing because we made these timing

18   arguments in the opening as well.

19             But more directly to answer your question, we

20   don't think there is a claim construction issue here.  After

21   having read the specification that outlines in black and

22   white what these terms mean, there really is no space for a

23   genuine dispute here.

24             The specification tells us in black and white

25   what these terms mean, and so we don't believe that the

1  exercise of having a separate claim construction inquiry

2  would be necessary or helpful.

3          All of that said, for the purposes of this

4  motion, we still -- if the Court desires to go with

5  plaintiffs' belated proposed claim construction, defendants

6  still win.  We don't believe they're very good

7  constructions, they're not very helpful, but it still can't

8  get away from the essence of what these claims are directed

9  to timeliness and nothing else.

10          CHIEF JUDGE STARK:  All right.  And then you're

11  covering step 1.  I think one of the issues that comes up

12  at step 1 is we're going to hear from plaintiff that these

13  claims really are directed to a technical improvement or

14  technical solution to a technical problem and not an

15  abstract idea; and that at minimum, there is a question or a

16  dispute about that.

17          I think they may suggest that that itself is

18  disputed, whether these claims fall under that line of cases

19  and it would be premature for me to resolve that dispute in

20  your favor at this stage.

21          Can you respond to that?

22          MR. VINCENT:  Certainly, Your Honor.

23          Again, I believe that is a belated argument that

24  is only prompted by the letter briefing.  But even if that

25  were credited, I don't see how there can be any dispute on

1   that point.

2           The only thing possibly technical about this is

3   that there are technical terms that have filled around.  But

4   having gone through the exercise of seeing what these terms

5   actually mean, it becomes clear that this is something that

6   humans can perform themselves, and this is not a purely

7   technical problem here.

8           And so I would submit that there is not a

9   genuine dispute on that fact, and that the plaintiff's

10  argument really shouldn't be credited on that point.

11          CHIEF JUDGE STARK:  When you say humans can do

12  it, I think you mean something like what you showed us in

13  slide 9.  You are not suggesting that the human mind could

14  break time frames into these small slices and perceive a

15  USF, et cetera; right?

16          MR. VINCENT:  To the contrary, I absolutely am.

17          Now, humans can speak in time frames.  Obviously,

18  we cannot operate fast enough to process at .577 millisecond

19  time frames, but the fact that computers can perform a method

20  faster than humans can doesn't mean that it is not abstract.

21          So humans can organize their communications by

22  taking pauses and dividing it up at certain times.  They can

23  interpret USFs because USFs are just a simple communication.

24  It can be a word, a password, it can be the word "USF."

25          So we do argue that humans can perform that.

1          CHIEF JUDGE STARK:  Okay.  You can continue.

2          MR. VINCENT:  Your Honor, I have eaten into

3   co-counsel's time quite heavily so I apologize for that.

4          I would note that on the final slide, slide 10,

5   provides a fairly clean comparison with previously invalid

6   claims.

7          If the Court has any time, I would urge them --

8   urge it to consider that comparison because this is the

9   issue at hand.

10          But with that, I yield the floor to counsel for

11   Digi to take up their argument.

12          CHIEF JUDGE STARK:  Okay.  Defendants have about

13   ten minutes left altogether, but go ahead.

14          MR. ALY:  Thank you.  Good afternoon, Your

15   Honors.  This is Amr Aly of Jenner & Block for Digi.

16          We do agree with what counsel for Elo has stated

17   with respect to the background technology and step 1.  I

18   will pick up with step 2, which is slide 17 on this deck.

19          And quite a bit of the discussion has already

20   been covered, but I would like to reiterate one point in

21   response to your and Judge Hall's question.

22          The alleged invention has to be significantly

23   more than the abstract idea in order to provide an inventive

24   concept.  And that is with step 2.  That is the *Bascom* case

25   at 1349.  That is 827 F.3d at 1349.

1          Another case that makes the same point that has

2    to be significantly more is *SecureMail*, 873 F.3d 905 at 911.

3          So with that, if you look at representative

4    claim -- and, again, there is no dispute that claim 5 of the

5    '413 patent is representative.  And the rest of the claims,

6    I would argue, rise or fall together.  And if you can take a

7    look at the claim; and we can even split that into two

8    sections.

9          So most of the beginning of the discussions

10   dealt with the receiving, monitoring, and transmitting

11   steps:   receiving an assignment of time slots, monitoring

12   the assigned time slots to detect a USF flag, and

13   transmitting in the appropriate time slots.

14          Our position is, under step 1, no steps are

15   clearly abstract.

16          And under *Sat*, S-a-t, 898 F.3d 1161, the

17   District Court need not consider those abstract limitations

18   in step 2.

19          So if you put those aside and focus on what is

20   remaining in the claim, as you said, Your Honor, there is

21   the shifted USF set which is the "wherein" clause at the

22   bottom of claim 5.

23          And all that does is, it shifts in time when the

24   U.S., when the USF flag is received.  So it shifts by one

25   time slot, and then depending on whether there's a shift or

1    not, then the response is either in, for example, in Figure

2    4, either in the first uplink slot or the second.

3              So all we have in the claimed invention is a

4    shifting of the USF.  That is in contrast to Uniloc, which

5    was discussed quite a bit this morning and right now as

6    well.  Uniloc, there's a data field that was added.  Here,

7    there's no addition beyond the prior art.  All there is is,

8    again, a shifting.

9              And if I can just take one step back to explain,

10   in light of InterDigital and some of the other cases

11   discussed this morning, this is under a TDMA function, so

12   TDMA, time division multiple access, and that appears in the

13   abstract of the '413 patent.

14             So of the TDMA, the communication between the

15   network and mobile devices is done on the same channel and

16   there's a division in time of that channel.

17             So here there's a frame, an eight-slot frame.

18   So from T0 to T7, a mobile device would get a time slot

19   within which it can communicate.

20             So all there is in terms of the frame, you're

21   splitting the frame into various time slots, not that there

22   is a physical, I believe in Mentone's presentation at slide

23   6, there's a discussion of every frame is divided into eight

24   physical multiplex channels.

25             The phrase multiplex channels I don't believe

1    appears anywhere in the specification.  What really happens

2    is every frame is divided into eight time slots.  So that's

3    a distinction we'd like to make.

4              So with respect to claim 5, slide 17, if you

5    strip away the receiving, monitoring and transmitting, all

6    you have left is a shifted USF, and we would argue, Your

7    Honor, that a shifted USF does not -- is not significantly

8    more than the prior art and therefore it does not provide an

9    inventive concept.

10             CHIEF JUDGE STARK:  All right.  You're going to

11   run out of time shortly.  So let me ask you there.  On what

12   basis would I find that the shifted USF is well understood,

13   conventional and routine at this stage of the proceeding?

14             MR. ALY:  Well, it's just providing a shifting.

15   Once again, if I understand your question correctly, Your

16   Honor, the USF is part of the prior art, but all the claimed

17   invention provides allegedly is if you shift the time of

18   when that USF is received, it provides, as Elo's counsel

19   indicated, it just provides more bandwidth.

20             So instead of --

21             CHIEF JUDGE STARK:  Wait.  Right.  But let's

22   just say for sake of argument that it's more reasonable

23   inference from the allegations in the complaint that that

24   has never been done before, that that was not well

25   understood, conventional and routine, and it led to an

1    improvement in the technical field.

2              Is there anything in the record that I can

3    consider that would allow me to reject such a contention at

4    this stage of the proceeding?

5              MR. ALY:  Well, the alleged problem in the prior

6    art is that there's -- it was too much turnaround time.  So

7    between the received mode and the transmit mode at the

8    mobile device, that was too much of a delay.  So the claimed

9    invention intended to resolve that issue and resolved it by

10   adding this shifted USF.

11             Our position is it did not resolve the problem

12   in the prior art.  So under the Federal Circuit law, this

13   alleged invention does not provide significantly more than

14   the abstract idea itself in order to meet the hurdle under

15   step 2 of providing an inventive concept.

16             CHIEF JUDGE STARK:  All right.  Let me ask you,

17   and I will give you a couple extra minutes for rebuttal

18   because we're basically out of time, but plaintiff also

19   suggested I should grant leave to amend.  I assume you

20   oppose that.  If so, why?

21             MR. ALY:  Sure.  So right now we are dealing

22   with a first amended complaint.  So they amended the

23   complaint once.  And we believe it is futile at this stage.

24   Even if you allow leave to amend, we will be back before

25   Your Honor dealing with the same exact issue.

1          Again, all of the claims rise or fall

2   together under this representative claim 5, and based on

3   the briefing to date, there had been no indication that the

4   steps 1 and 2 are met by this claim 5.  So again, even if

5   there is leave to amend, we believe it's futile at this

6   stage, Your Honor.

7          CHIEF JUDGE STARK:  And I take judicial notice

8   of the prosecution history here.  I think plaintiff is

9   asking us to do that.

10         Do you object?

11         MR. ALY:  We believe the reference to the

12  prosecution history is dealing with more than 102, 103

13  obvious arguments.  Your Honor, you can take judicial

14  notice.

15         CHIEF JUDGE STARK:  I can or I can't?

16         MR. ALY:  Can.

17         CHIEF JUDGE STARK:  Can.  Correct?

18         MR. ALY:  Correct.

19         CHIEF JUDGE STARK:  All right.  Thank you.

20  We'll give defendants an extra five minutes for rebuttal and

21  we'll give plaintiffs 35 minutes if they want.

22         I believe, Mr. Pazuniak, I know you've been

23  waiting all day.  Now is your turn.

24         MR. PAZUNIAK:  Thank you, Judge Stark and Judge

25  Hall.

1          And this is, in fact, the paradigm case

2     for *Alice* step 1, and defendants have pointedly failed

3     to address both in their briefs and in their slides and

4     in their presentation the most fundamental issue that

5     is the basis of the *Enfish* case and then the *KPN* case and

6     the *Uniloc* cases, and that is whether claim 5 is directed

7     to, "a specific asserted improvement in computer

8     capabilities."

9          The issue is not whether the claim actually

10    succeeded.  The question is not how important or how

11    valuable the improvement can be.  The only issue is whether

12    claim 5 is directed to computer capabilities.

13         And this actual -- this issue is actually very

14    easily resolved, and since I believe the Court already has

15    before it the Digi slides, I think I would ask the Court to

16    turn to the slide 3 of the Digi deck.  I'm sorry, slide 5 of

17    the Digi deck.

18         And it discusses the subject matter of the '413

19    patent, and bullet one reads that the patent relates to

20    methods of controlling timing and allocation of data

21    transmission and mobile station performing those methods.

22         Then there's a description of CDMA and then the

23    bullet three states, "relates to an allocation method where

24    access to the sheer channel is controlled by means of uplink

25    status flag."

1          And the simple question -- and the same point I

2     think is sort of made in Elo's slide 6, and we can maybe

3     take a look at that because counsel spent some time talking

4     about it.  And leaving to one side whether Figure 4 actually

5     fully represents claim 5 to one side, what are we looking at

6     here?

7          As counsel correctly pointed out, we're looking

8     at CDMA frames.  These are the basic fundamental units of

9     digital communication, and whether we're talking about a big

10     difference between the prior art and the claimed idea that

11     is -- maybe it's just a shifting, what we are talking about

12     is still something that is directed to the fundamental unit

13     of computer signalling, and that is a change in how the, and

14     particularly how the downlink frames designate the USFs and

15     then the resulting uplink frames and which data channels are

16     available for use in an uplink.  Allocating physical data

17     channels to a communication is about as fundamental and

18     basic to computer capabilities as one can imagine.

19          Then if we go back to the Digi slides and look

20     at slide 8, and here defendants argue that the alleged

21     invention differs from the prior art only by the simple step

22     of sifting an alert, "the USF to be sent in a different time

23     slot."

24          First of all, the word alert there is

25     troublesome because a USF is not an alert, and it's not just

1    a communication as argued by the defendant.  A USF is a

2    specific data construct.  It's a piece of data that controls

3    what uplink physical data channels will be made available to

4    a mobile station.  It is not a generic communication.

5    Rather, it is a very specific, non-abstract piece of data.

6    It is certainly -- that statement by defendant I think by

7    itself defeats, you know, their argument that this is an

8    abstract idea.

9           And then they, in point, bullet point 2 on slide

10   8, they continue:  "Since time slots are merely different

11   blocks of time, the claimed invention simply results in the

12   sending of the USF .577 milliseconds later than would

13   normally happen in the prior art systems."

14          Again, I don't want to get into whether or not

15   that is a correct statement, because I think the inventive

16   aspect here is much more than that, but assume that is still

17   correct.  It still confirms that claim 5 is directed to how

18   computers operate because it actually says when a computer

19   signals a specific -- by the shifted USF, the result is at

20   the mobile station, will utilize or will be allocated

21   different physical data channels for their communications

22   than was available in the prior art.

23               Now, defendants --

24               JUDGE HALL:  Mr. Pazuniak, this is Judge Hall.

25               Assuming we agree with you that it's a technical

1    solution to a technical problem, the Federal Circuit has

2    still made clear that the technical solutions have to be

3    specific enough in order to provide step 1, and so, for

4    example in *KPN*, they found that modifying this check data

5    device permutation in time had enough specific limitations

6    that it made it not abstract.

7            Do you understand the defendants to be arguing

8    here that what you have claimed is shifting?  And, of

9    course, you don't have to claim exactly, you know, the code

10   that accomplishes the shifting, but don't you have to

11   provide some specificity as to what the shifting is?

12   Shifting forward, shifting back?  I mean, the way you have

13   it claimed, it doesn't necessarily even capture the intended

14   improvement.

15           MR. PAZUNIAK:  Your Honor, there are a couple

16   different aspects to it, and perhaps what we can do is if I

17   can ask the Court to look at Mentone's slides and turn to

18   slide 17, because this is where I -- we have heard a lot

19   about the *Uniloc* case and slides 17 through 20 do try to

20   address the issue.

21           Because the point that has been made by the

22   defendants and actually by prior counsel in the prior

23   cases is that *Uniloc* was different because it provided an

24   additional data field.

25           Take a look at claim 5.  The first element of

1  claim 5 is receiving an assignment of at least a first PDCH,

2  active data channel, and a second PDCH.

3         And then the rest of the claim then addresses

4  what happens with that second -- how that second PDCH is

5  used.  But the key point here is that as far as the record

6  shows, there is no piece of prior art that has a second

7  assigned PDCH.  So right there, in the first limitation of

8  claim 5, you have something that is different than the prior

9  art.

10        And then we look at the basis for the *Uniloc*

11  decision.  Well, in *Uniloc* -- and I'm now on slide 18.

12        In *Uniloc*, the Court upheld that there was -- it

13  was eligible for patentability because the claimed invention

14  "was an improvement to computer functionality; namely, the

15  reduction of latency experienced by park secondary stations

16  in communication systems."

17        Well, the '413 patent, take a look at what the

18  '413 patent says.

19        It's "It is an object of this invention to

20  reduce the restrictions affecting the extended dynamic

21  allegation with minimal effect on the existing prescript."

22        So what we're talking about here is essentially

23  the same as *Uniloc*.  And that is, the invention is

24  eliminating a restriction that affected or limited extended

25  dynamic allocation of uplink physical data channels in the

1    prior art.

2                Then if we take a look at claim 19, it

3    continued.  Again, in *Uniloc*, on the left-hand side of slide

4    19, I'm not going to read it, but you have the quote from

5    *Uniloc* explaining why there was, the claims were eligible.

6                And it talked about site of the abstract and

7    the specification to demonstrate that eligibility because it

8    permitted a computer to do something that reduced data delay

9    in conventional systems.

10               Well, in this case, if you look at the '413

11   patent, the abstract and the specification, again, you have

12   a prior art problem that there was limitations on what

13   uplink data channels the mobile station could utilize.

14               And the claimed invention here resolved that

15   issue.  It provided additional choices in the allocation of

16   communication channels.  And the key point is additional

17   choices.  And that --

18               CHIEF JUDGE STARK:  Mr. Pazuniak, if that is

19   the key point, help me understand where that is in the claim

20   as opposed to the abstract or the other parts of the

21   specification.

22               MR. PAZUNIAK:  Okay.  It's -- and, again, okay.

23   So if we take a look at claim 5, so we have, as I have

24   indicated, we have the first limitation that is directed to

25   having both a first PDCH and a second PDCH.  So this is a

base station sending a message that assigns certain defined

physical data channels that the mobile station can use for

future communications in a TDMA system, then you have the

next step, which is monitoring an assigned PDCH to detect

the uplink status flag, and then transmitting on the PDCH

corresponding to the USF wherein, and then you have the

option or the choice.

And let me just stop there because counsel had

indicated that this whole wherein section of the claim can

be just totally ignored and eliminated because -- it wasn't

clear to me why, but it could be just eliminated.

Well, that is not correct.  What the system

requires -- or I'm sorry.  What claim 5 requires is that

there is a method in place by which either small (i) or a

small (ii) of the "wherein" clause is a choice.

As to -- you know, as to the decisions for which

(i) or (ii) are used, there are -- in any given system,

there will be many, many parameters that control that.  But

the issue here is not that the system here requires that a

particular choice be utilized in any particular situation

but that the system include the choice of either (i) or

(ii).  And both of them have to be available as part of the

method.

And then if you then -- so if you have now a

provision for a shifted USF, as Your Honor has indicated,

1    I'm not sure if it was Your Honor or Judge Hall that asked

2    the question, about, well, where is the prior art showing a

3    shifted USF, I don't think there is.

4            And as far as what is meant by a shifted USF?

5    Well, let's go -- again, these are now understood technical

6    terms.

7            If you go to Mentone slide 7 --

8            CHIEF JUDGE STARK:  All right.  Before we do

9    that, Mr. Pazuniak, I'm a little bit lost on the wherein

10   provision because unless I'm missing it, I don't see

11   anything in the claims that indicate when you would be at

12   little (i) versus little (ii); that is, when you would use a

13   shifted USF versus not use one.  I don't think there's even

14   anything in the specification about that.

15           And so in a 101 context, why doesn't that

16   mean really all we have is its functional claiming and an

17   abstract idea?

18           MR. PAZUNIAK:  Your Honor, the reason I wanted

19   to point to slide 7 because that is actually a section of

20   the governing technical standard, EPSI 144, et cetera.

21           This is a technical term standard.  And if you

22   look at it, it says -- the first sentence reads:  "In some

23   instances, shifted USF operation shall apply."

24           And then it says, "When a shifted USF operation

25   is used."

1            The whole point here is that there are many

2    reasons why a shifted USF may or may not be used.  The issue

3    is not -- and the claim doesn't have to say when it is used.

4    The invention here is that the claim provides deep shifted

5    USF as a functional choice that can be used and included in

6    a method.  In other words, the method has to give the system

7    a choice to using shifted USF.

8            In using the shifted --

9            CHIEF JUDGE STARK:  Is the shifted USF

10   conventional, well understood, and routine, or is it part of

11   what you say is the inventive concept here?

12           MR. PAZUNIAK:  I think it is the inventive

13   concept.

14           CHIEF JUDGE STARK:  And so tell me again what

15   this is, this SC standard as slide 7?  Is that something

16   that postdates the invention?

17           MR. PAZUNIAK:  Yes.

18           CHIEF JUDGE STARK:  So can I put any weight on

19   that?  Can I consider that in trying to understand the

20   motion to dismiss here today?

21           MR. PAZUNIAK:  I think that the -- I think so

22   because what we were looking at, a "wherein" clause that

23   discusses a shifted USF, which, again, has to be part of a

24   method in order for there to be -- you know, for there --

25   you know, for the method to fall within the scope of the

138 of 180

1    claims.

2            And so what you have is a claim that describes

3    how to shift the USF.

4            CHIEF JUDGE STARK:  Where?  "How" is an

5    important word.  Where does the claim tell the person of

6    skill in the art how?

7            MR. PAZUNIAK:  Well, the "how" is it really

8    needs to be only in the specification, not in the claims.

9    The claims do not have to -- they only provide the

10   parameters of the invention.  They are not supposed to be

11   enabling.

12           The enabling can be found in the specification,

13   and particularly at -- if you turn to slide 4 of the

14   Mentone, you have Figure 7 which was also discussed by

15   defendants' counsel.

16           But in slide 4, you have both the Figure 7 and

17   you have the description of that Figure 7 and, you know,

18   applies there.

19           So that is a description of how really that

20   "wherein" clause is invoked in a computer.  And it's a

21   very -- it's a detailed explanation; but, again, the choice

22   -- there are reasons for using a shifted USF in any

23   particular instance, and that is up to the architect of the

24   computer system, you know, when to use the shifted USF.

25           CHIEF JUDGE STARK:  All right.  Let me try.  I

understand why you interpreted my question as an enablement

one, and it may well have implications for enablement.

Obviously, I understand that is not the issue for today, but

I think there are cases, at least considering step 2, an

inventive concept and whether it is captured in the claims,

that suggest that an arguably similar analysis is ripe for

today on a 101 motion.

That is, if a person of skill in the art looking

at your patent would find no hint as to how or when or even

possibly why they should shift the USF or alternatively not

shift the USF, how can I say that what you're pointing to as

the inventive concept is actually captured in the claim?

MR. PAZUNIAK:  Okay.  Your Honor, there are a

couple steps.  One is if you look at -- and, again, this is

slide 3 of the Mentone stack, and you will see that as part

of the summary of the invention.  The inventor explains that

the prior art used a fixed one-to-one relationship between

the timing of the downlink and the uplink transmissions.

By using the shifted USF, you have basically

opened up uplink packet data options that were not available

in the prior art.

Then if -- and so if you look at claim 5,

beginning with the fact that you now have a requirement

for receiving an assignment of at least a first PDCH and a

second PDCH, which this -- you know, it's already -- okay,

this is not already a one-to-one relationship, and then you
have a requirement that the method provide for either using
the first PDCH or using the second PDCH, the provision for
shifting the USF to utilize a second PDCH is itself a novel
concept.

The novel concept here is that the mobile
station now has a greater number of uplink physical data
channels that it can use than it had the availability to use
in the prior art.

This is why, you know, I cited in slide 7 the
ETSI standard because that is how important it is.  This is
not some little, a little minor thing.  This shift at USF
operation is part of the standard because it is, in fact, an
important technical aspect of the -- it's called the
HSPA-plus standard here.  In other words, it's something if
this wherein clause is basically captured, and you can
compare the wherein clause to the technical standard.
You'll see that there's almost a direct correspondence
there.

If you have a technical standard that parrots a
wherein clause of a claim, then that should I think strongly
inform that, in fact, you have a concept here that is both
technically important, and in this case, unless defendants
can prove obviousness or, you know, anticipation, it's an
inventive concept.

1          I don't know if -- I don't know if I answered

2     Your Honor's question.

3          CHIEF JUDGE STARK:  I'm not sure either.  You

4     have about ten minuets left.

5          How would you distinguish the claims in *Two-Way*

6     *Media* from your claim 5 here?

7          MR. PAZUNIAK:  Okay.  If you take a look at our

8     slides or Mentone's slides 27 and 28, you will see that the

9     *Two-Way* -- in *Two-Way*, the claim in issue, and it's quoted

10    in slide 27, but again upon stripping all of that extra

11    verbiage, all it says is a method comprising using a

12    standard analogue-to-digital converter that exists in any

13    computer with a microphone or visual to stream content to a

14    user based on user selection monitoring reception and

15    indexing reception.

16         The *Two-Way* claims was all the content of a

17    communication and nothing relevant to how the content is

18    communicated.  In this case, the issue is how the content is

19    communicated, and that is specifically because now you have

20    additional uplink channels available to the mobile station

21    that were not available before.

22         And if you want to see what -- how the Federal

23    Circuit has viewed *Two-Way*, the *Two-Way* case, take a look at

24    slide 28 and where we -- where I quoted the analysis of

25    *Two-Way Media* in both the *Uniloc* and *KPN* cases.

1          And you will -- and, again, the Federal Circuit

2     stated that the claims were ineligible merely because they

3     recited a series of abstract steps of converting routing,

4     controlling monitoring and accumulating records in a

5     result-based functional language without describing how the

6     goal of realtime load balancing or the benefits would be

7     achieved.

8          Here, I know the defendants are arguing you just

9     strip all the verbiage and, you know, then all you have is

10     transmitting and receiving and whatever, but that's not

11     correct.  What we have is, first of all, a downlink, a

12     requirement for a downlink that has a first and second PPCH.

13     Then we have a provision that provides for shifted USF, and

14     the result of which is that there is more PPCH channels

15     available than existed in the prior art.  This is not just

16     transmitting data.  Yes, there's data that is transmitted,

17     but it's far more than transmitting data.

18          So the difference I think in a nutshell is

19     *Two-Way Media* as well as the *I.D.* case and all the other

20     cases cited by the defendants is that there was never an

21     issue as to the signalling, the computer signalling.  It was

22     always the content.  Okay.

23          You know, we add this information, or we compile

24     information in this way.  You know, the user selects this or

25     the user selects that.  It never got to the fundamental unit

1      of the signalling.  Here, the claims are directed to the

2      fundamental unit of a computer signalling system that is

3      here is how, you know, these little physical data channels,

4      which are defined by both frequency and time.

5                Here, you know, here is where the data, the

6      control data, the content data, you know, all of the data

7      that passes between two computers is put into these little

8      boxes or little, you know, PDCHs, or time slots if you want

9      to call them.  But they're still little boxes of

10     information, and the invention here provides for additional,

11     additional boxes to be available to a mobile station in an

12     uplink if it's needed.  And sometimes, you know, sometimes

13     it will be needed, sometimes it won't, but the system

14     provides for having that capability.

15               CHIEF JUDGE STARK:  I think that's where my

16     trouble is.  I can see the argument for distinction from

17     *Two-Way Media*.  The how is disclosed.  That is, I guess,

18     something about the multiple PDCHs and the shifted USF.

19     That's how we're going to start to solve this problem, but

20     the claim doesn't seem to tell us anything about, especially

21     when the shifted USF, when we're really -- how we would

22     shift it.

23               You know, it just leaves it completely agnostic,

24     and that worries me that it starts to sound like claims that

25     have been stricken for not disclosing anything other than

1    function and not disclosing the how or not capturing the

2    how.  So I think that's where my struggle is.  I don't know

3    if you have more to say on that.

4            MR. PAZUNIAK:  Yes.  Your Honor, first of all,

5    as to when to use the invention, I don't think, with all due

6    respect, I don't think that's a proper inquiry because the

7    claims don't have to tell you when the claim method is to be

8    used.  It only needs to define a novel and nonobvious

9    method, and whether it's, in fact, being used or not is a

10   question of infringement, and as to whether it -- the reason

11   for using it is actually irrelevant because intent is

12   irrelevant to the question of patent infringement.

13           The only question is, does a -- do the

14   defendants practice a method that falls within the scope of

15   the claims?  But to get to the issue of the how, well, maybe

16   I'm not making myself very well understood and I apologize.

17   But the how starts with the first element, which is

18   providing a first PPCH and a second PPCH.  Already there you

19   see a how.  That how, as far as I can tell from the record,

20   didn't exist before.

21           Then you have the fact that you would monitor

22   and transmit, but then you have the provision that the first

23   and the second PPCHs have to provide for a shifting, and

24   when you shift the USF, you, by definition, provide

25   different spectrum of PPCHs that are available to that

particular mobile user.

   I mean, now we're getting into the very, very granular details of how these frames operate.  You know, do you have -- if you look at the claim figures and look at the slides that are presented, you'll see that the downlink and the uplink, uplink frames are offset.  Well, the reason that they're offset, and everyone knows they have to be offset is because if you -- if they weren't offset, then you would have the mobile station both transmitting and receiving on the same PPCH at the same time, which is an impossibility.

   So you provide for, you know, for that shifting between downlink and the uplink PPCHs, and by shifting the USF, you now make available additional slots, time slots, slots, PPCHs, whatever you want to call it that were not available before, and that is I think the how.

   The how is providing, and it starts with the first limitation, providing the first PPCH and the second PPCH, and then utilizing the first and second PPCHs, which automatically provide for a different spectrum of uplink slots.

   CHIEF JUDGE STARK:  Okay.  Thank you, Mr. Pazuniak.  Your time with the extra five minutes is now up.

   MR. PAZUNIAK:  All right.

1    　　　　CHIEF JUDGE STARK:  Thank you.  We'll turn it

2    back to defendant.

3    　　　　MR. ALY:  Thank you, Your Honor.  Can I just

4    make a couple of points and then I will turn it to you?

5    　　　　This is Amr Aly at Jenner & Block for Digi.  If

6    I could just make a couple points, Your Honor.

7    　　　　Mr. Pazuniak early on in his presentation said

8    that he believed defendants said that the "wherein" clause

9    should be eliminated.  That's absolutely the opposite.  I

10   just want to clear the record.  That's not what we said.

11   And what Digi said is you should strip away the top half of

12   the claims, the receiving, monitoring and transmitting, and

13   then all you're left with is a "wherein" clause for purposes

14   of step 2.

15   　　　　With respect to Judge Hall's question regarding

16   specificity, we agree, there is no specificity here of

17   specific improvement, and we would even -- to the *Enfish*

18   case, and that brings up another point.  There are several

19   instances here where Mentone has brought in additional

20   argument, additional evidence very late in the game, and

21   *Enfish* is one of those cases.

22   　　　　We saw it for the first time in the deck

23   yesterday, so if you look at our slide deck, we don't have a

24   slide addressing *Enfish* because we learned of *Enfish* after

25   we submitted our deck.

1          And with respect to Judge Stark's question

2     regarding where in the claim does it explain how and

3     describing it in the specification, we believe that's

4     exactly right, and that's the *Two-Way Media* case at 1337.

5     You look to the scope of the claim to see how it

6     achieves the results, not whether it's in the specification.

7     The specification isn't enabled.  That's for another day.

8          With respect to the other cases, the *Uniloc*

9     and *KPN*, those are addressed in the Digi slide deck at slide

10    29, and, again, those are additional elements added, and

11    that is distinguishable from the Mentone patent, because

12    again, in Mentone, there is nothing more than a shifted

13    USF.

14          And with that, I will turn it over to Elo's

15    counsel.

16          CHIEF JUDGE STARK:  Yes.  Mr. Aly, either you or

17    co-counsel tell me something about the multiple PDCHs, which

18    seem to be a real focus of the argument today.

19          MR. VINCENT:  Yes, Your Honor.  Michael Vincent

20    for Elo.

21          This is news as well.  If I heard plaintiff

22    correctly, he asserted that in the prior art, only one PDCH

23    could be assigned.  I apologize because I'm having to

24    analyze it from a slide.  I do not recall this in the

25    briefing.  But in the background of the invention section,

1    at column 2, lines 4 and 5, it discloses that in the prior

2    art, multiple PDCHs could be allocated.  So I'm not sure how

3    that squares with plaintiff's argument the addition of a

4    second PDCH is somehow new.

5            I just, I don't see it from the claim language

6    of the specification.

7            And then real quick, to build off of Digi's

8    point just a minute ago, Your Honor's intuition about the

9    inventive concept needed to be in the claim itself is right

10   on point.  As Digi's counsel mentioned, that is in *Two-Way*

11   *Media*.  That is in a lot of cases.

12           In *Two-Way Media*, "The main problem that *Two-Way*

13   *Media* cannot overcome is that the claim, as opposed to

14   something purportedly described in the specification, is

15   missing on inventive concept."  874 F.3d 1338.

16           That is exactly what we have here.

17           Plaintiff went through an odyssey of trying to

18   find an inventive concept in the claim, and then he turned

19   to the specification.  And when that failed, we began

20   talking about this ETSI standard, which I have -- I do not

21   see how it relates to the patent or could be properly

22   considered at this stage.

23           So for all of those reasons, this patent is

24   ineligible.

25           CHIEF JUDGE STARK:  Okay.  Thank you, counsel.

1    Thank you all, counsel.

2              So we're going to take another recess.  We'll

3    reconvene at 4:30 today.  So just under two hours from now.

4    Everyone, or at least one attorney per party, needs to call

5    back this same number at 4:30.  I don't expect that I will

6    have any further questions, but I do hope that I will have

7    at least some decision for you.

8              So you are all free, at least as far as I'm

9    concerned, until 4:30, and we'll talk to you then.  Bye-bye.

10             (Brief recess taken.)

11             *      *      *

12             (Proceedings reconvened after recess.)

13             CHIEF JUDGE STARK:  Good afternoon, everybody.

14   It's Judge Stark, and Judge Hall.  I hope you can hear me

15   fine.

16             Let me just quickly do a rundown and make sure

17   that counsel are on the phone.

18             Who is there, please, for Pivital?

19             MR. BENNETT:  This is David Bennett on behalf of

20   Pivital IP.

21             CHIEF JUDGE STARK:  Okay.

22             MR. STAMOULIS:  Stam Stamoulis also on behalf of

23   Pivital.

24             Thank you, Your Honor.

25             CHIEF JUDGE STARK:  Okay.  And for

1    ActiveCampaign?

2              MR. CONNOLLY:  Your Honor, Arthur Connolly, Mark

3    Smith, and Stephanie Nelson.

4              CHIEF JUDGE STARK:  Okay.  And for Twilio.

5              MS. PALAPURA:  Your Honor, this is Bindu

6    Palapura, Michael Hendershot, Michael Oblon, and Jennifer

7    Hartjes.

8              CHIEF JUDGE STARK:  Okay.  SharpSpring.

9              MR. MAYO:  Your Honor, this is Andrew Mayo.  And

10   I have also Jennifer Gregor and Shane Delsman on the line.

11             CHIEF JUDGE STARK:  Okay.  Who's there for

12   InterDigital, please?

13             MR. BELGAM:  Your Honor, you have Neil Belgam,

14   Ryan Smith, Michael Levin, and David Steuer.

15             CHIEF JUDGE STARK:  Okay.  And for Lenovo?

16             MR. RODGER SMITH:  Your Honor, Rodger Smith and

17   Joe Micallef of Sidley Austin.

18             CHIEF JUDGE STARK:  All right.  And for Mentone?

19             MR. PAZUNIAK:  George Pazuniak, Your Honor.

20             CHIEF JUDGE STARK:  Okay.  For Digi?

21             MS. GAZA:  Anne Gaza, Your Honor, and Amr Aly.

22             CHIEF JUDGE STARK:  Okay.  And for Elo Touch?

23             MR. ANDERSON:  Jeremy Anderson, Ricardo Bonilla,

24   and Michael Vincent from Fish & Richardson.

25             CHIEF JUDGE STARK:  Okay, great.

1          Well, thank you.  Again, thank you for the

2    helpful arguments today.  I think we probably would all,

3    again, agree that this would be better in the courtroom, but

4    I'm happy to say that with the preparation that I and with

5    Judge Hall's great assistance was able to do, and with the

6    briefing, the letter briefs, the demonstrative slides that

7    were provided, and the fairly extensive discussions we were

8    able to have today during the argument, I am in the position

9    where I am going to be able to rule on the various motions

10   that were argued today.

11         It is going to take me a little bit of time to

12   do so.  I'm going to start with some legal standards, and

13   then I will go through the cases in the order that they were

14   argued throughout the day.

15         First, in terms of legal standards.

16         I adopt and incorporate by reference the legal

17   standards set out for Rule 12(b)(6) motions and Section 101

18   of the Patent Act in *DeStefano Patent Trust vs. LinkedIn* --

19         If everyone could put me on mute, that would be

20   helpful.  Thank you.

21         -- which was a 2018 decision from the District

22   of Delaware, affirmed by the Federal Circuit in 2019.

23         Also the legal standard of the *Berkheimer*

24   decision of the Federal Circuit in 2018.

25         Even though I'm adopting and incorporating by

reference those legal standards, I do want to touch on some

of the specific legal standards that I have applied,

particularly with respect to Section 101.

On 12(b)(6), there is really not much to be

said.  Nobody has disputed, and I have, of course, accepted

as true all well-pled factual, plausible material

allegations in the complaint.

On Section 101, the *Aatrix* decision tells us

that patent eligibility may be determined at the Rule 12

stage when there are no factual allegations that taken as

true prevent resolving the eligibility question as a matter

of law.

*Berkheimer* tells us that whether a claim recites

patent eligible subject matter is a question of law which

may contain a dispute over underlying facts.

*Alice* and *Mayo* set out the now familiar two-step

test relating to the judicially created exception to 35

U.S.C., Section 101.

The particular exception that is implicated by

all the motions today relates to abstract ideas.  The cases

specifically *Alice* and *Mayo* set out a two-step framework for

distinguishing patents that claim abstract ideas from those

that claim patent eligible applications.

At step 1, the Court must determine if the

claims are directed to an abstract idea.  In doing so, the

Court considers the claims in their entirety to ascertain whether their character as a whole is directed to excluded subject matter.  Courts must be careful not to oversimplify inventive concepts or downplay the invention's benefit.

At step 2, which the Court reaches if at step 1 it finds that claims are directed to an abstract idea, then at step 2, the Court proceeds to search the claims for an inventive concept.

A few other points, particularly about step 2, from *McRO*, we know that at step 2, the courts must look to both the claim as a whole and to individual claim elements to determine whether the claim contains a limitation or an ordered combination of limitations that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

From *Bascom*, we know that the inventive concept inquiry requires more than recognizing that each claim element by itself was known in the art.

The ordered combination of the limitations could still have recited an inventive concept and must be patent-eligible under step 2.

*Berkheimer* tells us that it is not enough just to disclose the improvement in the specification to recite an inventive concept sufficient to confer patent eligibility.  The claims must capture the alleged

1    improvement.

2            The *RecogniCorp* case tells us that to save a

3    patent at step 2, again, the inventive concept must be

4    evident in the claim.

5            *Berkheimer* says that the question of whether

6    a claim element or a combination of elements is well

7    understood, routine, and conventional to a skilled artisan

8    in the relevant field is a question of fact.  Any fact, such

9    as this one, that is pertinent to the validity conclusion

10   must be proven by clear and convincing evidence.

11           *BSG* says that a claimed invention's use of the

12   ineligible abstract idea to which it is directed under

13   step 1 cannot supply an inventive concept that renders the

14   invention significantly more than that ineligible concept

15   under step 2.  Instead, what may render the claim eligible

16   are claim limitations other than the invention's use of the

17   abstract idea to which it is directed, and that they are,

18   that is, those other limitations, are well understood,

19   routine -- are not well understood, routine or conventional.

20           In *Cellspin*, we're told that if a claim's only

21   inventive concept is the application of an abstract idea the

22   using conventional and well-understood techniques, the claim

23   has not been transformed into a patent-eligible application

24   of the abstract idea.

25           *SecureMail Solutions* tells us that in ruling

on a 12(b)(6) motion, the Court need not accept as true
allegations that contradict matters properly subject to
judicial notice or in exhibits such as the claims in the
specification.

And finally, for now, in *Aatrix*, we're told it
therefore follows that in a situation where the specification
admits that the additional claim elements were well
understood, routine, and conventional, it will be difficult,
if not impossible, for a patentee to show a genuine factual
dispute to preclude dismissal.

All right. So that's the overarching legal
standard that I have done my best to apply to the specific
motions.

Let me now turn to the specific motions in the
specific cases that were argued today.

And the first set of cases all involve the
plaintiff, Pivital IP, LLC. And those three cases, one
against ActiveCampaign, is Civil Action No. 19-2176; one
against Twilio, Civil Action 20-254; and one against
SharpSpring, Civil Action 20-255.

Each of the defendants moved to dismiss
Plaintiff Pivital's complaint on Rule 12(b)(6) on the same
grounds, the lack of patent eligibility under Section 101.

Accepting all factual allegations in the
complaint as true and drawing all reasonable inferences in

favor of Pivital, the Court will grant defendants' motion to dismiss.

The asserted patents here is U.S. Patent No. 6,636,965. The '965. The claim of the '965 patent recite a method and system for delivering a customized message that allows a user to create a single message containing a common message for general distribution, and then also contain comments that can only be received or reviewed by selective individuals.

The specification states that the invention aims to provide a new way of sending customized messages that reduce bandwidth messages and increase message sufficiency.

Plaintiff's alleged infringement of at least claims 1 and 11 against ActiveCampaign, claim 1 against Twilio, and claim 1 against SharpSpring.

No party has suggested that the Court need to analyze the patent eligibility of any claims other than claims 1 and 11.

These are the only claims that are asserted across the three cases and are the only claims that plaintiff says they would assert in any of these cases were they to go forward.

Nor has any party identified any claim construction dispute that would need to be resolved before deciding the pending motions under Section 101.

1    I will note that in its 101 letter, the

2  plaintiff made a vague allusion to claim construction.  That

3  comes too late and is too ambiguous a statement to cause me

4  to have a basis to defer ruling on the motions to dismiss.

5    Even plaintiff's letter does not identify any

6  disputed claim term or any proposed constructions so it

7  would be pure speculation to hold that I should not decide

8  the motions -- the fully briefed and fully argued motions,

9  that I should not decide them on the merits just because

10  further litigation might reveal a material claim

11  construction dispute.

12    Let me turn to the *Alice/Mayo* analysis.

13    So at step 1, I conclude that both claims 1 and

14  11 are directed to the abstract idea of encrypting a portion

15  of a common e-mail so that only a subset of recipients can

16  access the encrypted e-mail.

17    That happens to be ActiveCampaign's articulation

18  of the abstract idea.  And I am persuaded by defendants that

19  that is, in fact, what these claims are directed to.

20    One indication that the claims here are directed

21  to an abstract idea is that the claims consist of functional

22  results-oriented language.

23    For example, claim 1 recites the functional result

24  of creating, determining, encrypting, and transmitting.  But

25  neither of the challenged claims here describe how to achieve

the results of the purported invention in a non-abstract way.

Even the specification does not explain how any data is stored, encrypted, or decrypted, or point to any protocol for doing these functions.

The Federal Circuit has consistently held that functional claiming that advances the desired outcome without providing a concrete method for achieving the result is insufficient to survive a Section 101 challenge.

You can find that concept, that legal principle, for instance, in *Two-Way Media* and in the *Ameranth* decision, which was a 2016 Federal Circuit decision.

Another basis for my conclusion that the claims are directed to an abstract idea, step 1, is that I am not persuaded by plaintiff's contention that the claims relate to a technical improvement to computer functionality.

Neither the specification nor the claims describes anything more than existing encryption methods and other generic computer components.

The claims and specification describe encryption generically rather than disclosing a new method of encryption or decoding. The specification describes generic equipment such as e-mail servers, personal computers, and the Internet. Nothing in the claims describe a new method structure despite plaintiff's contentions to the contrary.

Unlike the cases plaintiff analogizes this case

to, the claims of the '965 patent do not provide for a
specific improvement in the operation of a computer.  For
instance, a new memory system, a new type of virus scan, a
new type of interface that may make a computer function more
accessible, those are the kinds of cases that plaintiff
analogizes these claims to, relying on cases like *Data
Engine*, *Core Wireless*, *Finjan* and *Visual Memory*, but those
are not persuasive analogies.

Plaintiff's alleged improvements, such as
reducing waste of processing resources, storage and
bandwidth, are not inventive here because they are generic
to any communication system that employs a filtering
feedback mechanism, whether conventional or computer
implemented.  And some of what I just read is a quote from
Judge Bryson sitting by designation here in the District of
Delaware in 2019 and in his *British Telecommunications*
decision, which was affirmed last month by the Federal
Circuit.

Yet another indication that the claims here are
directed to an abstract idea is that defendants have
articulated a fair and accurate real-world prior art analogy
that humans have long performed.  For instance, an
organization that distributes a hardcopy memorandum with
general information for a larger group accompanied by
customized information for certain recipients contained in a

sealed envelope or using redactions, those are longstanding
I think without dispute techniques that humans have followed
in the real world, the pre-computer world, and they are fair
analogies to what these claims are directed to.  There's
support for that in the patent itself in column 1, for
instance.  So bottom line, the problem and the solution of
these claims exists in a fair analogy of the real world
outside computer technology.

          If what I've already said were not enough, I
would say last and really most importantly, what persuades
me that these claims here are directed to an abstract idea
and, in fact, are not patent eligible, is that the Federal
Circuit has analyzed many similar claims and has repeatedly
found that patent claims like these, which are directed to
selective access to resources, are directed to abstract
ideas and are not patent eligible, and we know from many
cases now, including, for instance, *Enfish*, that a valid and
independently sufficient approach to resolving a 101 dispute
is to find what are the most analogous cases that have
already been decided, and to read from those analogies.

          So here, among the many analogous cases, there's
*British Telecom*, as I've already alluded to, where claims
were found to be directed to an abstract idea of
distributing information based on feedback from people
receiving that information, tailoring content to a user and

providing restricted access to resources.  Those claims were found not to survive Section 101 challenges.

Similarly, in *Ericsson*, the Federal Circuit earlier this year found invalid patent claims that were directed to an abstract idea of controlling access to or limiting permission to certain resources.

*Prism Technologies* from the Federal Circuit in 2017 found claims were directed to an abstract idea of providing restricted access to resources.

The *Umbanet* decision from the Eastern District of Texas in 2017 and affirmed by the Federal Circuit in 2018 found that claims directed to providing selective or particularized access to an e-mail were invalid under Section 101.

And yet another one just handed down a few weeks ago, the *Dropbox* decision on June 19th, 2020, from the Federal Circuit found that asserted data security claims fall squarely within the abstract category of controlling access to data.

So all of that is by way of why I found the challenged claims to fail *Alice* step 1 and alternative to *Alice* step 2, much of what I've already said also happens to address the step 2 inquiry as well, but I must, of course, determine if step 2, whether the claims are valid because they may contain an inventive concept.

1          I find that the '965 patent fails this step

2     because it does not recite any inventive concept and

3     transforms the abstract idea into patent eligible subject

4     matter.  As already discussed, the specification describes

5     generic equipment and technology.  This was well summarized

6     today in ActiveCampaign's slide 3, which showed with

7     citations to the patent that what is involved in the claims

8     here are all generic computer components whereas here

9     nothing in the claims understood in light of the

10    specification requires anything other than off-the-shelf

11    conventional generic computer hardware, there is no

12    inventive concept.

13         And that's a statement right from the *Electric*

14    *Power Group* decision of the Federal Circuit.  "Merely

15    applying the abstract ideas of standard and generic computer

16    equipment is unpatentable."  And that can be found in the *IV*

17    *vs. Symantec* decision from the Federal Circuit in 2016.

18         Here, nothing in the claims improve or change

19    the functioning of a computer.  At best, the claims here

20    describe creating and sending electronic messages,

21    encryption and decoding based on the recipient, but the

22    claims recite these steps in an abstract way without

23    specifying any improvement to computer functionality.

24    The claims do not disclose a new way to create or

25    deliver e-mail, encrypt or decrypt a portion of a message,

determine user authorization, or to use an icon or
instruction.

There's no inventive concept in the ordered
combination of the method step as the elements of claim 1
are organized in a conventional way, create a message,
encrypt a portion of a message, transmit the message and
decode the message, and claim 11 is not materially different
than that.

The plaintiff argues that there is a new method
structure that applies an inventive concept.  Structure is
not even mentioned in the claims; and I find no basis here
to plausibly find that the purported new method structure
that plaintiff argued for is anything other than
conventional, well understood and routine.

The specification does make a few references to
improving bandwidth, but the claim language itself does not
improve bandwidth.  The plaintiff has not articulated any
plausible basis to conclude that more efficient use of
bandwidth is in any way captured in the claim.  The claims
make no mention of bandwidth.  In fact, to the contrary, it
appears that the bandwidth efficiency on which plaintiff is
relying applies instead to an unclaimed embodiment, the one
disclosed in Figure 3 of the patent, in which the message
processor automatically decides if private comments should
be decrypted and sent to recipient before e-mails are

transmitted.  The claims the Court is analyzing cover a different embodiment that decrypt comments only after the e-mail is sent.

As the Federal Circuit said, for instance, in *American Axle* in 2019, we have repeatedly held that features that are not claimed are irrelevant at step 1 or step 2 of the Mayo/*Alice* analysis.

So that's all reasons that I find the defendants have met their burden at step 2.  Let me conclude by just addressing a few other additional arguments plaintiffs had made.  They made certain arguments based on the prosecution history, suggesting that the prosecution history explains the unconventional and non-generic features of the claimed invention.  In light of everything that I have said and what I have found that the claims are directed to, this contention about prosecution history is clearly unavailing.

Plaintiff has analogized the case to *Finjan* and to *Uniloc*.  I find these comparisons are not persuasive.  Unlike in *Finjan* where the claims were rooted in a technical solution to a technical problem, they are relating to virus screening.  Here in those specific improvements, the computer technology is claimed.

Also in *Finjan*, the specific steps to accomplish the results were recited in the challenged claims, but here the claims are, as I have tried to explain, directed merely

1  to result.

2          The analogy in *Uniloc* also fails.  In *Uniloc*, I

3  don't think that there was a fair, real-world analogue as

4  there is here, but more fundamentally, in *Uniloc*, we know

5  that there was a technical problem that received a technical

6  solution, and here, as I've explained, there is not.

7          And, finally, we heard a lot, particularly

8  today, about the patent may allow for fewer e-mails to be

9  sent, but we know, for instance, from the *British Telecom*

10 case that I cited earlier, that just because it may be that

11 fewer e-mails will be sent using the patent, that is not

12 necessarily, and here it's not a technical solution to a

13 technical problem.

14         So for all of those reasons, those many reasons,

15 the motion to dismiss in Pivital, in the Pivital cases are

16 granted.  I do not reach the other grounds that were cited

17 in the briefing, the non-101 grounds for possibly granting

18 the motion.  I'm granting the motion on 101 grounds.

19 Because the only asserted claims have now been found not

20 patent eligible, I will be closing these cases.  So that's

21 it on Pivital.

22         Let me turn next to InterDigital, and I have

23 less to say about InterDigital.  I will be significantly

24 quicker even though that case involved six patents, six

25 patents being challenged for alleged lack of patentability.

1              Neither party argues that any claim is

2    representative, but they agree nonetheless that I only

3    need to determine the patent eligibility of the claims

4    that are stuffed in the motion.  That is, they agree that,

5    for today's purposes at least, I only need to address one

6    claim per patent.  It's also helpful I think to group the

7    six patents into four groups, but really, I can make my

8    decision today even simpler than that.  I really think it

9    comes down largely to one decision that resolves for the

10   most part this motion with respect to all of the claims, as

11   I will explain.

12             Having done the work necessary for this

13   InterDigital case, my decision is to deny the motion to

14   dismiss with respect to all six patents.  I find that Lenovo

15   has not met its burden at either step 1 or step 2 of the

16   *Alice/Mayo* test.

17             None of the six claims have been shown to be

18   directed to an abstract idea, and even if any of the claims

19   were directed to an abstract idea, InterDigital has

20   sufficiently and plausibly alleged at least a fact dispute

21   as to whether each of the six challenged claims actually

22   claiming non-routine, nonconventional, or not well

23   understood inventive concepts.

24             Let me turn back to the one decision.  What this

25   motion has largely come down to for me is a dispute as to

whether the claims of the six patents are more analogous to those which survive Section 101 scrutiny in *Uniloc* and *KPN*, or instead are more like those claims that were deemed ineligible in, for example, *Two-Way Media*.  I have concluded that plaintiff's comparison to *Uniloc* and *KPN* is persuasive, and Lenovo's effort to distinguish those cases is not persuasive.

*Uniloc* especially involves similar technology and a similar technical solution to a technical problem. This is especially true of the asserted claim in what we've called group 1, that is the '873 patent which, like the claims upheld in *Uniloc*, is directed to reducing latency by adding a field to a message in a wireless communication.

More generally and with respect to all six of the patents at issue on this motion, the criticism by Lenovo of the six claims that they all consist only of functional results-oriented language and are insufficiently specific, that criticism of Lenovo of these six claims would, if accepted, mean, I think, that the claims upheld in *Uniloc* should have been deemed ineligible for patenting.  But they weren't deemed ineligible for patenting, so I cannot be persuaded by defendants' argument.

The bottom line is that if the claims in *Uniloc* are adequate under Section 101, and we know that they are, then the claims asserted by InterDigital are as well.

Much the same could be said for another case persuasively relied on by plaintiff; that is, the *KPN* decision.

The claims that survive the motion in *KPN* lead me to conclude that the claim challenged by Lenovo survive here.

I have considered the comparative cases that Lenovo would prefer I analogize the claims that the six patents at issue in this motion to, but I just find them not as persuasive as comparators as *Uniloc* and *KPN*.

So, specifically, I have considered the *Ericsson* decision from this year in connection with the '873 patent, *Two-Way Media*, as I have already mentioned, with respect to all the patents, but especially the group 2 '665 and '954 patents; the *Cybersource* decision, especially in connection with the '774 and '294 patent; and *In Re: Gram*, especially in connection with the '612 patent.

Again, those are not as persuasive to me as comparators as *Uniloc* and *KPN*.

The conclusions that I have reached as a general matter about why these claims are not ineligible under Section 101 are further supported by looking specifically at each of the challenged patent claims which I will do briefly.

The '873 patent aims to solve the problem of

avoiding the blockage condition described in the patent.  It

claims to solve that problem by automatically transmitting

scheduling information in response to the WTRU having a

non-zero grant smaller than needed.

This idea of triggering is not captured in

Lenovo's proposed abstract idea.  So Lenovo has not met

its burden to articulate it's an abstract idea to which the

claim is directed.

Also given the persuasive analogy to, for

example, *Uniloc*, the challenged claim is directed to a

technical solution to a technical problem and, therefore,

is not directed to any abstract idea.

Turning to group 2, the '665 and '954 patents,

Lenovo has failed to show that the claims are directed to

its proposed abstract idea, which was receiving a message

and, where no time interval for a response is indicated,

transmitting a response at a predetermined time interval.

Instead, the claims allow automatic allocation

of channel access to send acknowledgment of a received

message, which is a technical solution to a technical

problem.

That's what the claims are directed to, and,

therefore, they are not directed to an abstract idea.

Groups 3 and 4 can be considered together.

That's the '726, '449, and '612 patents.

1          Lenovo's proposed abstract idea is not correct

2   because it contends that the focus of the claims is on a

3   comparison between two channels.  But InterDigital

4   persuasively explains that the claims are instead directed

5   to an improvement with respect to one channel.

6          The claims are directed to a technical solution

7   to a technical problem, not to an abstract idea.

8          I also agree with plaintiff that these claims

9   are more specific than the claims that are upheld and

10  patent-eligible in *Uniloc*.  So it has to follow, again,

11  based on *Uniloc*, that these claims survive the pending

12  motion.

13          Even if all of what I have just said about

14  Lenovo's failing at step 1 were not correct, Lenovo would

15  nonetheless lose this motion with respect to all six claims

16  at step 2.

17          The operative first amended complaint plausibly

18  alleges that each of the six patents has an inventive

19  concept that was not routine, conventional, and well

20  understood; and it does so including, for example, by citing

21  to pertinent portion of the prosecution histories.

22          Accordingly, and for all of those reasons,

23  the Court will deny Lenovo's motion.  And I will also be

24  directing that the parties in the InterDigital case meet and

25  confer and submit a proposed scheduling order as the case is

1      going to proceed with respect to not just these six patents

2      challenged today but the other patents-in-suit.  I believe

3      there are two others that were not challenged today.

4                    Finally, let me turn to the last set of cases,

5      the Mentone cases.

6                    This was two related cases involving Mentone

7      and U.S. Patent No. 6,952,413.  The two defendants move to

8      dismiss their respective first amended complaints under

9      Rule 12(b)(6), both under Section 101 and for failure to

10     adequately plead infringement.

11                    Having considered all the pertinent law and the

12     briefing and the arguments, I have decided to grant the

13     motion on Section 101 grounds and, therefore, will not reach

14     the challenge to the adequacy of the pleading.

15                    My decision is specifically about claim 5.  All

16     parties agree that claim 5, which is the only claim

17     specifically asserted in the operative complaint, is

18     representative of the '413 patent's claim.

19                    Let me talk first briefly about claim

20     construction.

21                    Mentone has, in its 101 letter brief, proposed

22     constructions of two claim terms.  Those proposals do not in

23     any way preclude the Court from resolving the motions to

24     dismiss today.

25                    I would say contrary to Mentone's suggestion, I

don't view defendants as having created a claim construction

dispute or having attempted to rewrite the claims in their

briefing.  All the defendant did was propose an abstract

idea to which they contend claim 5 is directed, which is

part of their burden on a motion such as this one arising

under Section 101.

Moreover, the two claims that Mentone identifies

in its letter as requiring construction do not alter the

Court's analysis in any material way.  In fact, as

defendants conceded today, the Court can, for purposes of

the motion, adopt and apply Mentone's proposed construction

for the two terms as proposed in the letter brief.

And so I have done that.  And in analyzing these

claims, I have applied Mentone's proposed constructions for

PDCH and USF.

I actually think, if anything, that Mentone's

constructions of those two terms in the asserted and

challenged claim actually reinforce my finding, which I'm

going to explain, that those two claim elements were well

understood, routine, and conventional components of the

prior art systems known to persons of ordinary skill in the

art at the time of the invention and discussed in the

specification.

Before I dive into step 1 and step 2 of the

Alice/Mayo test, I wanted to explain that part of what has

driven my conclusion in the Mentone motion is that even if I were to accept the plaintiff's analogy of the claim here to *KPN*, and even if I were to say that this claim involved a technical solution to a technical problem, there is insufficient specificity of that solution captured in the claims.

That is, there is not sufficient specificity of that purported technical solution to a technical problem captured in the claim to allow the claims to survive the motion to dismiss. And I'll hope to make clear what I mean there as I go through step 1 and step 2.

But, basically, how to do the purported technical solution to the technical problem is not specified with any sufficiency in the claim here.

Let me turn to the two steps.

So at step 1, I find that the challenged claim, claim 5, is directed to the abstract idea of receiving a USF and transmitting data during the appropriate time slots. That's the articulation that Digi offered for the abstract idea.

And I am persuaded that that is what the claims are directed to, and I'm persuaded that that is an abstract idea, which we know from numerous Federal Circuit cases, such as *Electric Power*, where the Court concluded that similar data manipulation steps, like receipt, detection,

and transmission of information, are abstract.  It is plain

to me from this patent that there are only functional

limitations in claim 5:  Recognize -- I'm sorry.  Receiving,

monitoring, and transmitting communications.

The claims, it's functional language, because

the claims indicate nothing about when, how, or why one

would, for instance, and most importantly, shift the USF or

how a shifted USF would specifically improve the functioning

of a prior art system.

That is, claim 5 recites the alternative use of

normal and shifted USFs without describing any meaningful

difference between the two beyond merely shifting.  The

claim language is functional and results-oriented, which we

know, and as I have explained in connection with the earlier

case, to be fatal defect that causes the claim not to

survive step 1.

In the Court's view, claim 5 is most analogous

to claims the Federal Circuit considered in *Two-Way Media*

which were also directed to a functionally claimed patent

ineligible abstract idea.

In *Two-Way Media*, the Federal Circuit emphasized

the lack of any non-abstract language in the claim that

indicated how they improved the functioning of the system.

Here, arguably, the how of the improvement is

done by shifting the USF, but there's nothing in the claims

or even really in the specification about how and when one would shift the USF.  There's certainly nothing specifically on that in the claim.  The claims broadly claim shifting of the USF, but there's no indication that shifting the USF will always lead to a solution.  We're not even told whether the shifting, which direction the shifting has to be in or the magnitude of the shifting.  All of that is absent from the claim.

Claim 5 is in my view distinguishable from the claims in *KPN*, which were directed to an implementation of an improvement computer functionality that was specific enough to render the claims patent eligible.  Mentone called my attention to the comparison to *KPN*, but they only make a conclusory comparison to the claims in *KPN*, which has not been persuasive.  In *KPN*, there was a claimed improvement that fulfilled the solution disclosed in the specification for a specific improvement over existing methods.  Claim 5 instead does not improve any individual element of the existing system, nor does it recite any specific improvement over the existing system.  Claim 5 is also distinguishable from Uniloc, which was also relied on by plaintiff.  There is an obvious similarity between claim 5 and the patent in Uniloc, both purportedly disclosed that their solution is reducing or eliminating delay in a process, but there's an important distinction in *Uniloc*.  The claimed solution was

1    captured in the claim, but claim 5 of the '413 patent, the

2    alleged solution, is absent from the claim.

3              Having made those findings at step 1, I need to

4    turn to step 2, and I find that Mentone has not advanced any

5    meritorious inventive concept that's captured in claim 5.

6    In its briefing Mentone did not argue that there was

7    anything inventive in a normal USF, or articulate any

8    argument that there's something inventive in the ordered

9    combination of all of the claims pled.

10             The three functional limitations that I have

11   found to be the abstract idea at step 1 cannot supply the

12   inventive concept.  At step 2, there really, as I view it,

13   Mentone's argument in step 2 largely relies, at least up

14   until today it did, largely relies on the shifted USF, but

15   the shifted USF, even in combination with the abstract idea,

16   functional limitations, and anything else that Mentone says

17   is in the claims do not turn out to be in my view

18   significantly more than a claim to the abstract idea.

19             Focusing for a moment on the shifted USF, the

20   complaint does not allege that use of a shifted USF is

21   itself not well understood, routine or conventional.

22             I think at a certain point Mentone did purport

23   to raise a factual dispute as to step 2 concerning whether

24   claim 5 is directed to a specific and discrete system of

25   altering the fixed relationship in the timing of the

download allocation signalling as subsequent uplink transmission. This argument fails. This fact that Mentone suggests could not provide a possible inventive concept here because it's just an abstract description of the abstract idea to which the claims are directed. This purported fact is also unsupported by the specification and the claims. Nothing in the specification or in claim 5 describes how shifting the USF changes the fixed relationship underscored by Mentone. In fact, the specification shows that shifting the USF did not alter this fixed relationship. So none of that helped Mentone survive the challenge at step 2.

Now, today we did hear quite a bit about the claim limitations relating to multiple PDCHs and how they potentially supplied an inventive concept. This argument was new to me today. It did not appear in Mentone's brief in response to Digi's motion to dismiss. It did not appear in Mentone's brief responding to Elo Touch's motion to dismiss. It did not appear in the subsequent 101 day letter brief, so it's untimely and I need not consider it, and I really have not had time to consider it much, having heard it only just a couple hours ago. I will note that defense counsel was able to point to an indication in the specification that the multiple PDCHs may have been in the prior art. I really don't know. I have not had sufficient time to evaluate that contention.

1          All said, I do not treat the arguments today

2    about multiple PDCHs as arguments that can materially affect

3    the analysis or alter the outcome here.

4          So my decision in the Mentone case is that

5    claim 5 is invalid for lack of patent eligible subject

6    matter under Section 101.  Because claim 5 is representative

7    according to the parties of the rest of the claims of the

8    '413 patent, defendants' motions to dismiss are granted on

9    this basis and the Court will not address the further

10   argument about the plausibility of the plaintiff's

11   allegations.

12          I do note that at least in passing, plaintiff

13   had asked for leave to amend its complaint.  I find that

14   amendment would be futile given my findings and given the

15   representations, sorry, given the representative nature of

16   claim 5.  So I will be granting the motion to dismiss and I

17   will be closing the Mentone cases.

18          That concludes by rulings.  Thank you for your

19   patience on that.

20          Let me quickly run through counsel and see if

21   you have any questions.

22          First, from Pivital, any questions?

23          MR. BENNETT:  No, Your Honor.  This is David

24   Bennett on behalf of Pivital IP.

25          No questions.

1          THE COURT:  Thank you.  ActiveCampaign?

2          MR. MARK SMITH:  This is Mark Smith on behalf of

3    ActiveCampaign.

4          No, Your Honor.

5          THE COURT:  Twilio?

6          MR. HENDERSHOT:  This is Mike Hendershot of

7    Jones Day on of behalf of Twilio.

8          No questions, Your Honor; and thank you and

9    Judge Hall for your time today.

10          THE COURT:  Thank you.  SharpSpring?

11          MR. MAYO:  Your Honor, this is Andrew Mayo from

12    Ashby & Geddes.

13          I echo the comments of counsel.  Thank you for

14    your time today; and there's no questions from us.

15          THE COURT:  Thank.

16          InterDigital?

17          MR. RYAN SMITH:  No questions.

18          THE COURT:  Okay.  Lenovo?

19          MR. MICALLEF:  This is Joe Micallef for Lenovo.

20          No questions.  Thank you, Your Honor.

21          THE COURT:  Mentone?

22          MR. PAZUNIAK:  No.  No questions, Your Honor.

23          THE COURT:  Okay.  Digi?

24          MR. ALY:  Good afternoon, Your Honor.  Amr Aly

25    of Jenner & Block.

1           And thank you to you and Judge Hall for your

2    time.

3           THE COURT:  And for Elo Touch?

4           MR. ANDERSON:  This is Jeremy Anderson for Elo

5    Touch.

6           Thank you, Your Honors.  No questions.

7           THE COURT:  Okay.  Well, thank you, all, very

8    much.  It has been a long day.

9           I want to once again thank Judge Hall.  Her help

10   has been tremendous.

11          I hope everyone stays safe; and thank you again

12   for the arguments.  We will be in recess.  Bye-bye.

13          (Counsel respond, "Thank you, Your Honor.")

14          (35 U.S.C. 101 En Banc Telephonic Oral Argument

15   concluded at 5:23 p.m.)

16

17          I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

18

19                         /s/ Brian P. Gaffigan
                          Official Court Reporter
20                          U.S. District Court

21

22

23

24

25