**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERDIGITAL TECHNOLOGY CORPORATION, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LENOVO HOLDING COMPANY, INC., *et al.*, | ) ) | |
| Defendants. | ) ) ) | C.A. No.:  19-1590-JDW |
| | ) | **JURY TRIAL DEMANDED** |
| LENOVO (UNITED STATES) INC. and MOTOROLA MOBILITY LLC, | ) ) ) | |
| Counterclaimants, | ) ) ) | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| v. | ) ) | |
| INTERDIGITAL TECHNOLOGY CORPORATION, *et al.*, | ) ) ) | |
| Counterclaim Defendants. | ) ) ) | |

**PLAINTIFFS' OPPOSITION BRIEF TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND TO EXCLUDE CERTAIN EXPERT TESTIMONY**

---

**CONFIDENTIALITY LEGEND**:

InterDigital Confidential ➜ Yellow highlighting
Lenovo Confidential ➜ Green highlighting
Qualcomm Confidential ➜ Purple highlighting

**TABLE OF CONTENTS**

PAGE(S)

I.      INTRODUCTION ............................................................................................. 1

II.     LENOVO IS NOT ENTITLED TO SUMMARY JUDGMENT OF
        NONINFRINGEMENT ................................................................................... 2

        A.      Lenovo Directly Infringes the Asserted Apparatus Claims .................................. 2

                1.      Lenovo Directly Infringes By Selling the Accused Products .................... 2

                2.      Lenovo Directly Infringes By Using the Accused Products...................... 5

        B.      InterDigital Has Presented Sufficient Evidence of Lenovo's Infringement
                of the Asserted Method Claims.......................................................................... 6

        C.      InterDigital Has Presented Evidence of Lenovo's Indirect Infringement ............. 9

        D.      InterDigital Produced Evidence of Lenovo's Infringement of the '873
                Patent.......................................................................................................... 13

        E.      The Accused Products Transmit "Channel Qualities," and Thus Infringe
                the Asserted Claims of the '612 or '449 Patents.................................................. 14

        F.      The Accused Products Receive A Configuration Comprising a
                "Periodicity" ................................................................................................ 18

        G.      The Accused Products Do Not Receive An Allocation of The Second
                Time Interval................................................................................................ 22

        H.      The Accused Products Do Not Receive An Allocation of The Second
                Uplink Channel ............................................................................................ 25

        I.      InterDigital Preserved its Doctrine of Equivalents Theories for
                Infringement................................................................................................ 27

III.    LENOVO IS NOT ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY
        OF CERTAIN CLAIMS OF THE '580 AND '747 PATENTS ....................................... 27

IV.     LENOVO'S DAUBERT CHALLENGES SHOULD BE DENIED ................................. 31

        A.      InterDigital's Reply Reports Properly Addressed Doctrine of Equivalents ......... 31

        B.      InterDigital's Technical Experts Applied the Court's Claim Constructions ........ 32

        C.      Mr. Kennedy's Methodologies Are Reliable ........................................................ 34

1.    Mr. Kennedy's Patent Benefits Approach Is Reliable and Based on Sufficient Facts and Data ........................................................................ 35

    a)    Mr. Kennedy Properly Relies on the Expert Opinions of Dr. Vojcic ................................................................................................ 35

    b)    Mr. Kennedy Properly Relies on the Expert Opinions of Dr. Groehn ............................................................................................... 38

    c)    Mr. Kennedy Properly Considers ROIC ....................................... 40

2.    Mr. Kennedy's "Infrastructure Cost Approach" Is Not Speculative ........ 41

3.    Mr. Kennedy's "Comparables Approach" Is Well Supported and Tied to the Facts of the Case .................................................................... 45

    a)    Mr. Kennedy Properly Apportions the Comparable Licenses to Reflect the Value of the Asserted Patents ................. 46

        (1) Skewness in the Value of Patents is a Well-Founded Principle Supported by Academic Research and Accepted by the Courts ........................................................................... 46

        (2) Mr. Kennedy's Determination of the Number of Patent Families Driving the Value in Licensing Negotiations Is Tied to the Facts of the Case ..................................................... 47

    b)    Mr. Kennedy's Conclusion that the Asserted Patent Families Are Among the Top 20% Most Valuable 3G and 4G LTE Patent Families Is Supported by Sufficient Facts and Data ................................................................................... 48

V.    CONCLUSION ..................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

### CASES

*3M v. Johnson & Johnson Orthopaedics, Inc.*,
976 F.2d 1559 (Fed. Cir. 1992).......................................................................43

*Alcon Rsch. Ltd. v. Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014)...................................................................29, 30

*Apple v. Motorola*,
757 F.3d 1286 (Fed. Cir. 2014)...................................................................45, 46

*Apple v. Wi-LAN, Inc.*, 2019 WL 13162735 (S.D. Cal. Oct. 1, 2019)........................38, 44, 49, 50

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014)........................................................................42

*Conn v. C.R. Bard, Inc.*, 4:14-CV-298,
2021 U.S. Dist. LEXIS 107523 (S.D. Tex. June 8, 2021) ................................37

*Cordis Corp. v. Boston Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009).......................................................................17

*Droplets v. Yahoo*, Case No. 12-cv-03733-JST,
D.I. 1000 (N.D. Cal. Jan. 12, 2022) ...............................................................41

*Droplets, Inc. v. Overstock.com, Inc.*,
Case No. 2:11-cv-401-JRG-RSP, 2015 WL 11120843
(E.D. Tex. Jan. 7, 2015)..................................................................................39

*Droplets, Inc. v. Overstock.com, Inc.*, No. 2:11-CV-401-JRG-RSP,
2015 WL 11120841 (E.D. Tex. Jan. 7, 2015)..................................................39

*Earl v. Boeing Co.*, No. 4:19-cv-507,
2021 WL 3140545 (E.D. Tx. July 26, 2021) ...................................................39

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F. 3d 1201, 1216-17 (Fed. Cir. 2014)...............3, 4, 35, 46

*Fantasy Sports Properties v. Sportsline.com*,
287 F. 3d 1108, 1118 (Fed. Cir. 2002)..............................................................4

*Festo Corp. v. Shoketsu Kinzoku*,
535 U.S. 722 (2002) (*Festo I*)........................................................................22

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
344 F.3d 1359 (Fed. Cir. 2003) (*Festo II*) ................................................15, 21

*Finjan, Inc. v. Secure Comput. Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) .........................................4

*FTC v. Qualcomm Inc.*,
411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019)................................................11

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)..................................................................19

*Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1369 (Fed. Cir. 2010) ........................16

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)..................................................2, 34, 35, 47, 49

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
    967 F.3d 1380 (Fed. Cir. 2020) (*IP Bridge 1*), cert. denied, 141 S. Ct.
    2862, 210 L. Ed. 2d 965 (2021) ..................................................................19

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983)..................................................................42

*i4i L.P. v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)..................................................................37

*In re Innovatio IP Ventures, LLC*,
    MDL No. 2303, 2013 U.S. Dist. Lexis 144061 (N.D. Ill. Sept. 27, 2013)........................47

*In re Maxim Integrated Prods.*,
    No. 12-244, 2015 U.S. Dist. LEXIS 124062 (W.D. Pa. Sep. 11, 2015)............................32

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) ...........................................................29, 30

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
    385 F.3d 1360 (Fed. Cir. 2004)..................................................................16

*Intel Corp. v. Tela Innovations, Inc.*,
    No. 3:18-cv-02848-WHO, 2021 WL 1222622 (N.D. Cal. Feb. 11, 2021) ........................47

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 ..................................................................................46

*LG Display Co. v. AU Optronics Corp.*,
    722 F. Supp. 2d 466 (D. Del. 2010)............................................................46, 47

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F. 3d 1301 (Fed. Cir. 2009)..................................................................12

*Marshall Div. SimpleAir, Inc. v. Google Inc.*, 77 F. Supp. 3d 569 (E.D. Tex.
    2014), vacated on other grounds by *SimpleAir, Inc. v. Sony Ericsson
    Mobile Commc'ns. AB*, 820 F.3d 419 (Fed. Cir. 2016) ........................................43

*Maxell, Ltd. v. Apple Inc.*,
    No. 5:19-CV-00036-RWS, 2020 WL 8269548 (E.D. Tex. Nov. 11, 2020)......................39

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003)..................................................................43

*Mitutoyo Corp. v. Central Purchasing, LLC*,
    499 F.3d 1284 (Fed. Cir. 2007)..................................................................41

*Odyssey Wireless, Inc. v. Apple Inc.,*
  No. 15-cv-01735-H-RBB, 2016 U.S. Dist. Lexis 187982
  (S.D. Cal. Sept. 14, 2016) ............................................................................47

*Optis Wireless Tech., LLC v. Apple Inc.,*
  Case No. 2:19-cv-00066-JRG, D.I. 437 (E.D. Tex., July 29, 2020)...................38, 44, 45

*Optis Wireless Tech., LLC v. Huawei Techs. Co.,*
  No. 2:17-CV-123, D.I. 301 (E.D. Tex. Aug. 21, 2018)..............................................44, 45

*Powell v. Home Depot U.S.A., Inc.,*
  663 F.3d 1221 (Fed. Cir. 2011)...............................................................................42, 45

*Prism Techs. LLC v. Sprint Spectrum L.P.,*
  849 F.3d 1360 (Fed. Cir. 2017)...........................................................................42, 43, 45

*Purdue Pharma L.P. v. Faulding Inc.,*
  230 F. 3d 1320 (Fed. Cir. 2000)..................................................................................28

*Qualcomm Inc. v. Apple Inc.,* No. 3:17-cv-01375-DMS-DD,
  D.I. 538 (S.D. Cal. Jan. 18, 2019)...............................................................................41

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.,*
  Case No. 2:13-CV-213-JRG-RSP, 2015 WL 604577
  (E.D. Tex. Jan. 29, 2015) adopted, 2015 WL 627949 (E.D. Tex. Feb. 6,
  2015), affirmed, 853 F.3d 1370 (Fed. Cir. 2017) .......................................................39, 40

*Shopify Inc. v. Express Mobile, Inc.,*
  No. 19-439-RGA, 2021 U.S. Dist. LEXIS 179773 (D. Del. Sep. 21, 2021) ..............32, 33

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,*
  932 F.2d 1453 (Fed. Cir. 1991)...................................................................................42

*Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.,*
  No. 17-1734-RAG, 2021 WL 982729 (D. Del. Mar. 16, 2021) .......................................47

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.,*
  760 F. App'x 977 (Fed. Cir. 2018) ...............................................................................45

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
  254 F. Supp. 3d 680 (D. Del. 2017)........................................................................9, 10, 12

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.,*
  802 F.3d 1283 (Fed. Cir. 2015).....................................................................................39

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,*
  No. 13-0366, 2016 U.S. Dist. LEXIS 73985 (E.D. La. June 7, 2016).............................37

*TCL v. Ericsson,* No. 14-cv-00341-JVS-DFM), D.I. 1802
  (C.D. Cal. Dec. 21, 2017) ............................................................................................48

*Travel Sentry, Inc. v. Tropp,*
  877 F.3d 1370 (Fed. Cir. 2017).......................................................................................6

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..................................................................47

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
    2018 WL 288050 (N.D. Cal. Jan. 4, 2018) ...............................................43

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013).....................................................................4

*ViiV Healthcare Co. v. Gilead Scis., Inc.*,
    437 F. Supp. 3d 395 (D. Del. 2020)...........................................................18

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)..................................................................47

## STATUTES

35 U.S.C. § 120..................................................................................................27, 28

## RULES

Fed. R. Evid. 703 ...................................................................................................37

Fed. R. Evid. 702 ...................................................................................................31

## TABLE OF ABBREVIATIONS

| ABBREVIATION | REFERENCE |
|---|---|
| Ex. __ | Exhibit to the attorney declaration attaching supporting documents and materials |
| '449 Patent | U.S. Patent No. 9,456,449 (D.I. 221-2, Ex. B) |
| '665 Patent | U.S. Patent No. 8,085,665 (D.I. 221-5, Ex. E) |
| '954 Patent | U.S. Patent No. 8,427,954 (D.I. 221-6, Ex. H) |
| '873 Patent | U.S. Patent No. 8,797,873 (D.I. 221-7, Ex. G) |
| Asserted Patents | U. S. Patent Nos. 8,085,665 ("the '665 patent"), 8,199,726 ("the '726 patent"), 8,427,954 ("the '954 patent"), 8,619,747 ("the '747 patent"), 8,675,612 ("the '612 patent"), 8,797,873 ("the '873 patent"), 9,203,580 ("the '580 patent"), and 9,456,449 ("the '449 patent") |
| Bims Dep. Tr. | 8/31/22 Dr. Harry Bims Deposition Transcript (Ex. 12) |
| Bims Resp. Rept. | 7/18/22 Response Expert Report of Dr. Harry Bims re Non-Infringement of the Asserted Claims of U.S. Patent Nos. 8,085,665 and 8,427,954 (Ex. 14) |
| DOE | Doctrine of Equivalents |
| ETSI IPR Policy | ETSI IPR Policy, Clause 4.3 (IDC-LEN-1590-0538747-58) (Ex. 31) |
| InterDigital | InterDigital Technology Corporation, IPR Licensing, Inc., InterDigital Communications, Inc., InterDigital Holdings, Inc., and InterDigital, Inc. |
| Kennedy Op. Rept. | 6/21/22 Corrected Expert Report of Mr. David Kennedy (Ex. 22) |
| Kennedy Reply Rept. | 8/9/22 Corrected Reply Expert Report of Mr. David Kennedy (Ex. 21) |
| Lenovo | Lenovo (United States) Inc., Motorola Mobility LLC, and Lenovo Holding Company Inc. |
| Lenovo's Op. Br. | 9/15/22 Ex. A, Defendants' Opening Brief ISO Their Motion for Summary Judgment and to Exclude InterDigital's Expert Opinions (D.I. 228, Ex. A) |
| Lenovo's Resp. to ROG 22, 24 | 7/15/21 Lenovo's Objections and Responses to InterDigital's Third Set of Interrogatories (Nos. 7-25) (Ex. 6) |
| Milner Dep. Tr. | 4/21/22 Thomas Milner Deposition Transcript (Ex. 1) |
| Panda Dep. Tr. | 4/8/22 Ajit Kumar Panda Deposition Transcript (Ex. 7) |
| PSUMF | Plaintiffs' Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment, filed concurrently herewith |

| ABBREVIATION | REFERENCE |
|---|---|
| POSA | Person of ordinary skill in the art |
| Putnam Reb. Rept. | 7/22/22 Corrected Expert Rebuttal Report of Jonathan D. Putnam (Ex. 9) |
| ROIC | Return on Invested Capital |
| Stark Dep. Tr. | 8/8/22 Deposition of Wayne Stark (Ex. 10) |
| Stark Op. Rept. | 6/16/22 Opening Expert Report of Dr. Wayne Stark (D.I. 221-8, Ex. H) |
| Stark Reb. Rept. | 7/18/22 Rebuttal Expert Report of Dr. Wayne Stark (D.I. 221-37, Ex. KK); and (Ex. 19) |
| Stark Reply Rept. | 8/8/22 Reply Expert Report of Dr. Wayne Stark (D.I. 221-14, Ex. N); and (Ex. 20) |
| Staudte Dep. Tr. | 4/1/22 Tobias Staudte Deposition Transcript (Ex. 2) |
| Valenti Dep. Tr. | 08/26/22 Matthew C. Valenti Deposition Transcript (Ex. 5) |
| Valenti Expert Rept. re Invalidity of '747 & '580 Patents | 6/16/22 Expert Report of Dr. Matthew C. Valenti re Invalidity of the Asserted Claims of U.S. Patent Nos. 8,619,747 and 9,203,580; and (Ex. 16) |
| Vojcic Dep. Tr. | 8/25/22 Dr. Branimir Vojcic Deposition Transcript (Ex. 14) |
| Vojcic Op. Rept. | 6/16/22 Opening Expert Report of Dr. Branimir Vojcic (D.I. 221-9, Ex. I) and (Ex. 23) |
| Vojcic Reb. Rept. | 7/18/22 Rebuttal Expert Report of Dr. Branimir Vojcic; (Ex. 18) |
| Vojcic Reply Rept. | 8/8/22 Reply Expert Report of Dr. Branimir Vojcic; (D.I. 221-15, Ex. O); and (Ex. 3) |
| Asserted Method Claims | '665 Patent claims 32 and 35; '954 Patent claims 4 and 6; '747 Patent claims 1, 2, 4, 10, 13 and 15; '612 Patent claims 1, 7 and 8; '873 Patent claims 1 and 2; '580 Patent claims 17 and 18; and '449 Patent claims 13, 15, 16, 33 and 35. |

*Unless stated otherwise, all emphasis is added, and internal citations are omitted.*

## I.      INTRODUCTION

The Court should deny Lenovo's Motion for Summary Judgment and for *Daubert* exclusion:

**Infringement -** Lenovo advances no less than nine different non-infringement defenses; each premised on a misstatement of law or overlooking material factual disputes. Lenovo first disputes direct infringement. But Lenovo admittedly sells the Accused Products in the United States and contends only that the Accused Products are not "configured" until turned on. The law, however, is that apparatus claims are infringed when the accused products are *reasonably capable* of infringing. Lenovo next argues there is no evidence that it performed the asserted method claims but ignores its own product testing within the United States. Lenovo also disputes indirect infringement in the face of pre-suit knowledge of the Asserted Patents and a lack of any belief of non-infringement. Lenovo also advances a series of non-infringement arguments premised on InterDigital's alleged misapplication of various claim constructions. But Lenovo cannot deny that InterDigital's technical experts acknowledged and applied the Court's claim constructions to the Accused Products. Disagreements between experts about the operation of the Accused Products confirm the existence of material factual disputes.

**Invalidity -** Lenovo next moves for summary judgment of invalidity as to certain claims of the '747 and '580 Patents, based on the claim term "eNodeB." Lenovo contends that the term lacks written description and is not enabled. Lenovo cannot meet its clear and convincing burden on summary judgment in the face of the testimony of its own witnesses and documents emphasizing that by the effective filing date "eNodeB" was a known and readily understood term.

**Daubert –** Lenovo seeks to preclude InterDigital's damages expert (David Kennedy) from testifying regarding his three reasonable royalty approaches: "patent benefits,"

"infrastructure cost," and "comparable license." Mr. Kennedy relies on the unchallenged

technical apportionment analysis from one of InterDigital's technical experts and an

unchallenged conjoint survey from another expert. By doing so, Mr. Kennedy ensured that the

damages will not exceed the technological footprint of the Asserted Patents. Mr. Kennedy also

undertook a meticulous and thorough analysis of the *Georgia-Pacific* factors, including an

independent review of InterDigital's comparable licenses, from which he further sought to

apportion the value of the Asserted Patents. Mr. Kennedy's methodologies are sound. Lenovo's

disagreement with his conclusions go to the weight of his testimony providing grounds for cross

examination, not exclusion. Lenovo also seeks to exclude InterDigital's technical experts based

on the same arguments in its concurrently filed Motion to Strike and its Motion for Summary

Judgment and should be denied for the same reasons as the Court should deny those motions.

## II.    LENOVO IS NOT ENTITLED TO SUMMARY JUDGMENT OF NONINFRINGEMENT

### A.    Lenovo Directly Infringes the Asserted Apparatus Claims

There is a material factual dispute as to Lenovo's direct infringement of the Asserted

Apparatus Claims, with respect to both Lenovo's sales and use of the Accused Products.

### 1.    Lenovo Directly Infringes By *Selling* the Accused Products

Lenovo admits to selling the Accused Products within the United States. However,

Lenovo contends that the "configured to" language found in the preamble of the apparatus claims

is not satisfied until the Accused Products receive certain signaling from base stations.

InterDigital's technical experts disagree. Drs. Stark and Vojcic have presented detailed opinions

that, as sold, the Accused Products are "configured to" perform the recited functions. D.I. 221-8,

Ex. H (Stark Op. Rept.) ¶ 223 ("Each Accused Product comprises a processor ***configured to***

perform the requirements of claim 16 [of the '747 patent]…."); *id.* ¶ 251 (same opinion for claim

32 of the '747 Patent); *id.* ¶ 274 ("Each Accused Product comprises a processor **configured to** perform the requirements of claim 1…."); D.I. 221-15, Ex. O (Vojcic Reply Rept.) at ¶¶ 55, 63, 98. In reaching their opinions, InterDigital's technical experts affirmatively acknowledged the parties' stipulated claim construction, finding that each Accused Product was "set up for operation" when sold by Lenovo. As explained by Dr. Stark, "[a] POSA would appreciate that 'configured' [sic] construed by the Court as 'set up for operation,' is satisfied if a device has the capability to perform the recited functionality in accordance with its intended and ordinary use." D.I. 221-14, Ex. N (Stark Reply Rept.) ¶ 46. Dr. Vojcic offered a similar opinion. Vojcic Reply Rept. ¶ 55 ('873 Patent); *see also id.* at ¶ 63 ('665 Patent), ¶ 98 ('954 Patent). Lenovo's Rule 30(b)(6) witness effectively agreed with InterDigital's technical experts, admitting that the Accused Products were "configured" when sold. Ex. 1 (Milner Dep. Tr.) 140:5-10 ("Q. … Motorola smartphones are already **configured out of the box** to operate on the mobile network, right? A. **Yes, they are.**").

Lenovo contends that InterDigital's direct infringement evidence is premised on an improper interpretation of "configured to." Specifically, Lenovo contends that "set up for operation" cannot be satisfied unless and until the Accused Products receive **all** parameters necessary for operation from the base station. The parties never agreed to Lenovo's newly devised construction. Lenovo does not contend otherwise.

Lenovo's interpretation of "configured to" also violates the established principle that, to infringe, an accused product need only be "reasonably capable" of satisfying the apparatus claim limitation. For instance, in *Ericsson, Inc. v. D-Link Sys., Inc.*, the patent-in-suit claimed, "a processor for arranging information for transmission ... which identifies a type of payload information...." 773 F. 3d 1201, 1216-17 (Fed. Cir. 2014). In upholding the jury's infringement

verdict, the court found that "products only need to have a component that is ***reasonably capable*** of 'arranging information for transmission ... which identifies a type of payload information....'" *Id. See also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013) ("While 'a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim,' ... an accused product 'may be found to infringe if it is ***reasonably capable*** of satisfying the claim limitation.'") (quoting *Finjan, Inc. v. Secure Comput. Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010).

Similarly, in *Fantasy Sports Properties v. Sportsline.com*, the patent-in-suit claimed "[a] computer for playing football" setting forth "a number of functionally defined means." 287 F. 3d 1108, 1118 (Fed. Cir. 2002). In reversing summary judgment of non-infringement, the court explained that "although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are ***already present in the underlying software***." *Id.* (emphasis in original). Thus, to infringe, the computer code "must be written in such a way as to enable a user of that software to utilize the function […] without having to modify that code." *Id.*

As in *Ericsson* and *Fantasy Sports*, the Asserted Apparatus Claims are directed to "a processor," or other hardware, for performing numerous recited functions. The question of direct infringement turns on whether the claimed functions "are already present in the underlying software" and thus "reasonably capable" of infringement. As explained above, InterDigital's technical experts have provided ample evidence that the Accused Products are reasonably capable of infringement when sold. There is no dispute that the Accused Products are specifically intended to, and in fact would, send and receive data on a cellular network, thereby performing the accused functionality.

### 2. Lenovo Directly Infringes By *Using* the Accused Products

Even if the Court concludes that the Accused Products do not infringe the Asserted

Apparatus Claims when sold, but instead only after they receive signaling from a base station,

the Court should still deny summary judgment because Lenovo "uses" the Accused Products in

the United States by conducting interoperability (or field) testing. More specifically:

> [I]nteroperability testing, including field tests, for Accused Products to be sold
> for use with U.S. carriers…Such testing would include, for example, phone calls
> and file transfer. Such operations would likely, if not necessarily, result in
> performance of asserted method claims. Although Motorola/Lenovo may not
> necessarily perform field tests themselves, these tests would be at
> Motorola/Lenovo's control and direction for purposes of obtaining the
> certifications needed to sell their phones for use with U.S. carriers.

Stark Reply Rept. ¶ 24; *see also* Vojcic Reply Rept. ¶ 119 ("Such operations would likely, if not

necessarily, result in performance of asserted method claims."); Ex. 2 (Staudte Dep. Tr.) 152:16-

21 ("the test house will take the particular device and go to that specific network and does [sic]

the testing.").

Drs. Stark and Vojcic opined that Lenovo uses the Asserted Products by directing and

controlling conformance testing within the United States. Lenovo, in fact, admits to "***regularly***

***contract[ing]*** with certain facilities to perform conformance testing on its products to ensure

compliance with network carrier requirements." *See* Lenovo's SUMF No. 15. *See* Stark Op.

Rept. ¶ 104 ("[T]o pass this and other tests, an Accused Device ***must*** practice the [Asserted

Claims]."); *id.* ¶ 107 ("These tests bolster my opinion that CQI reports are transmitted on the

PUSCH in a manner that would infringe the '612 and '449 Patents."); Stark Reply Rept. ¶ 43

("[P]erformance of this conformance test would ***necessarily*** practice the Asserted '747 Claims

and the Asserted '580 Claims"); Ex. 3 (Vojcic Reply Rept.) ¶ 121 ("This test report is, in my

view, further confirmation that Lenovo directed and controlled the practice of the asserted claims in the United States.").

To the extent Lenovo does not itself perform testing, the testing is at Lenovo's control and direction. As explained by Lenovo's Rule 30(b)(6) witness, "[t]here are ***rules in place***, especially for PTCRB, that ***specific tests must be executed*** at a PTCRB-accredited lab…." Ex. 2 (Staudte Dep. Tr.) 118: 2-8. Lenovo's witness further explained that the testing houses have no discretion because "***[t]he test cases are defined in the test standard"*** and "***that's then what's being used in the certification testing***." *Id.* at 122:14-21. Dr. Stark identified numerous examples of testing houses in the United States. *See* Stark Reply Rept. ¶ 43 ("For example, Intertek purports to be in the United States. An exemplary summary test report, dated May 5, 2016, indicates that Intertek performed § 7.1.4.4.4 of 3GPPP TS 36.523-1…[P]erformance of this conformance test would necessarily practice the Asserted '747 Claims and the Asserted '580 Claims."). *See Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1376 (Fed. Cir. 2017) (direct infringement under "direction or control" where infringer "conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance.").

The Court should, therefore, deny summary judgment since there is a material factual dispute regarding Lenovo's direct infringement of the Asserted Apparatus Claims.

### B. InterDigital Has Presented *Sufficient* Evidence of Lenovo's Infringement of the Asserted Method Claims

Lenovo seeks summary judgment of no direct infringement of the Asserted Method Claims. But as explained above, Lenovo performs both interoperability testing and conformance testing, both necessarily entail performance of the Accused Method Claims. Lenovo also disputes, separately for each patent, that conformance testing establishes infringement:

**'580 Patent**. Lenovo disputes that a "system simulator" functions as an "eNB." InterDigital's technical expert disagrees. *See* Stark Op. Rept. ¶¶ 103-104 (explaining why performing conformance tests satisfy the claim language); Stark Reply Rept. ¶ 43 (further explaining "performance of this conformance test would necessarily practice the Asserted '747 Claims and the Asserted '580 Claims"). Further, Lenovo's Rule 30(b)(6) witness admitted that "[t]he system simulator is trying to be a network cell." Ex. 2 (Staudte Dep. Tr.) 133:9-12. Such evidence raises, at a minimum, a triable issue as to whether a system simulator functions as an eNB.

**'747 Patent**. Lenovo contends that "[t]he testing documentation says nothing about the tested product first receiving an allocation comprising a periodicity or an indication of dedicated physical resources as required by the claims of the 747 Patent." Lenovo's Op. Br. at 9. Not so. Dr. Stark identifies a specific test that includes the step of "[t]he SS transmits a MAC PDU containing 10 MAC SDUs each containing a RLC SDU." Stark Op. Rept. ¶ 103. Based on this sequence, Dr. Stark concludes that "to pass this and other tests, an Accused Device must practice the Asserted '747 Claims and the Asserted '580 Claims." *Id.* ¶ 104. Lenovo also disputes "that the scheduling request transmitted in the recited test is a 'transmission burst over the NCB uplink control channel . . . wherein the presence of the transmission burst on resources dedicated to the WTRU' as required by the claims." Lenovo's Op. Br. at 10. Dr. Stark identifies a test where "the UE transmit 6 Scheduling Requests separately on 6 consecutively available PUCCHs." Stark Op. Rept. ¶ 103. Dr. Stark also opines that the Scheduling Request is the burst and that the PUCCH is the NCB uplink control channel. *Id.* at ¶¶ 148-149. And Dr. Stark did not limit his infringement opinion to "Format 1." He also identifies Formats 1a and 1b. *Id.* at ¶ 148, ¶ 149 ("SR is transmitted a UE shall use PUCCH Format 1a or 1b"), *id.* ¶¶ 241-242. There is, at least, a triable

issue as to whether the test sequence meets the claim language of the '747 Patent.

**'665 Patent**. Lenovo contends that the testing documentation analyzed by Dr. Vojcic does not mention the claimed "'predetermined time interval' between receipt of a CDMA signal and transmission of an acknowledgment." Lenovo's Op. Br. at 10. However, Dr. Vojcic's analysis shows that the Accused Products transmit an acknowledgement message over the HS-DPCCH. D.I. 221-9, Ex. I (Vojcic Op. Rept.) ¶ 76. He also shows that the HS-DPCCH "carries uplink feedback signaling related to the downlink HS-DSCH transmission" and that the predetermined interval is between allocations on the HS-DSCH and an acknowledgment on the HS-DPCCH. *Id.* In other words, Dr. Vojcic expressly linked the acknowledgment message required by the conformance testing with an element-by-element claim comparison.[1]

**'954 Patent**. Lenovo asserts that the test documentation "does not state whether testing related to the transmission of a HARQ ACK on the PUCCH […ison] is] at a 'predetermined time period' after the time interval on the downlink channel is performed." Lenovo Op. Br. at 11. However, as explained by Dr. Vojcic, the test documentation confirms that the HARQ acknowledgement message is, in fact, transmitted on the PUCCH. Vojcic Op. Rept. ¶ 75. Dr. Vojcic further explains that "[t]he PUCCH uplink channel … can be used for the sending of acknowledgement messages" (*id.* ¶ 167) and "[t]he transmission of feedback information on the PUCCH channel is in a ***predetermined time*** interval, 4 subframes, from the time interval on the downlink channel, as specified by the LTE standard." *Id.* ¶ 174.

**'449 Patent**. Dr. Stark has identified conformance testing differential channel quality

---

[1] Lenovo's own testing documentation indicates that these tests are required. *See* Ex. 32 (Staudte Dep. Ex. 39) (Verizon Technical Test Entrance Criteria V.3.7); Ex. 33 (Staudte Dep. Ex. 41) (U.S. Cellular Terminal Device Requirements V.2018.1.0).

indicators as required by LTE. *See, e.g.,* Stark Op. Rept. ¶ 107 ("Test 36.521-1 § 9.3.1.1.1 … the purpose is '[t]o verify that preferred sub-bands can be used for frequency-selective scheduling.'"). Specifically, the test requires that "a sub-band ***differential*** CQI offset … shall be reported…" *See* Ex. 4 (TS 36.521-1) at 2096, 2141, 2148; Stark Op. Rept. ¶ 460 ("The *2N* bits used to report subband ***differential*** CQI correspond to 2 bits for each of *N* different subbands."). Lenovo also contends that its conformance testing would not infringe the '449 Patent because a "system simulator" is not a "base station." As discussed above, Lenovo admits that "system simulators" operate as a a network cell or base station. Ex. 2 (Staudte Dep. Tr.) 133:9-12.

**'612 Patent**. Lenovo contends that "[t]he testing documentation IDC cites says nothing about either deriving a channel quality for each of plurality of downlink resources or transmitting channel qualities by rotating through the derived channel qualities, as claimed." Lenovo's Op. Br. at 12. InterDigital's technical expert, Dr. Stark, explained that the Accused Products passed several conformance tests, including test 36.521-1 § 9.2.1.1. Stark Op. Rept. ¶ 106. This test includes periodic CQI reports sent over the PUCCH, which comports with Dr. Stark's infringement theory. Lenovo also criticizes Dr. Stark's reliance on CQI reports sent over the PUSCH as opposed to the PUCCH. But the method claims of the '612 Patent are not limited to sending CQI feedback on a "control" channel. Lenovo cites no evidence indicating why the claims should be so limited.

The Court should, therefore, deny Lenovo's motion for summary judgment of no direct infringement of the Asserted Method Claims.

### C.     InterDigital Has Presented Evidence of Lenovo's Indirect Infringement

Lenovo seeks summary judgment of no induced infringement. Lenovo Op. Br. at 15. There is, however, ample evidence as to each of the three elements of induced infringement. Specifically: (1) Lenovo had pre-suit knowledge of the Asserted Patents; (2) Lenovo took action

to encourage or instruct its customers to operate the Accused Products in an infringing manner; and (3) end users directly infringed. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 696 (D. Del. 2017).

As to the first element, Lenovo had pre-suit knowledge of the Asserted Patents. *See* Ex. 6 (Lenovo's Resp. to Interrog. No. 22) at 32 ("Lenovo received claims charts of [the '665 patent …] on June 13, 2012. Lenovo received a letter from InterDigital identifying [the '954 patent] on May 13, 2013. Lenovo received a list of patents including [the '747, '612, '580 and '449 patents] from InterDigital on June 30, 2017."). InterDigital's correspondence clearly alleged that selling and/or using cellular phones infringed the Asserted Patents.

Turning to the second element, Lenovo continued to engage in the allegedly infringing conduct armed with knowledge of the Asserted Patents, including designing the Accused Products for operation on cellular networks. *See* Ex. 1 (Milner Dep. Tr.) 111:11-21 (the Accused Products are "created for the carrier channel"). Lenovo did so with knowledge that *all* Accused Products will be used in an allegedly infringing manner. Ex. 5 (Valenti Dep. Tr.) 202:20-203:4 ("[I]n the ordinary course of purchasing and activating a phone for LTE, I would expect that [the Accused Products] would be set up to operate on the network at some point."). Additionally, Lenovo provided end-users with documentation "guiding the user through setting up their phone." Ex. 1 (Milner Dep. Tr.) 60:9-11. Lenovo "also provide[s] online user guides that users can reference, if necessary, if they have questions on how to use a particular feature for their device." *Id.* at 60:12-15. Thus, even under Lenovo's "configured" argument (which InterDigital disagrees with) Lenovo knew that end-users would use the Accused Products in an infringing manner.

InterDigital accused Lenovo of patent infringement before this lawsuit, yet Lenovo never analyzed InterDigital's patents and thus never formed a good-faith belief of non-infringement. *See* Ex. 6 (Lenovo's Resp. to Interrog. No. 24) at 34 ("Lenovo neither performed nor received any analysis of the Asserted Patents prior to InterDigital filing its Complaint in this action."). Lenovo, in fact, did nothing to avoid infringement. Ex. 7 (Panda Dep. Tr.) 29:7-10 ("Q … [D]o you recall ever taking any steps during the time you were at Motorola to avoid patent infringement? A No, I don't recall any specific steps, no."). After InterDigital filed its complaint, Lenovo failed to articulate non-infringement argument until just recently submitting rebuttal expert reports. *See* D.I. 225-4, Ex. D, at 2-8. And none of Lenovo's technical witnesses even reviewed InterDigital's patents in advance of their depositions. Ex. 1 (Milner Dep. Tr.) 29:25-30:2 ("Q. Have you read or reviewed any of the patents at issue in this case? A. No."); Ex. 2 (Staudte Dep. Tr.) 20:20-22 ("Q. Have you reviewed any of the patents that InterDigital is asserting in this case? A. No."); Ex. 7 (Panda Dep. Tr.) 31:19-22 ("Q. And do you recall reviewing any of the patents that are identified in the complaint as allegedly being infringed? A. No, I have not.").

Lenovo's admitted licensing practices further confirm its intent. Lenovo's Vice President of IP (Ira Blumberg) confirmed that Lenovo did not consider whether it infringed valid patent claims. Rather, Lenovo focuses exclusively on whether a license is cheaper than litigation. *FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 787 (N.D. Cal. May 21, 2019) ("When the negotiated alternative is equal to or greater than the likely litigation outcome, I'm not ready to sign, and I'm ready to keep negotiating and/or litigating as necessary"); *see also* Ex. 8 (9/21/18 Email re Lenovo & InterDigital Meeting). IDC-LEN-1590-0527284-86. Lenovo's economic expert (Dr. Putnam) concluded that, rather than enter into a patent license like most of the industry, "Lenovo

has held out and delayed for over fourteen years." Ex. 9 (Putnam Reb. Rept.) ¶ 318. Worse still,

Dr. Putnam found that "Lenovo is engaging InterDigital with negotiators who lacked the

authority required to lead negotiations and conclude deals." *Id.* at ¶ 311. Stringing InterDigital

along for years, without any reason to dispute infringement, is further evidence of Lenovo's

intent to cause direct infringement.

Lenovo's conduct at least raises a triable factual issue, especially considering that less

egregious conduct was found sufficient to support a jury's verdict of induced infringement. For

example, in *SRI* a Delaware court reasoned:

> With respect to the intent factor, for the relevant time period, [patent owner]
> presented evidence that [defendant] knew about the patents and [patent
> owner's] belief that [defendant] infringed the patents. [Patent owner] also
> presented evidence that [defendant's witness] did not read the patents until his
> deposition [...] and [defendant's other witness] was not asked to investigate the
> possibility of infringement.

254 F. Supp. 3d at 696.  *See also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. 3d 1301, 1322

(Fed. Cir. 2009). ("A plaintiff may still prove the intent element through circumstantial evidence,

just as with direct infringement, as discussed above.").

Regarding contributory infringement, Lenovo contends that the Accused Products do not

directly infringe until they receive certain signaling from a base station. Under Lenovo's theory

(which InterDigital disagrees with), the Accused Products are material components of the

claimed inventions. As explained above by Dr. Valenti, an end-user need only turn on the

Accused Product to receive the necessary signaling. Ex. 5 (Valenti Dep. Tr.) 202:20-203:4.

Lenovo provides specific instructions to ensure that end-users are able to turn on and use the

Accused Products. Ex. 1 (Milner Dep. Tr) 60:1-15.

There is, at minimum, a triable issue of material fact as to whether Lenovo has induced

end-users to directly infringe the Asserted Patents.

**D.      InterDigital Produced Evidence of Lenovo's Infringement of the '873 Patent**

Lenovo alleges there is no evidence that it infringes the '873 Patent. Lenovo Op. Br. at 15-17. Lenovo's entire argument is that the words "power ratio" do not appear in the reports of Dr. Plock who analyzed the Qualcomm source code. *Id.* at 17. Dr. Plock did not, however, offer an opinion on infringement of the '873 Patent. Rather, he analyzed Qualcomm source code in support of another technical expert (Dr. Vojcic) who opined on Lenovo's infringement of the '873 Patent. Lenovo's motion should be denied because Dr. Vojcic affirmatively acknowledged the Court's construction (Vojcic Op. Rept. ¶ 203) and went on to provide unchallenged opinions regarding infringement, including as to the term "power ratio." *Id.* ¶¶ 204-209.

Even putting aside Dr. Vojcic's expert opinions, Lenovo's motion still fails as it overlooks the detailed source code evidence in Dr. Plock's reports which addressed the claim term "non-zero grant," which the Court construed to mean "power ratio greater than zero." D.I. 100 at 13. Dr. Plock's *unrebutted* testimony is that ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Lenovo does not dispute Dr. Plock's analysis of "non-zero grant" limitation. Instead, Lenovo makes the superficial argument that because the words "power ratio" do not appear in Dr. Plock's reports, this must mean that there is no evidence to show infringement. Lenovo's Op. Br. at 16. As noted above, Dr. Vojcic affirmatively relied on Dr. Plock's source code analysis to conclude that the Accused Products satisfy the

-13-

"non-zero grant" requirement. There is at least a triable issue of material fact as to whether Lenovo infringes claims 6 and 7 of the '873 Patent. The Court therefore should deny Lenovo's motion.

**E.    The Accused Products Transmit "Channel Qualities," and Thus Infringe the Asserted Claims of the '612 or '449 Patents**

Lenovo incorrectly asserts that the Accused Products do not transmit "channel qualities" under the parties' agreed construction. Lenovo's Op. Br. at 17. InterDigital's technical expert (Dr. Stark) has offered expert opinions, consistent with the agreed construction, that the Accused Products transmit what the technical standard calls "channel quality indicators" or "CQI," which are "channel qualities" under the parties' stipulated claim construction. As explained by Dr. Stark, "[t]here is a one-to-one correspondence between the CQI index and efficiency of the associated coding and modulation scheme that is employed for that CQI index." Stark Reply Rept. ¶ 68. Dr. Stark's opinions are consistent with the surrounding claim language. For example, claim 1 of the '449 Patent recites that "the first channel quality indication is used to indicate to the base station a modulation and coding set (MCS) that has been determined based on channel quality." DI 221-2, Ex. B ('449 Patent) at 7:47-50. Accordingly, indicating MCS is sufficient to constitute a "channel quality."

Dr. Stark also opines that the CQI Index corresponds to "a particular efficiency and is 'a value/values quantifying how efficiently downlink resources of a channel can communicat[e] information.'" Stark Reply Rept. ¶ 69. As an example, Dr. Stark noted that "CQI Index '1' corresponds to an efficiency of 0.1523" while "CQI Index '2' corresponds to an efficiency of 0.2344." *Id.* Dr. Stark further explained this point at his deposition: "The table there shows a channel quality index. And associated with each channel quality index is an efficiency, and ***that efficiency measures the -- how efficiently the -- the transmission can be made***…." Ex. 10

(Stark Dep. Tr.) 43:14-20. In his opinion, a person of ordinary skill in the art "would appreciate that the transmitted CQI Index is a measurement of efficiency because it quantifies the 'efficiency' values." Stark Reply Rept. ¶ 70. Dr. Stark also opined that "reporting a difference in CQI indices meets the requirement for reporting a differential channel quality." *Id.* ¶ 86. Dr. Stark therefore concludes that "the CQI Index values themselves are 'values quantifying how efficiently downlink resources of a channel can communicat[e] information." *Id.* ¶ 71. Contrary to Lenovo's assertion, Dr. Stark's opinion is that CQI Index values are *themselves* "channel qualities" under the parties' agreed claim construction.[2]

As an alternative to literal infringement, InterDigital alleges that the Accused Product infringe the '612 and '449 Patents under the DOE. Specifically, InterDigital asserts that a CQI Index is equivalent to channel quality. Lenovo seeks summary judgment, asserting that InterDigital's proposed equivalent is precluded under the doctrine of prosecution history estoppel. Lenovo's Op. Br. at 20. However, the presumption of prosecution history estoppel may be overcome if "the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) (*Festo II*).

The rationale for InterDigital's claim amendment is unrelated to its proposed equivalent. Specifically, Lenovo points to a January 2, 2013 claim amendment in response to the examiner's rejection based on a purported prior art reference named "Ue." In amending the claims,

---

[2] Lenovo inaccurately characterizes Dr. Stark's deposition testimony. He did not testify "that the accused index/values are unitless integers that cannot themselves quantify anything." Lenovo's Op. Br. at 19.  Rather, Dr. Stark testified that "you could call it an index if you wanted, but it's a subband differential CQI value." Ex. 10 (Stark Dep. Tr.) 59:17-19. Dr. Stark never testified that the CQI Index is not quantitative.

InterDigital explained that (1) "Ue fails to teach deriving, by the UE, a channel quality for ***each of a plurality of downlink resources***" and (2) "Ue also fails to teach transmitting, by the UE, the derived channel qualities in ***a pattern of time intervals by rotating through the derived channel qualities*** wherein each derived channel quality is transmitted in different time intervals of the pattern." *See* D.I. 221-28, Ex. BB ('612 File Wrapper) at IDC-LEN-1590-0011400. In other words, InterDigital never argued that Ue did not transmit channel quality. Nor did InterDigital argue that a CQI Index differed from channel quality.

In *Funai Elec. Co. v. Daewoo Elecs. Corp.*, the disputed claim element was "insulating material." 616 F.3d 1357, 1369 (Fed. Cir. 2010). Although the claims were amended, "the nature of the insulating material was not a factor in the allowance" and thus tangential to the amendment in question. *Id.* Here, the nature of the "channel qualities" was never discussed and, in fact, the claim term itself was not amended. *See also Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1362 (Fed. Cir. 2004). InterDigital's reasons for amending the claims are unrelated to its proposed equivalent.

Lenovo also argues that prosecution history estoppel precludes DOE for the '449 Patent. As noted by Lenovo, InterDigital canceled the original claims in a preliminary amendment. Lenovo erroneously asserts that, while the original claims required merely "sending a channel quality report to the base station, wherein the channel quality report is indicative of at least one of the respective MCSs," the new claims introduced narrower claim language. Lenovo's Op. Br. at 21. Lenovo overlooks that original application claim 8 included substantially the same limitation, as seen in the following table:

| Original Claim 8 | Amended Claim 21 |
|---|---|
| "a ***channel quality report*** comprising the ***first value*** and each of the respective ***differential channel quality*** values to the base station."<br><br>D.I. 221-29, Ex. CC ('449 File Wrapper) at IDC-LEN-1590-0010210 | "… at least one ***channel quality report*** comprises the ***first channel quality indication*** … the second channel quality indication is reported as a ***differential channel quality*** with respect the first channel quality indication."<br><br>*Id.* at IDC-LEN-1590-0010244 |

Because the term "differential channel quality" was in both the original and amended claims, the reason for any amendment could not have been related to that particular term. Like the '612 Patent, the reason for the amendment would necessarily be tangential to the proposed amendment since the amendment focused on entirely different language. InterDigital has, therefore, rebutted prosecution history estoppel.

Lenovo next argues that InterDigital is estopped from relying on the DOE due to arguments made during an IPR proceeding. Lenovo is wrong as a matter of law. Prosecution history estoppel precludes a claim construction contrary to a "clear and unmistakable" surrender by the patentee in the specification or prosecution history. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009). Neither party is seeking to construe the term "channel qualities." Prosecution history estoppel does not foreclose InterDigital's ability to rely on DOE since it is not recapturing claim scope disclaimed during prosecution. Specifically, InterDigital never sought to distinguish "channel quality" from an index to a table providing for "channel quality."

Lenovo also argues that DOE is barred by the disclosure dedication rule. Lenovo's Op. Br. at 23. According to Lenovo, the common specification for the '612 and '449 Patents disclose an embodiment involving transmitting "an indication of one of the available sets or levels of the

modulation coding set (MCS) for each timeslot." *Id.* (citing Ex. A ('612 Patent) at 5:55-6:9). Lenovo contends that "this alternative does not involve the transmission of channel qualities as claimed." *Id.* Lenovo's argument collapses because the language describing the allegedly "dedicated" embodiment closely tracks the claim language. For example, claim 1 of the '449 Patent recites that "the second channel quality indication is used to indicate […] an MCS that has been determined based on a channel quality of a particular downlink resource…." D.I. 221-2, Ex. B ('449 Patent) 7:52-57. Dependent claim 8 states that "each downlink resource […] corresponds to a timeslot." *Id.* at 8:21-23. Similarly, claim 1 of the '612 Patent recites "deriving […] a channel quality for each of a plurality of downlink resources" and "transmitting […] the derived channel qualities in a pattern." D.I. 221-1, Ex. A ('612 Patent) 7:27-32. Further, dependent claim 4 recites that "the plurality of downlink resources are timeslots" (7:40-41) while dependent claim 7 recites that "the derived channel quality indicates a modulation and coding set." (7:49-50). In other words, both the '449 and '612 Patents claim the embodiment that Lenovo contends was dedicated to the public. *See ViiV Healthcare Co. v. Gilead Scis., Inc.*, 437 F. Supp. 3d 395, 400 (D. Del. 2020) ("By definition, a disclosure in a claim is *not* dedicated to the public.").

The Court should, therefore, deny summary judgment because there is at least a material factual dispute as to whether the Accused Products transmit "channel quality" either literally or under the DOE.

### F. The Accused Products Receive A Configuration Comprising a "Periodicity"

Lenovo seeks summary judgment of non-infringement for the asserted claims of the '747 Patent on the ground that the Accused Products do not receive a "configuration" comprising a "periodicity." Lenovo Op. Br. at 24. InterDigital's technical expert, Dr. Stark, disagrees, opining that "the SR configuration index is interpreted, within this context, as periodicity." Stark Reply Rept. ¶ 23. In rendering his opinion, Dr. Stark relied on another expert, Dr. Plock, who

conducted a detailed source code analysis. Dr. Stark explained the result of that source code analysis:



*Id.* In other words,

Ignoring Dr. Stark's opinions, Lenovo argues that Dr. Stark testified differently at his deposition. But Lenovo's counsel questioned Dr. Stark regarding a table in the 3GPP technical specification, not about how "periodicity" was implemented in the Accused Products. Even if the 3GPP technical specification does not expressly identify a unit for "SR configuration Index" values, the Accused Products nonetheless interpret the variable "SR periodicity" as "periodicity" when copied into the appropriate data structure. Lenovo cannot discount Dr. Stark's direct comparison between the claims and the Accused Products. *See Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 967 F.3d 1380, 1384 (Fed. Cir. 2020) (*IP Bridge 1*), cert. denied, 141 S. Ct. 2862, 210 L. Ed. 2d 965 (2021) ("infringement must be proven by comparing the claims to the accused products, or by proving that the accused devices 'implement any relevant optional sections of the standard'") (quoting *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1328 (Fed. Cir. 2010).

Lenovo also quotes a snippet from the expert report of InterDigital's source code analyst (Dr. Plock) regarding the Qualcomm source code. Lenovo's Op. Br. at 25. Lenovo omits Dr. Plock's conclusion which was that "the allocation described above *includes periodicity* and dedicated physical resources." D.I. 221-25, Ex. Y (Plock Op. Rept.) ¶ 126. InterDigital's technical experts were, therefore, consistent that the "periodicity" is included in the allocation transmitted from base stations to the Accused Products.

The conflicting opinions offered by Lenovo's technical expert provides another basis for denying summary judgement. In some instances, Lenovo's technical expert (Dr. Valenti) supports Lenovo's argument that the Accused Products do not receive a periodicity. But he also opines that mobile devices (such as the Accused Products) which rely on time slots, *necessarily* receive a periodicity. For instance, in a UK proceeding between the parties involving a related patent, Dr. Valenti testified that "[t]he *different [time] slots are used by different users*.  In order to allocate those time slots to users, the users *would have to be told the periodicity* of those time slots." Ex. 11 (*InterDigital Tech. Corp. v. Lenovo Grp. Ltd.*, No. HP-2019-000032, Day 5) at 681:22-25. Dr. Valenti offered essentially the same opinion at his deposition in this case:

> "Q. So if the user equipment knows which time slots to use, *we can infer that it received an indication of periodicity*?
> A. **Yes**. I think in this example that's a fair statement."
> * * *
> Q. [...] So in other words, if, you know, a non-contention-based channel is being allocated to a mobile device, *it would necessarily receive an indication of periodicity*?
> A. I think **that would be generally true**....

*See* Ex. 5 (Valenti Dep. Tr.) 124:23-125:2, 126:6-11.

Lenovo's other technical expert, Dr. Bims, testified that the configuration, which includes timing parameters such as periodicity, *is sent* from the base station to the Accused Products. Ex. 12 (Bims Dep. Tr.) 156:6-12 ("Q. Would the configuration include information about timing

parameters for the uplink and downlink channels? A. I believe so, yes. Q. And that's *the configuration sent from the base station to the UE*? A. Yes.").

As explained above, Dr. Stark offered a literal infringement opinion based on base stations transmitting "periodicity" to the Accused Products.  In the alternative, Dr. Stark offers a DOE opinion and opines that an "index to a periodicity" is equivalent to "periodicity." As explained in InterDigital's opposition to Lenovo's Motion to Strike, Dr. Stark's DOE opinion was properly set forth in his reply expert report, since Lenovo failed to previously explain any non-infringement argument suggesting the basis for InterDigital's DOE position. D.I. 233.

Lenovo also contends that the doctrine of prosecution history estoppel precludes DOE for the '747 Patent. Prosecution history estoppel is inapplicable for at least two reasons. First, there was no narrowing claim amendment. *Festo Corp.*, 344 F.3d at 1366 ("*Festo II*"). Lenovo argues otherwise, first pointing to an obviousness rejection in view of the Sizeland reference in combination with several other references. Lenovo Op. Br. at 25. In response to that rejection InterDigital amended the application claims and explained that "the cited references nowhere teach that allocation of a wireless *NCB channel, wherein the usage of the NCB channel is during a periodic interval*."  D.I. 221-32, Ex. FF ('747 File Wrapper) at IDC-LEN-1590-0007317. InterDigital also explained that "[t]he office action acknowledges that [the cited prior art references] do not teach the allocation of a wireless NCB channel." *Id.*  Importantly, InterDigital then canceled this entire claim set, introducing a new claim set (Nos. 105-143) having substantially different limitations. *Id.* at IDC-LEN-1590-0008115. In other words, the amendment to which Lenovo points is with respect to canceled claims that differ substantially from those that ultimately issued. Then, on May 30, 2013, InterDigital initiated an interview with the patent examiner. *Id.* at IDC-LEN-1590-0008113. The patent examiner proposed canceling

certain claims (Nos. 1-104) and further proposed newly drafted claims (Nos. 105-143). *Id.* at IDC-LEN-1590-0008115-121. Claim 105 (which eventually issued as claim 1) recited, in part, "a configuration comprising an indication of dedicated physical resources and a periodicity…." *Id.* at IDC-LEN-1590-0008115. Following the examiner's allowance, InterDigital amended this language to read "the configuration comprises a periodicity and an indication of dedicated physical resources." *Id.* at IDC-LEN-1590-0008233. This simple rewording represented the only amendment to the relevant portion of the claim language.  Such an amendment did not narrow the scope of the claims and was clearly not required for allowance, which the examiner had already granted.

Second, the rationale for InterDigital's amendment bore no more than a tangential relation to the equivalent in question. *Festo Corp. v. Shoketsu Kinzoku*, 535 U.S. 722, 740 (2002) (*Festo I*). As explained above, Dr. Stark opined that transmitting an index to a periodicity is equivalent to transmitting a periodicity. InterDigital never sought to draw any distinction based on "periodicity."

### G. The Accused Products Do Not Receive An Allocation of The Second Time Interval

Lenovo seeks summary judgment of no infringement of the '665 Patent. According to Lenovo, the Accused Products do not meet the limitation "wherein … a specific allocation of the second time interval is not received by the CDMA subscriber unit," which has been construed to mean "wherein [] a control or signaling message assigning the second uplink channel to a particular subscriber unit is not received and [] there is no separate process for allocating reverse link channels for the sending of acknowledgement messages in response to receipt of a forward link packet." Lenovo Op. Br. at 27-29.

Lenovo first argues that the Accused Products receive an "RRC connection setup message" that "causes it to 'initiate' physical channels … and provides communication parameters necessary to transmit an acknowledgement on the HS-DPCC." *Id.* at 28. Lenovo contends that the "RRC connection setup message" is a "control or signaling message assigning the second uplink channel to a particular subscriber unit" under the Court's construction and the Accused Products do not infringe because they receive this message. *Id.* InterDigital's technical expert, Dr. Vojcic, disagrees. Vojcic Reply Rept. ¶¶ 67-74. Specifically, "[t]he Accused Products (as per the standards section identified in my opening report) do not receive a message allocating the second uplink channel. I disagree with Dr. Bims that because the calculation of 'm' is predicated on the timing of the downlink DPCH frame from the HS-DSCH that a subscriber unit receives a control or signaling message allocating the second uplink channel." *Id.* ¶ 70.

Lenovo's argument is also at odds with its own expert, Dr. Bims, who testified that RRC messages are sent between a mobile phone unit ("UE") and a base station (or cell tower) to ***establish*** a connection. Dr. Bims testified that when a UE associates itself with a cell tower, "the base station can initiate a sequence of communications with the device, which results in an RRC connection establishment message." Ex. 12 (Bims Dep. Tr.) 152:11-20. Dr. Bims also testified that when a UE and base station first connect, "previous to the RRC connection establishment message is an ***RRC connection set-up message***, and then based on responses from the UE, then the connection is then established with the connection establishment message." *Id.* at 154:3-8. He further testified that "when there's a hand-over, there's either going to be an RRC connection establishment message or an RRC connection reestablishment message." *Id.* at 155:8-14.

Dr. Bims's testimony confirms that the RRC connection setup message, are sent between a UE and a base station when they first ***establish*** a connection. Lenovo does not cite any evidence that the RRC signaling "allocates" the second time interval. At most, Lenovo has

shown that RRC signaling provides parameters for the initiation of ***all physical channels***.

Lenovo Op. Br. at 28. Lenovo has not shown a specific allocation of an HS-DPCCH channel "to

a particular subscriber unit." Lenovo's argument is akin to saying that because the UE must be

powered on before an uplink channel is allocated, this means that powering on the phone

allocates the channel. *Id.* at 4-6. This argument is nonsensical. Moreover, when asked about

Lenovo's noninfringement theory at his deposition, InterDigital's expert Dr. Vojcic testified that

"the user could infringe [] even during [an] RRC connection procedure [] if [it sends an]

acknowledgement [for] messages that it receives from the base station." Ex. 13 (Vojcic Dep. Tr.)

130:7-17. At a minimum, the testimony of both experts confirms that there is a triable issue.

      Lenovo next argues that there is a "separate process for allocating reverse link channels

for the sending of acknowledgement messages in response to receipt of a forward link packet"

pointing to a 3GPP technical specification that Dr. Vojcic cited in paragraph 104 of his opening

report. Lenovo Op. Br. at 29. However, a preferred embodiment, as shown in Figure 2, explains

that when a data packet is received, the system "makes an assumption that the acknowledgment

message will be expected to be transmitted in corresponding time slot **70-4** on the reverse link

traffic channel **52**-i."  D.I. 221-5, Ex. E ('665 Patent) at 5:61-65. The patent further explains that

because "[t]he time slot 70-4 is positioned timewise a given number of time slots, m, away from

the time slot 60-4 allocated to the forward link, [t]his, in effect, results in automatic reservation

of a reverse link time slot for the acknowledgment message a fixed number of time slots, m, in

the future." *Id.* 5:66-6:3.

      According to Dr. Vojcic, Figure 34 from TS 25.211 "shows that 'the second time interval

is a ***predetermined time interval after*** the first time interval' because it shows a timing offset

between the reception time of the HS-PDSCH (i.e., 'the first interval') on the downlink and the

transmission time of feedback information on the HS-DPCCH (i.e., the 'second time interval')

on the uplink." Vojcic Op. Rept. ¶ 103. Accordingly, the feature that Lenovo contends is a "separate allocation" in the standard is clearly shown in an embodiment of the '665 Patent as a "time interval on the second uplink channel [that] is a pre-determined time period away from the time interval on the downlink channel." D.I. 221-6, Ex. F ('954 Patent) 8:39-41. As the patent explains, this feature of the invention is the reason why "[u]nlike prior art systems, there is no specific assignment needed of reverse link traffic channel slots." *Id.* 5:62-65. Lenovo's argument, which misses this point entirely, is incorrect and should be rejected.

### H. The Accused Products Do Not Receive An Allocation of The Second Uplink Channel

Lenovo also seeks summary judgment of the '954 Patent. Like the '665 Patent, Lenovo contends the Accused Products do not meet the limitation "wherein an explicit allocation of the second uplink channel is not received," which the Court construed to mean "wherein a control or signaling message assigning the second uplink channel to a particular subscriber unit is not received and there is no separate process for allocating reverse link channels for the sending of acknowledgement messages in response to receipt of a forward link packet." Lenovo Op. Br. at 27-30.

Lenovo's first argument—that RRC signaling is "a control or signaling message assigning the second uplink channel"—should be rejected because it is unsupported by Lenovo's purported evidence, including the standard, Dr. Vojcic's testimony and the report of Dr. Stark who did not provide opinions on either the '954 Patent or the related '665 Patent. Lenovo Op. Br. at 27-28. First, both the standard and Dr. Vojcic's testimony about the standard say the same thing—"PUCCH resources *for SR and CQI reporting* are assigned and can be revoked through RRC signaling…. *PUCCH resources for SR and CQI are lost when the UE is no longer synchronized*." Vojcic Op. Rept. ¶ 167 (quoting from TS 36.300 § 5.2.3). Lenovo's motion

overlooks the emphasized language that says the PUCCH resources are "for SR [Scheduling Request] and CQI [Channel Quality Information] reports" and "are lost when the UE is no longer synchronized." Instead, Lenovo focuses on Dr. Vojcic's statement summarizing the disclosure of the standard where he writes "PUCCH resources are pre-allocated" and attempts to mischaracterize this as an admission that the second uplink channel is allocated. *Id.* Lenovo ignores that in that following paragraph, Dr. Vojcic writes that the standard meets the claim as construed by the Court because "[t]he transmission of feedback information on the PUCCH channel is in a predetermined time interval, 4 subframes, from the time interval on the downlink channel." *Id.* ¶ 174. Dr. Vojcic also explains that "[t]he PUCCH uplink channel ('the second uplink channel') can be used for the sending of acknowledgment messages and there is no process of allocating PUCCH for sending of acknowledgment message in response to receipt of a forward link packet. Instead, the PUCCH resources are pre-allocated by higher layers, specifically using RRC signaling, as indicated by the LTE standard." *Id.* ¶ 167.

Lenovo's second argument—that the UE uses PUCCH resources for transmission of HARQ-ACK—was also addressed by the experts who disagree on the interpretation of the standard. In ¶¶ 87-88 of his rebuttal report, Lenovo's expert, Dr. Bims, made the same argument that Lenovo now presents. Dr. Bims opined that TS 36.213 § 10.1 should be interpreted to mean that "the DCI assigning and $N^{(1)}{}_{PUCCH}$ are used to assign a PUCCH resource for transmission of HARQ-ACK." Ex. 14 (Bims Resp. Rpt.) ¶ 88. In response, Dr. Vojcic provided multiple reasons why he disagrees. Ex. 3 (Vojcic Reply Rpt.) ¶¶ 114-15. For example, Dr. Vojcic explained that "PUCCH channel is never assigned using DCI." *Id.* He also disagreed with Dr. Bims's conclusion that the "network utilizes DCI as a control or signaling message [sic] to assign a PUCCH to a particular subscriber unit." *Id.* Dr. Vojcic explained that the citation Dr. Bims relies

on actually "discusses assignment of PDSCH via PDCCH and discloses HARQ-ACQ is transmitted predetermined 4 subframes after the frame in which PDSCH was received." *Id.*

Lenovo's motion does not address any of these competing arguments by the experts or even acknowledges that there are numerous disputed facts relating to the experts' interpretation of the evidence from the standard. Lenovo's motion for summary judgment therefore must be denied.

## I.      InterDigital Preserved its Doctrine of Equivalents Theories for Infringement

Contrary to Lenovo's assertion, InterDigital timely disclosed DOE in its Final Infringement Contentions for all of the Asserted Patents. *See* Final Infringement Contentions (Cover Pleading). InterDigital's experts then addressed DOE in their reply reports for certain of the Asserted Patents in response to Lenovo's previously undisclosed non-infringement arguments. Lenovo's Op. Br. at 37-38. In accordance with its Final Infringement Contentions, InterDigital reserves the right to rely on DOE should Lenovo present new non-infringement arguments. The Court should therefore deny summary judgement of non-infringement based on material factual disputes as to both literal infringement and infringement under DOE.

## III.     LENOVO IS NOT ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY OF CERTAIN CLAIMS OF THE '580 AND '747 PATENTS

Lenovo bears the burden of proving patent invalidity by clear and convincing evidence. There is at least a material factual dispute as to each of Lenovo's invalidity arguments, as discussed in turn below:

*First*, Lenovo asserts that "[i]t is undisputed that if InterDigital's priority claims fail, the asserted claims of the 580 Patent are invalid as anticipated by or obvious in view of at least the 269 Application." Lenovo Op. Br. at 33. Not so. Under 35 U.S.C. § 120, "[a]n application for patent for an invention [...] in an application previously filed in the United States [...] which

names an inventor or joint inventor in the previously filed application shall have the same effect, as to such invention, *as though filed on the date of the prior application*…." The '580 Patent lists the 269 Application as a "Continuation ('580 patent at [63]) and the '580 patent's prosecution history identifies itself as a "continuation of" the 269 Application in satisfaction of 35 U.S.C. § 120. *See* Ex. 15 ('580 File Wrapper) at IDC-LEN-1590-0009021. As a continuation, the '580 patent contains the same figures and a nearly identical written description. Lenovo does not contend that the '580 patent added any new matter beyond what was set forth in the 269 Application. In other words, the '580 patent has an effective filing date of at least January 31, 2007. The '580 patent therefore shares the same effective filing date as the 269 Application and thus does not qualify as prior art under pre-AIA 35 U.S.C. § 102(b). *Purdue Pharma L.P. v. Faulding Inc.*, 230 F. 3d 1320, 1323 (Fed. Cir. 2000) ("In order to satisfy the written description requirement, the disclosure as originally filed does not have to provide *in haec verba* support for the claimed subject matter at issue.").

**Second**, Lenovo alleges that the 269 Application fails to enable and provide written description support for the claim term "evolved Node B" or "eNB."[3] The test for written description is whether the disclosure reasonably conveys to a POSA that the inventor had possession of the invention. The specification for the '580 Patent expressly discloses the term "eNB" and ascribes meaning within the context of the patented embodiments. *See, e.g.,* D.I. 221-4, Ex. D ('580 Patent), FIG. 1 (showing examples of eNB interactions with wireless transmit

---

[3] Lenovo makes the same lack of written description and enablement arguments for claims 16, 17, 21 and 24 of the '747 Patent which also recite the term eNB. Lenovo's Op. Br. at 33. InterDigital incorporates the same arguments made with respect to the '580 Patent.

receive units "WTRUs"); FIG. 3 (item 320 depicts the eNB transmitting NCB channel allocation), FIGS. 5-7, 3:20-46, 3:65-4:10, 4:63-67, 5:18-22, 5:51-59.

Lenovo also alleges that the '580 patent claims are invalid for lack of enablement. "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the *claimed invention* without 'undue experimentation.'" *Alcon Rsch. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (quoting *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988)). Lenovo's lack of enablement argument fails because it is untethered to the "claimed invention." Contrary to Lenovo's assertion, the claims are not directed to an "eNB," but, rather, to a wireless transmit receive unit (WTRU) which communicates with an eNB in a specified manner. The question is not whether a POSA could build an eNB but whether the claimed WTRU is enabled. Importantly, Lenovo does not assert that the '580 Patent lacks an enabling disclosure for performing the claimed steps.

Even if it were required that the '580 Patent enable an unclaimed "eNB," Lenovo's argument fails as it is premised on an overly narrow interpretation of the Court's claim construction of "eNB," which is "a base station in a 4G/LTE network as opposed to the 'Node Bs' or 3G/UMTS networks or the 'BTS' of 2G/GSM networks." D.I. 100 at 16. According to Lenovo, an eNB "must therefore include *all of the functionality* necessary to function as 'a base station in a 4G/LTE network.'" Lenovo's Op. Br. at 35. However, the Court framed the parties' dispute as "whether the term refers to a base station generally or to a base station in the context of LTE." *Id.* The Court then reasoned:

> [A] POSA would understand that the patents refer to LTE-based base stations.
> The incorporated 3GPP standards (published in November 2006) provide that
> an 'Evolved NodeB (eNodeB) is the base station for LTE radio.' (D.I. 77 Ex. 4)
> Extrinsic evidence demonstrates that a POSA would understand the term

> '*eNodeB*' *to be related to* '*a term that had recently been coined for LTE, to distinguish 4G base stations from 2G/3G base stations*' *and a POSA* '*would therefore understand that the invention was intended for use in forthcoming LTE/4G networks.*' *(D.I. 93 Ex. 1 at 250)*

*Id.* The Court's reasoning does not suggest that an eNB include all functionality needed to fully comply with the applicable 3GPP standards, including functionality unrelated to the claims of the '580 Patent. On the contrary, the Court specifically acknowledged that eNB referenced "use in ***forthcoming*** LTE/4G network," *i.e.*, the term was interpreted for use in a ***future*** network where some technical details were not fully implemented. In this regard, eNB merely distinguishes 4G base stations from 2G/3G base stations.

Lenovo also failed to apply the test for "undue experimentation."[4] Unencumbered by any citation to evidence, Lenovo argues that "before December 2008, no amount of experimentation would have permitted a [POSA] to divine what the 3GPP standards committee would ultimately adopt as the final design." Lenovo's Op. Br. at 36. Dr. Stark disagreed. Stark Reb. Rept. ¶ 107. Among other evidence, Dr. Stark considered the duration between InterDigital contributing its invention to the 3GPP standard (October 2007) and finalization of the standard (December 2008). *Id.* Within the context of the relevant technical filed, Dr. Stark did not view this period as indicating "undue experimentation." Dr. Stark also opined that in 2006, more than one year before the '580 patent's effective filing date, "you could have built an eNode-B and had it set up

---

[4] "Undue experimentation" requires a complex inquiry involving weighing many "factual considerations," including: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *Alcon Rsch.,* 745 F.3d at 1188 (quoting *In re Wands,* 858 F.2d 731, 736–37 (Fed. Cir. 1988)).

so that […] when the appropriate parts of the specification were completed, you could modify the software so that it would [sic] function as an eNode-B." Ex. 10 (Stark Dep. Tr.) 153:2-6.

Lenovo's technical experts generally agree.  According to Dr. Bims, "[t]here were companies who leveraged their own internal designs *to implement early versions of the LTE standard* prior to the […] release of the standard itself." Ex. 12 (Bims Dep. Tr.) 208:6-9. Dr. Bims acknowledged that "from a technical standpoint, *persons of ordinary skill could work out the details to implement wireless technology for cellular communications at the speeds contemplated by LTE*." Ex. 12 (Bims Dep. Tr.) 209:21-210:6. Dr. Valenti identified several other patents contemporaneous with the '580 patent, which also used the term eNB. Ex. 16 (Valenti Op. Rept.) ¶¶ 186-190 (discussing U.S. Patent No. 7,912,471 to Patabandi), *id.* ¶ 191 (identifying additional patent also using the term "eNB").

Additionally, in 2007, contemporaneous with the effective filing date of the '747 and '580 patents, Lenovo (through its subsidiary Motorola) released a white paper stating that "[t]he evolved RAN for LTE consists of a single node, i.e., *the eNodeB (eNB)*…." Lenovo repeatedly characterized "eNB" in the *present tense* describing its "many functions." Ex. 17 (Panda Dep. Ex. 74) at 4. When confronted with the white paper, Lenovo's 30(b)(6) witness agreed that "Motorola knew what an eNodeB was in 2007." Ex. 7 (Panda Dep. Tr.) 82:25-83:6.

Lenovo failed to meet its burden of proving, by clear and convincing evidence as a matter of law, invalidity of certain claims of the '580 and '747 patents. There is at least a material factual dispute as to written description and enablement.

## IV.   LENOVO'S *DAUBERT* CHALLENGES SHOULD BE DENIED

### A.   InterDigital's Reply Reports Properly Addressed Doctrine of Equivalents

Lenovo does not challenge the DOE opinions of Drs. Vojcic and Stark for falling short of the requirements for expert opinion testimony under FRE 702 or *Daubert.* Lenovo instead

references its Motion to Strike. Lenovo's Op. Br. at 20, 25. InterDigital's opposition to that
motion shows that the DOE opinions were timely disclosed in response to Lenovo's belated non-
infringement arguments. D.I. 233.

### B. InterDigital's Technical Experts Applied the Court's Claim Constructions

Lenovo alleges InterDigital's technical expert opinions on infringement contradict the
Court's claim constructions and moves to exclude on this basis. Lenovo Op. Br. at 38-40. The
testimony in question, however, shows the experts relying on the Court's constructions. *See, e.g.*,
Vojcic Op. Rept. ¶¶ 56-59; Ex. 18 (Vojcic Reb. Rept.) ¶¶ 10-11; Ex. 3 (Vojcic Reply Rept.) ¶¶ 4-
5, 14; Stark Op. Rept. ¶¶ 71-74; Ex. 19 (Stark Reb. Rept.) ¶ 12-14; Ex. 20 (Stark Reply Rept.) ¶
3. It also shows there is a dispute among experts over "how a court's claim construction should
be applied to the facts of a case," which is not grounds for exclusion. *See In re Maxim Integrated
Prods.*, No. 12-244, 2015 U.S. Dist. LEXIS 124062, at *28 (W.D. Pa. Sep. 11, 2015).

**"configured to":** Lenovo asserts that the Accused Products are not "configured" until
they are powered on in an actual network and receive all parameters necessary for operation
from a base station. As discussed above in § II.A.1, Drs. Vojcic and Stark acknowledged and
properly applied the parties' stipulated construction for this claim term. InterDigital's experts
also noted that Lenovo's argument contradicts the established principle that an accused product
need only be "reasonably capable" of satisfying an apparatus claim limitation. ("A [POSA]
would understand that 'configured to' (construed by the Court as 'set up for operation') means
that a device has the capability to perform the specified functionality in its intended and ordinary
use"); Stark Reply Rept. ¶¶ 46-47 (same opinion); *see also* § II.A.1, *supra* (quoting Federal
Circuit cases establishing the reasonable capability principle for infringement of apparatus
claims). A disagreement between the experts over how the Court's claim construction should be
applied is not grounds for exclusion under *Daubert*. *See Shopify Inc. v. Express Mobile, Inc.*, No.

19-439-RGA, 2021 U.S. Dist. LEXIS 179773, at *92 (D. Del. Sep. 21, 2021) (*Daubert* motion denied when experts "opined and testified that they were faithful to the claim construction" and there was a "factual question" of applying the Court's construction). Lenovo's motion therefore should be denied.

      **"evolved NodeB"**: Lenovo argument that Dr. Stark misinterpreted the term "evolved NodeB (eNB)" lacks merit. Dr. Stark never testified that a base station that "could not operate as 'a base station in a 4G/LTE network'" satisfies the "eNode B" limitation. Lenovo's Op. Br. at 39. To the contrary, as discussed above in § III, Dr. Stark expressly applied the Court's construction. Stark Reb. Rept. ¶ 112. He also observed that the claimed eNB must be capable of performing the functions recited by the asserted claims and explained that these requirements "are specific to a 4G/LTE network and distinguishable from the operation of a Node B or BTS." *Id.* at ¶¶ 113-17. At his deposition, he testified "I'm applying the Court's construction" and then accurately quoted the construction. Ex. 10 (Stark Dep. Tr.) 158:23, 159:3-6; *see also id.* at 159:14-16 ("So it [the Court's construction] says a base station for 4G as opposed to the 3G and 2G networks"). The whole of Dr. Stark's testimony confirms that he knew the Court's construction and applied it in his analysis.[5] Lenovo's motion is baseless and should be denied.

      **"specific/explicit allocation"**: There is likewise no support for Lenovo's third argument regarding the "specific/explicit allocation" claim terms. During his deposition, Dr. Vojcic acknowledged the Court's construction without altering it in any way. D.I. 221-26, Ex. Z (Vojcic

---

[5] Lenovo's attempt to misinterpret Dr. Stark's testimony is clear from the questioning which basically asked him if an eNB performs the claim limitations would it be an eNB. Ex. 10 (Stark Dep. Tr.) 159:18-20 ("[I]f a device has the capability set forth in the claim language, it is, therefore, evolved --it is, therefore, an evolved Node-B?"); *id.* at 160:9-12 ("[I]f a device does those things or capable of doing those things, then it is an evolved Node-B for purposes of this patent, correct?").

Dep. Tr.) 70:11-20. In his reply report, Dr. Vojcic again repeats the Court's construction when he refutes Lenovo's argument that timing messages, such as the DPCCH offset parameter, are a specific allocation. Vojcic Reply Rept. ¶ 92 ("[T]his message is not a separate process for allocating reverse link channel for the sending of acknowledgment messages *in response to* receipt of a forward link packet."). Dr. Vojcic also explained that "allocation of DPCH offset cannot be an allocation of the reverse link channel" and even if it can "indirectly in part set[] a second time interval, this is not in response to a receipt of a forward link packet." *Id.* Lenovo nonetheless argues that "in response to receipt of a forward link packet" <u>only</u> modifies the phrase "sending of acknowledgment messages" in the Court's construction. Lenovo's Op. Br. at 39-40. This belated claim construction argument is incorrect because it would mean that the Court's construction bars allocation of all reverse link channels *without limitation*. There is no support in the claims or specification for narrowing the claims in this manner. To the contrary, the Court's construction clearly states, "there is no separate process for allocating reverse link channels ***for*** the sending of acknowledgement messages ***in response to*** receipt of a forward link packet." D.I. 101, at 3. The "reverse link channels" and "receipt of a forward link packet" therefore are related and not independent as Lenovo now contends. Once again, there may be a disagreement between the experts over the application of the Court's construction to the facts, but this is not grounds for exclusion.

### C.     Mr. Kennedy's Methodologies Are Reliable

Mr. Kennedy's expert report presents three separate damages approaches: (1) Patent Benefits Approach, (2) Infrastructure Cost Approach, and (3) Comparable License Approach. Contrary to Lenovo's claims, each of Mr. Kennedy's approaches focuses on measuring the "economic benefits gained by Lenovo through its use of the Patents in Suit in the Accused Products." Ex. 21 (Kennedy Reply Rept.) ¶ 8. That is also what is called for by *Georgia-Pacific*

Factors 9 and 10:

> Factor 9: "The utility and advantages of the patent property over old modes or devices, if any, that had been used for working out similar results."

> Factor 10: "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also* Ex. 22 (Kennedy Op. Rept.) ¶ 263 ("I have undertaken my analysis of Factors 9 and 10 in ways that isolate only the economic benefit delivered by the Asserted Claims, absent any benefit delivered to Lenovo through the relevant standards.").

As explained further below, each of Mr. Kennedy's approaches is also consistent with Federal Circuit precedent requiring the apportionment of damages.  The goal of apportionment is to identify the "benefit" attributable to the Asserted Patents and ensure that the patent owner's damages are proportional to the value the Asserted Patents contributed to the Accused Products and do not include value attributable to unpatented features. Methodologically, there are numerous ways this apportionment can be done depending on the facts and circumstances specific to the patents at issue. *See, e.g.*, *Ericsson*, 773 F.3d at 1226.

Lenovo's Daubert motion misstates Mr. Kennedy's methodologies and presents disagreements with his conclusions. Because Mr. Kennedy relies on sufficient facts and data, measures the value of the Asserted Patents, and appropriately apportions damages, the Court should deny Lenovo's Daubert motion directed to Mr. Kennedy.

### 1.      Mr. Kennedy's Patent Benefits Approach Is Reliable and Based on Sufficient Facts and Data

#### a)      Mr. Kennedy Properly Relies on the Expert Opinions of Dr. Vojcic

Mr. Kennedy is neither a technical nor survey expert. As such, in Mr. Kennedy's Patent Benefits Approach, he seeks to measure the benefits associated with the patented inventions by

relying in part on a technical expert and a survey expert, whose credentials Lenovo never challenges and whose opinions Lenovo has not sought to exclude.

Mr. Kennedy relied on Dr. Vojcic's opinion that the Asserted Patents meaningfully contributed to enhanced speeds. Ex. 22 (Kennedy Op. Rept.) ¶ 43; *see also id.* ¶ 64 ("Patents in Suit generally relate to improving the performance of cellular communication systems by optimizing the use of overhead data in 3G and LTE communications technologies. I understand that one of the benefits from optimizing overhead data is increased cellular data speed."). Mr. Kennedy also relied on Dr. Vojcic's opinion regarding the performance drawbacks associated with non-infringing alternatives: "If th[e] Accused Products were unable to use any one or more of the Asserted Claims of the '612 and '449 Patents, and were instead to use the most reasonable alternative that would avoid infringement of each of those Claims, then the average LTE data performance of those Accused Products would be reduced. . . . Those impacts would typically be experienced by a user as a reduction in the apparent speed at which requested cellular data are received by the Accused Product device, e.g., a reduction in the speed experienced for a request to view a web page, or listen to streamed music, or watch streamed videos." *Id.* ¶¶ 67, 80; *see id.* Section 4.

In addition to Dr. Vojcic's technical opinions, Mr. Kennedy also relied on the opinions of Dr. Groehn regarding consumer preferences, and more specifically, the "price premium that consumers are willing to pay . . . for the improved LTE speed enabled by the Patents in Suit." *Id.* ¶ 142. Mr. Kennedy further considered Dr. Groehn's calculation of the "minimum cost that Lenovo would incur by offering the Accused Handsets with degraded LTE performance, as compared to the Actual World where it offers the Accused Handsets with their current performance." *Id.* ¶ 143.

Under Federal Rule of Evidence 703, Mr. Kennedy is entitled to rely on experts whose education, experience, expertise, knowledge, methodology, and analysis have not been separately challenged. *See Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0366, 2016 U.S. Dist. LEXIS 73985, at *49 (E.D. La. June 7, 2016) ("Federal Rule of Evidence 703 allows experts to base their opinions on facts or data that the expert has been made aware of or personally observed, which includes the efforts of other experts"); *see also Conn v. C.R. Bard, Inc.*, 4:14-CV-298, 2021 U.S. Dist. LEXIS 107523, at *18 (S.D. Tex. June 8, 2021) (permitting expert to rely upon other experts' opinions).

Here, Lenovo challenges neither Dr. Vojcic's technical expertise nor Dr. Groehn's consumer and survey expertise, and does not seek to exclude either of their opinions.  Instead, what Lenovo expresses is merely a disagreement with Dr. Vojcic's *conclusions*, as relied upon by Mr. Kennedy. Lenovo argues that Dr. Vojcic "conflates the Asserted Patents with the value of the 3G and 4G LTE cellular standards as a whole." Lenovo Op. Br. at 43.

As a preliminary matter, Lenovo's disagreement with Dr. Vojcic's conclusions regarding the nature and extent of the benefits of the patented technology, including translations of improvements in overhead data efficiency to overall cellular data speed, is not a sufficient basis to exclude. Rather, it reflects a technical dispute that Lenovo's experts can try to refute. But the proper forum for Lenovo to challenge Dr. Vojcic's conclusions is upon cross-examination at trial, and not through a *Daubert* motion directed at a wholly different expert. *i4i L.P. v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility"). Additionally, Lenovo misstates Dr. Vojcic's analysis. Dr. Vojcic specifically

measures the value of the *patented technology*, not the value of the standards as a whole. That is why Dr. Vojcic expressly compared the patented technology to "the most reasonable alternative that would avoid infringement" of the patented claims. *See, e.g.*, Ex. 22 (Kennedy Op. Rept.) ¶¶ 67, 72, 76; *see also* Ex. 23 (Vojcic Op. Rept.) ¶¶ 253-255, 277-280, 307, 317-321, 332.

Lenovo's reliance on *Apple v. Wi-LAN, Inc.* is unavailing. That case was distinguishable on multiple grounds. *First*, the court in *Wi-LAN* excluded the "correlation" opinion of the technical expert on which Mr. Kennedy relied. *See* 2019 WL 13162735, at *7 (S.D. Cal. Oct. 1, 2019). Here, Lenovo has not moved to exclude any aspect of Dr. Vojcic's opinions, nor does the lack of any "correlation of the benefits of [Wi-LAN's] inventions with improved voice quality" bear any relevance to the technology at issue here." *Id.*

*Second*, unlike Wi-LAN's technical expert, who used "VoLTE as a starting point for apportionment, rather than the patented technology," (*id.* at *3), Dr. Vojcic measures the technical benefits of the patented technology, isolated from the benefits of the standard as a whole. *Compare* Ex. 23 (Vojcic Op. Rept.) ¶¶ 337-340 *with Wi-LAN*, 2019 WL 13162735, at *3, *7. Furthermore, despite reliance on *Wi-LAN*, other courts have denied very similar motions to exclude Mr. Kennedy's survey-based opinions. *See* Ex. 24 (*Optis Wireless Tech., LLC v. Apple Inc.*, Case No. 2:19-cv-00066-JRG), D.I. 437 at 162-164 (E.D. Tex., July 29, 2020) (*Optis Wireless)* (denying *Daubert* motion to exclude Mr. Kennedy's testimony, including his "Survey Approach").

### b) Mr. Kennedy Properly Relies on the Expert Opinions of Dr. Groehn

Lenovo's criticisms of Mr. Kennedy based on Dr. Groehn's survey are similarly meritless. At bottom, Lenovo appears to criticize the degree of granularity associated with the survey questions. Lenovo Op. Br. at 44 (claiming that survey improperly focused on unspecified

levels of generic "cellular data speed" rather than improvements in use of "overhead data" attributable to the Asserted Patents). Lenovo then speculates that Dr. Groehn's survey results led to a "fundamentally flawed conclusion." *Id.* Neither (1) Lenovo's disagreement with the phrasing of the survey questions nor (2) Lenovo's speculation that the outcome of the survey would have differed had the questions included references to the highly technical term "overhead data" is sufficient to support Lenovo's *Daubert* motion. Indeed, courts have previously held that speculation that differently-worded survey questions would have yielded different results is insufficient to warrant exclusion. *See, e.g., Droplets, Inc. v. Overstock.com, Inc.*, Case No. 2:11-cv-401-JRG-RSP, 2015 WL 11120843, at *2-3 (E.D. Tex. Jan. 7, 2015) (denying motion to exclude damages expert who relied on survey data because moving party "will have their opportunity to cross examine [both experts] at trial regarding these perceived deficiencies").

Here, Lenovo has not moved to exclude the survey, which InterDigital does not agree was flawed in any way. In any event, "[t]he fact that [the] survey may be imperfect or conducted in an alternative fashion does not automatically support Defendants' conclusion that [the] methodology was unreliable." *Droplets, Inc. v. Overstock.com, Inc.*, No. 2:11-CV-401-JRG-RSP, 2015 WL 11120841, *2-3 (E.D. Tex. Jan. 7, 2015). *See also, Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1298–99 (Fed. Cir. 2015) ("flaws go to the weight of the evidence, not to [ ] admissibility"); *Earl v. Boeing Co.*, No. 4:19-cv-507, 2021 WL 3140545, at *7 (E.D. Tx. July 26, 2021) ("[c]ritiquing an expert's opinion simply by suggesting an alternative and allegedly superior methodological approach is, without more, insufficient"); *Maxell, Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2020 WL 8269548, at *17 (E.D. Tex. Nov. 11, 2020) ("Apple's challenges to Dr. Erdem's survey . . . are topics for vigorous cross-examination, not exclusion"); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, Case No. 2:13-CV-

213-JRG-RSP, 2015 WL 604577, at *4 (E.D. Tex. Jan. 29, 2015), adopted, 2015 WL 627949

(E.D. Tex. Feb. 6, 2015), affirmed, 853 F.3d 1370 (Fed. Cir. 2017) (finding that dispute over

survey which referred to "full smartphone feature set" instead of "infringing feature" at issue in

the case was "factual in nature" and could be "adequately addressed during the [expert's] cross-

examination").

### c)      Mr. Kennedy Properly Considers ROIC

Lenovo's arguments regarding the ROIC goes squarely to the weight of the evidence.

Mr. Kennedy utilizes the parties' ROIC to a limited extent, and only after he has calculated the

range of economic benefit obtained by Lenovo from the Accused Products' use of the patented

technology:

> Based on my licensing experience, and considering all of the facts and
> circumstances of this case, I believe that using ROIC is the most reasonable metrics
> for the parties at the Hypothetical Negotiations to apply when negotiating where
> agreement should be reached within an acceptable range of royalty rates in this
> matter. Lenovo's ROIC, for example, reflects the return that it generally achieves
> on its investments in its businesses, such as those it would have made in a
> Hypothetical License and complementary technologies. Similarly, InterDigital
> would consider achieving its ROIC on the economic value of the technology at
> issue a reasonable outcome from the negotiation. I have used ROIC as a means to
> allocate economic benefit between two parties in license negotiations on many
> occasions during my licensing career, and I have seen it used by other licensing
> professionals.

Ex. 22 (Kennedy Op. Rept.) ¶ 349. On the one hand, Lenovo contends that ROIC is a "*company-

wide* metric," rather than one specifically tied to the Asserted Patents. Lenovo Op. Br. at 45. On

the other hand, InterDigital contends that because Mr. Kennedy applies ROIC to the fully

apportioned value derived from the Asserted Patents, Mr. Kennedy appropriately captures the

value to Lenovo of only those Asserted Patents. At that stage, it is entirely reasonable and

appropriate to use a company-wide economic metric – the parties' ROIC at the time of the

hypothetical negotiation – to assess the positions of the parties.[6]  That Lenovo disagrees with the significance Mr. Kennedy attributes to ROIC is not sufficient to justify exclusion. *See Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (finding that trial court did not err in relying on profit margins to determine royalty rate; "[w]hile the trial court could have looked to other figures," that did not render finding erroneous).

Nor is Lenovo correct in arguing that the allocation of profit must be tied to a financial metric specific to the Asserted Patents. As explained in Section C.1.(a), *supra*, Dr. Vojcic and Mr. Kennedy already valued the benefits associated with the Asserted Patents. Having already considered the benefits conferred by Lenovo's use of the Asserted Patents on the Accused Products, further consideration of the parties' ROIC as a metric to allocate economic benefit between the parties is acceptable. *See* Ex. 25 (*Qualcomm Inc. v. Apple Inc*., No. 3:17-cv-01375-DMS-DD, D.I. 538 at 5 (S.D. Cal. Jan. 18, 2019)) (denying exclusion of damages expert's bargaining power approach using parties' financial metrics). To the extent Lenovo disagrees with Mr. Kennedy's analysis, its remedy is cross-examination, not exclusion.

## 2. Mr. Kennedy's "Infrastructure Cost Approach" Is Not Speculative

Mr. Kennedy's "Infrastructure Cost Approach" measures the value of the Asserted Patents against potential non-infringing alternatives ("NIA"). Relying on Dr. Vojcic's conclusion that even the most reasonable NIAs would reduce the LTE speed of the Accused Products, Mr. Kennedy considers the cost of moving to such NIAs in two separate ways: (i) "the cost (i.e., the

---

[6] *Droplets v. Yahoo*, Case No. 12-cv-03733-JST, D.I. 1000 at 6-7 (N.D. Cal. Jan. 12, 2022) is distinguishable. There, Nordstrom had estimated an ROI for each *specific* investment to determine which investment to make. There is no evidence that either party did so here. Rather, Mr. Kennedy benchmarked ROIC for the company as a whole in evaluating whether a license outcome would be acceptable to overall ROIC goals of the parties.

lost profit) to Lenovo of selling the Accused LTE Handset Products with reduced LTE data

performance," and (ii) "the cost to Lenovo of incentivizing the Carriers to ameliorate or

eliminate that reduced LTE performance by increasing the amount of LTE network capacity that

is allocated to the Accused LTE Handset Products."  Ex. 22 (Kennedy Op. Rept.) ¶ 138. Lenovo

seeks to exclude the second measurement as speculative and not apportioned. Neither of

Lenovo's claims have merit.

Mr. Kennedy's Infrastructure Cost Approach measures the potential cost savings Lenovo

enjoys by practicing the Asserted Patents rather than purchasing additional network capacity. It

is well settled that parties may measure damages via cost savings over NIAs. *See Prism Techs.*

*LLC v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1375-77 (Fed. Cir. 2017) ("A price for a

hypothetical license may appropriately be based on consideration of the costs and availability of

non-infringing alternatives and the potential infringer's cost savings"); *see also Aqua Shield v.*

*Inter Pool Cover Team,* 774 F.3d 766, 771-72 (Fed. Cir. 2014); *Powell v. Home Depot U.S.A.,*

*Inc.,* 663 F.3d 1221, 1240 (Fed. Cir. 2011) ("Reliance upon estimated cost savings from use of

the infringing product is a well-settled method of determining a reasonable royalty"); *see also*

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1458-59 (Fed. Cir. 1991); *Hanson v.*

*Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1080-81 (Fed. Cir. 1983).

The *Prism* case is particularly analogous. The patentee in *Prism* "presented evidence that

a reasonable royalty would reflect Sprint's willingness, in a hypothetical negotiation, to pay an

amount calculated by reference to the costs that Sprint, in order to provide its customers the kind

of service it wanted to offer them, would have incurred if it had chosen not to infringe – in this

case, the costs of building a private backhaul network instead of leasing back-haul services from

third-party providers." 849 F.3d at 1375. The Federal Circuit upheld the district court's

allowance of this testimony: the "requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action." *Id*. at 1376. Like the expert in *Prism*, Mr. Kennedy properly values the patented technology by distinguishing between what Lenovo's infringement allows it to provide its customers and the more costly course of action that Lenovo might have otherwise undertaken.

Lenovo's claim that device manufacturers would not buy additional carrier capacity is both a red herring and factually unsupported. Damages experts operate in the artificial "but-for" construct of a hypothetical negotiation. In any event, Lenovo is merely raising a factual argument about the availability of this alternative, to be decided by the jury. Indeed, factual disagreements regarding the availability of non-infringing alternatives do not require exclusion of an expert's opinion. *Micro Chem., Inc. v. Lextron, Inc*., 317 F.3d 1387, 1392–94 (Fed. Cir. 2003) (factual dispute over the availability of non-infringing alternatives did not provide grounds for exclusion under *Daubert*, holding that where "experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony"); *3M v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992) ("The existence of a noninfringing substitute is a question of fact …."); *Marshall Div. SimpleAir, Inc. v. Google Inc.,* 77 F. Supp. 3d 569, 581-83 (E.D. Tex. 2014), vacated on other grounds by *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns. AB*, 820 F.3d 419 (Fed. Cir. 2016) ("Determining the weight to be given to proposed noninfringing alternatives is "a task for the jury."); *Verinata Health, Inc. v. Ariosa Diagnostics, Inc*., 2018 WL 288050, at *5 (N.D. Cal. Jan. 4, 2018).

Regardless, Mr. Kennedy's assumption that a device manufacturer could seek to purchase additional network capacity is fully supported. Mr. Kennedy relied on Dr. Vojcic's analysis that

it would be technically feasible to do so: "Carriers control which handsets can utilize their Base Stations, and can regulate the amount of bandwidth of a given handset. If a Carrier wished to prioritize Lenovo handsets over handsets from other vendors, or to throttle the downlink for other vendors, [Dr. Vojcic] is aware of no technical reason that would prohibit a Carrier from doing so." Ex. 21 (Kennedy Reply Rept.) at ¶ 53 n.40; *see also* Ex. 3 (Vojcic Reply Rept.) ¶ 224. Not only is it technically feasible, but device manufacturers have actually considered the very alternative that is the subject of Mr. Kennedy's report: "The central premise of Apple's attack on Mr. Kennedy's infrastructure cost model is that Apple would never consider purchasing dedicated network capacity. In December 2019, after the *Wi-LAN* decision, Apple finally produced an internal document that proposed just this solution." Ex. 26 (*Optis Wireless*), D.I. 395 at 1 (E.D. Tex. July 22, 2020). Lenovo's skepticism about the desirability of the proposed solution does not support a motion to exclude.

Lenovo relies heavily on *Wi-LAN*. But the facts of this case are distinguishable from *Wi-LAN*. In particular, the infrastructure analysis in *Wi-LAN* was excluded largely because Mr. Kennedy had noted that because replacing lost network speed by purchasing additional network capacity would be more costly than simply accepting degraded service, it was not "economically feasible" for Apple to do so. *Id.* at *7. As such, Mr. Kennedy's testimony regarding the purchase of additional network capacity was found to be unhelpful to the jury. In contrast, with respect to Lenovo, the costs are reversed: here, it would be less costly – and more "economically feasible" – for Lenovo to purchase additional network capacity than to settle for degraded service. Ex. 22 (Kennedy Op. Rept.) at Ex. 3A; *see also* Ex. 21 (Kennedy Reply Rept.) ¶ 54.

Other courts have permitted Mr. Kennedy to testify regarding similar infrastructure approaches at trial. *See, e.g.*, Ex. 27 (*Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-

CV-123), D.I. 301 at 172:9-178:15 (E.D. Tex. Aug. 21, 2018)); Ex. 24 (*Optis Wireless*), D.I. 437 at 162-64 (E.D. Tex. July 29, 2020). Indeed, the defendants in the 2020 *Optis* case advanced nearly identical arguments to those Lenovo makes here, and the court rejected those arguments in denying their motion to strike Mr. Kennedy's infrastructure approach.

Lenovo's final argument is that Mr. Kennedy's Infrastructure Cost Approach focuses on the costs of adding infrastructure equipment *unrelated* to the Asserted Patents and fails to apportion. However, as explained above, because Dr. Vojcic calculated the degradation percentage of the specific Asserted Patents compared to NIAs, Mr. Kennedy's opinions are directly tied to the Asserted Patents and appropriately apportioned. *See supra* at Section C.1.(a). As discussed above, experts regularly measure the value of patented technology by calculating cost savings associated with the cost of implementing an NIA. *See, e.g.*, *Prism*, 849 F.3d at 1376-77 (rejecting argument that "leasing costs are unreliable because they also include technological and business-related factors, *e.g.*, repair costs, which have nothing to do with Sprint's technical requirements"); *Powell*, 663 F.3d at 1240 (allowing testimony about costs not associated with infringing instrumentality).

For these reasons, Mr. Kennedy's Infrastructure Cost Approach should not be excluded.

### 3.      Mr. Kennedy's "Comparables Approach" Is Well Supported and Tied to the Facts of the Case

It is well settled that comparable license agreements covering more than the Asserted Patents can be used to establish a reasonable royalty for the Asserted Patents. Lenovo Op. Br. at 47; *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 983-84 & n.3 (Fed. Cir. 2018) (affirming damages verdict where plaintiff's expert relied on royalty rates from two agreements covering more than asserted patents); *Apple v. Motorola*, 757 F.3d 1286, 1323-26 (Fed. Cir. 2014) (affirming damages expert's reliance on licenses covering "hundreds of patents"

when only one is asserted; finding expert properly apportioned incremental value of asserted

patent by relying on technical expert's opinion that asserted patent "represented an important

innovation" and was "disproportionately valuable in the context of [patentee's] overall

portfolio"); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79; *Ericsson*, 773 F.3d at

1225-28.

### a)    Mr. Kennedy Properly Apportions the Comparable Licenses to Reflect the Value of the Asserted Patents

Mr. Kennedy's apportionment methodology is not based on speculative theories but on

(1) well-accepted valuation principles, which recognize that not all patents have equal value,  (2)

interviews of InterDigital personnel involved in the development, valuation, and licensing of its

technology, and (3) other documentary evidence in the record.

### (1)    Skewness in the Value of Patents is a Well-Founded Principle Supported by Academic Research and Accepted by the Courts

Mr. Kennedy correctly observes based on academic literature and the licensing practices

of InterDigital and others in the industry that patents in a licensed portfolio are not all considered

to be of equal value. In fact, the value of the patents in a licensed portfolio is highly skewed, with

a fraction of the patents typically accounting for a larger portion of the value of the overall

portfolio. Ex. 22 (Kennedy Op. Rept.) ¶¶ 182, 183 fns.181, 183; Ex. 21 (Kennedy Reply Rept.) ¶

138 fn.104 (citing multiple academic papers and journal articles discussing skewness in value of

patents in portfolio licenses); Ex. 28 (KENNEDY013609-640) (Schankerman paper) (discussing

skewness findings for patent valuation).

Not only has this principle been rigorously studied by academics, but it has also been

accepted by a number of courts in concluding that an expert's application of skewness is

reasonable and not based on speculative theories. *See, e.g.*, *LG Display Co. v. AU Optronics*

*Corp.,* 722 F. Supp. 2d 466, 472 (D. Del. 2010) (holding that expert's reliance on skewness

studies in determining value attributable to asserted patents was "credible and consistent with

Federal Circuit case law and the *Georgia-Pacific* factors"); *Odyssey Wireless, Inc. v. Apple Inc*.,

No. 15-cv-01735-H-RBB, 2016 U.S. Dist. Lexis 187982, at *32-33 (S.D. Cal. Sept. 14, 2016)

(refusing to strike expert's analysis applying skewness studies to value LTE patents and

distinguishing skewness principle from "arbitrary, general rule of thumb like the 25 percent rule

or the Nash Bargaining Solution"); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, No.

17-1734-RAG, 2021 WL 982729, at *6 (D. Del. Mar. 16, 2021) (holding that skewed

distribution of patent value is "an accepted rule" and that it is reasonable for a damages expert to

use to calculate value of the patents-in-suit); *Intel Corp. v. Tela Innovations, Inc.,* No. 3:18-cv-

02848-WHO, 2021 WL 1222622, at *33 (N.D. Cal. Feb. 11, 2021) (holding that evaluating

allocation of value among patents using skewness findings is generally regarded as reliable in

this field ); *In re Innovatio IP Ventures, LLC*, MDL No. 2303, 2013 U.S. Dist. Lexis 144061, at

*180-181 (N.D. Ill. Sept. 27, 2013) (used to value 802.11 SEPs).

Lenovo's reliance on *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308 (Fed. Cir. 2014),

and *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), are inapposite. In both

cases, the Federal Circuit rejected the use of "rules of thumb" that were not tied to the facts of

the case. In contrast, as demonstrated below, Mr. Kennedy is properly relying on well-

established patent skewness analyses that he applies to the specific facts of this case.

> **(2)** **Mr. Kennedy's Determination of the Number of Patent Families Driving the Value in Licensing Negotiations Is Tied to the Facts of the Case**

Mr. Kennedy appropriately applies a patent skewness valuation ratio (analogous to what

has been discussed in papers and accepted in case law) to the specific facts of this case. In

particular, Mr. Kennedy calculates the number of likely standard essential 3G and 4G LTE patent

families that InterDigital owned around the time of the hypothetical negotiation. Mr. Kennedy does so by identifying the total number of U.S. granted patent families that InterDigital had disclosed to ETSI as potentially essential and applying essentiality ratios (███ for 3G and ███ for 4G) that the independent consulting firm – PA Consulting – had determined after evaluating hundreds of InterDigital's disclosed patents. Mr. Kennedy then applied his skewness findings to those case-specific facts, and calculated the number of patent families that comprised the top 20% most valuable patent families in InterDigital's patent portfolio.

Lenovo's criticism of Mr. Kennedy's use of essential patent families, rather than individual patent claims, misses the mark. First, in valuing SEPs, it is common for courts to look at a portfolio on a family basis. *See, e.g.*, Ex. 29 (*TCL v. Ericsson*, No. 14-cv-00341-JVS-DFM), D.I. 1802 at 28-29 (C.D. Cal. Dec. 21, 2017); Ex. 30 (*Unwired Planet Int'l Ltd. v. Huawei Techs. Co. Ltd.*, No. HP 2014-000005 / [2017] EWHC 2988 (Pat)) ¶¶ 207-08, 212 (Approved Judgment) (Mar. 11, 2017); *see also* Ex. 31 (ETSI IPR Policy, Clause 4.3) at IDC-LEN-1590-0538747 (discussing obligations which are defined by reference to "patent famil[ies]"). Second, by counting the number of patent families, Mr. Kennedy intentionally avoids increasing his damages number when more than one Asserted Patents that are members of the same family are both infringed. It is therefore both sensible and conservative to group families together in both the numerator and denominator for apportionment purposes, as Mr. Kennedy does.

> **b)** **Mr. Kennedy's Conclusion that the Asserted Patent Families Are Among the Top 20% Most Valuable 3G and 4G LTE Patent Families Is Supported by Sufficient Facts and Data**

Based on extensive evidence in the record, Mr. Kennedy concludes that the three asserted LTE patent families and two asserted 3G patent families are included within InterDigital's top 20% most valuable 3G and 4G LTE patent families. Among other things, in reaching his conclusion, Mr. Kennedy considered the following:

- Interview with InterDigital's former Chief Executive Officer, who noted (1) InterDigital's patent licensing program is driven by its portfolio of SEPs; (2) a relatively small number of patents, typically U.S. patents, are normally the focus of the parties' technical licensing discussions and drive the negotiation of the financial terms of the license; and (3) patents that have been used over time in multiple license negotiations are considered to be strong and valuable;

- Interview with InterDigital's former Chief Patent Officer, who noted that three of the four Asserted Patent families (1) are among the most heavily used families in InterDigital's licensing discussions; (2) have been heavily vetted by prospective licensees that entered into agreements under InterDigital's portfolio; and (3) were awarded InterDigital's most prestigious annual invention award;

- Dr. Vojcic's conclusions as to the substantive performance improvements attributable to the asserted LTE patent families and their importance to consumers;

- Claim charts of several of the Asserted Patent families provided to licensees, including RIM and Lenovo; and

- *Georgia-Pacific's* required assumption that the Asserted Patents are valid and infringed.

Ex. 22 (Kennedy Op. Rept.) ¶¶ 195, 219-230.

As demonstrated above, Mr. Kennedy's conclusion is supported by more than sufficient facts and data. Given the abundant evidence on which Mr. Kennedy referenced and relied, Lenovo's suggestion that Mr. Kennedy should have considered whether PA Consulting had concluded that the Asserted Patents were essential is thus meritless. Further, to the extent Lenovo disputes the underlying facts or conclusions to be drawn therefrom, that goes to the weight of the evidence, and is not a basis to exclude Mr. Kennedy's opinions.

Lenovo wrongly claims that the *Wi-LAN* decision compels exclusion here. Lenovo Op. Br. at 48.  The Federal Circuit's decision in *Wi-LAN* turned on the specific apportionment methodology and facts of that case and does not undermine the concept of patent skew or that "key patents" can drive the value of a license that includes other patents.  Instead, the Federal Circuit observed that there was no evidence that Wi-LAN actually treated the asserted patents as "key patents" during the course of license negotiations. *Wi-LAN*, 2019 WL 13162735, at *7-8.

The Federal Circuit also noted the lack of any explanation for attributing 75% of a portfolio's value to one asserted patent, but only a combined 25% of the value to five other "equally situated" patents. *See id.*

Here, on the other hand, in over 20 pages of his report, Mr. Kennedy both explains and substantiates the methodology he uses through citations to academic journals and case law.  Ex. 22 (Kennedy Op. Rept.) Section 7. Mr. Kennedy applies the accepted methodology to the specific facts of this case, and supports his conclusion that the Asserted Patents families are among the 20% most valuable with substantial evidence.  *See supra*, Ex. 22 (Kennedy Op. Rept.) ¶ 229.  Unlike in *Wi-LAN,* Mr. Kennedy equally apportioned the 80% of portfolio value among each of InterDigital's 3G and 4G LTE SEP families in the top 20%, such that each patent family was apportioned only 8% of the value of InterDigital's comparable license agreements.

Given the very different fact pattern, methodology, and amount of evidentiary support at issue in *Wi-LAN*, it simply does not support exclusion here*.* Any disagreement by Lenovo with the evidence relied upon by Mr. Kennedy goes to the weight rather than admissibility of Mr. Kennedy's testimony.

## V.   CONCLUSION

For the foregoing reasons, InterDigital respectfully requests that the Court deny Lenovo's motion for summary judgment and to exclude certain expert opinions.

OF COUNSEL:

SMITH, KATZENSTEIN & JENKINS LLP

David S. Steuer
Michael B. Levin
Maura L. Rees
Matthew Reed
Ryan R. Smith
WILSON SONSINI GOODRICH &
ROSATI
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300
dsteuer@wsgr.com
mlevin@wsgr.com
mrees@wsgr.com
mreed@wsgr.com
rsmith@wsgr.com

/s/ Neal C. Belgam

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Attorneys for Plaintiffs*
*InterDigital Communications, Inc., InterDigital*
*Technology Corporation, IPR Licensing, Inc.,*
*InterDigital Holdings, Inc., and InterDigital,*
*Inc.*

Lucy Yen
WILSON SONSINI GOODRICH &
ROSATI
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022 212-999-5800
lyen@wsgr.com

Dated: September 30, 2022